**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matters of | **)** | |
| | **)** | |
| Local Number Portability Porting Interval and | **)** | WC Docket No. 07-244 |
| Validation Requirements | **)** | |
| | **)** | |
| Telephone Number Portability | **)** | CC Docket No. 95-116 |

**REPORT AND ORDER AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: May 13, 2009**                **Released: May 13, 2009**

**Comment Date: (30 days after Federal Register Publication)**
**Reply Comment Date: (60 days after Federal Register Publication)**

By the Commission: Acting Chairman Copps and Commissioners Adelstein and McDowell issuing
separate statements.

## I. INTRODUCTION

1. In this Report and Order (Order), we reduce the porting interval for simple wireline and simple intermodal port requests. Specifically, we require all entities subject to our local number portability (LNP) rules to complete simple wireline-to-wireline and simple intermodal[1] port requests within one business day.[2] In a related Further Notice of Proposed Rulemaking (FNPRM), we seek comment on what further steps, if any, the Commission should take to improve the process of changing providers. We act today to ensure that consumers are able to port their telephone numbers efficiently and to enhance competition for all communications services.

---

[1] By "intermodal ports," we refer to: (1) wireline-to-wireless ports; (2) wireless-to-wireline ports; and (3) ports involving interconnected Voice over Internet Protocol (VoIP) service. Because interconnected VoIP service can be provided over various types of facilities, we refer to all interconnected VoIP ports as "intermodal" irrespective of the facilities at issue.

[2] We note that not all wireline and wireless providers are required to port telephone numbers in all circumstances. In the *Intermodal Porting Order and FNPRM*, the Commission clarified that wireline carriers are required to complete wireline-to-wireless ports only where the requesting wireless carrier's "coverage area" overlaps the geographic location in which the customer's wireline number is provisioned, provided that the porting-in carrier maintains the number's original rate center designation following the port. *See Telephone Number Portability*, CC Docket No. 95-116, Memorandum Opinion and Order and Further Notice of Proposed Rulemaking, 18 FCC Rcd 23697, 23698, 23706, paras. 1, 22 (2003) (*Intermodal Porting Order and FNPRM*). The Commission also reaffirmed that wireless carriers must port numbers to wireline carriers within the originating rate center, and clarified that carriers are not required to complete wireless-to-wireline ports where the location of the wireline facilities serving the customer requesting the port is not in the rate center where the wireless number is assigned. *See id.* This issue remains pending before the Commission. *See id.* at 23714-15, paras. 42-43.

## II.    BACKGROUND

2.    *Statutory Authority*.  Section 251(b)(2) of the Communications Act of 1934, as amended (the Act), requires local exchange carriers (LECs) to "provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission."[3]  The Act and the Commission's rules define number portability as "the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another."[4]  In addition, section 251(e) of the Act gives the Commission plenary jurisdiction over the North American Numbering Plan (NANP) and related telephone numbering issues in the United States.[5]  To implement these congressional mandates, the Commission required all carriers, including wireline carriers and covered commercial mobile radio service (CMRS) providers, to provide LNP according to a phased deployment schedule.[6]  The Commission found that LNP provided end users options when choosing among telecommunications service providers without having to change their telephone numbers,[7] and established obligations for porting between wireline providers, porting between wireless providers, and intermodal porting (*i.e.*, the porting of numbers from wireline providers to wireless providers, and *vice versa*).[8]  The Commission also directed the North American Numbering Council (NANC), its advisory committee on numbering issues, to make recommendations regarding various LNP implementation issues.[9]

3.    *Porting Processes*.  Twelve years ago, in 1997, the Commission adopted the NANC's recommendation for a four-business day porting interval for wireline ports.[10]  This four-business day

---

[3] 47 U.S.C. § 251(b)(2).

[4] 47 U.S.C. § 153(30); 47 C.F.R. § 52.21(l).  The Commission has interpreted this language to mean that consumers must be able to change providers while keeping their telephone number as easily as they may change providers without taking their telephone number with them.  *See Telephone Number Portability; Carrier Requests for Clarification of Wireless-Wireless Porting Issues*, CC Docket No. 95-116, Memorandum Opinion and Order, 18 FCC Rcd 20971, 20975, para. 11 (2003) (*Wireless Number Portability Order*), aff'd, *Central Tex. Tel. Coop., Inc. v. FCC*, 402 F.3d 205 (D.C. Cir. 2005).

[5] 47 U.S.C. § 251(e).

[6] *See Telephone Number Portability*, CC Docket No. 95-116, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 8352, 8393, para. 77 (1996) (*First Number Portability Order*); *see also Telephone Number Portability*, CC Docket No. 95-116, First Memorandum Opinion and Order on Reconsideration, 12 FCC Rcd 7236, 7272, para. 59 (1997) (*First Number Portability Order on Reconsideration*) (concluding that LECs and covered CMRS providers were required only to deploy LNP to switches for which another carrier has made a specific request for the provision of LNP).

[7] *See First Number Portability Order*, 11 FCC Rcd at 8368, para. 30.

[8] *See id*. at 8401, 8431, 8433, 8440, paras. 93, 152, 155, 166.  Although the Act excludes CMRS providers from the statutory definition of "local exchange carrier," the Commission extended the LNP obligations to CMRS providers under its independent authority in sections 1, 2, 4(i) and 332 of the Act.  *See id*. at 8431, para. 153; *First Number Portability Order on Reconsideration*, 12 FCC Rcd at 7315-17, paras. 140-42 (affirming the Commission's decision to impose number portability obligations on CMRS providers).  In 2007, the Commission extended LNP obligations to interconnected Voice over Internet Protocol (VoIP) providers.  *See Telephone Number Requirements for IP-Enabled Services Providers; Local Number Portability Porting Interval and Validation Requirements; IP-Enabled Services; Telephone Number Portability; Numbering Resource Optimization*, WC Docket Nos. 07-243, 07-244, 04-36, CC Docket Nos. 95-116, 99-200, Report and Order, Declaratory Ruling, Order on Remand, and Notice of Proposed Rulemaking, 22 FCC Rcd 19531, 19561-62, paras. 59, 63 (2007) (*VoIP LNP Order* or *2007 LNP NPRM*), aff'd sub nom. *National Telecomms. Cooperative Ass'n v. FCC* (D.C. Cir. Apr. 28, 2009).

[9] *See, e.g.*, *First Number Portability Order*, 11 FCC Rcd at 8401, 8403, paras. 93, 99.

[10] *See* North American Numbering Council Local Number Portability Selection Working Group Final Report and Recommendation to the FCC, Appendix E (rel. April 25, 1997); 47 C.F.R. § 52.26.

interval also applies to simple intermodal ports.[11]  The wireless industry established a voluntary standard of two and one-half hours for wireless-to-wireless ports.[12]

4.  On November 10, 2003, the Commission released a Memorandum Opinion and Order and Further Notice of Proposed Rulemaking (*Intermodal Porting Order and FNPRM*) clarifying certain aspects of intermodal porting and seeking further comment on issues relating to intermodal LNP.[13] Specifically, the Commission sought comment on whether providers should be required to reduce the current four-business day porting interval for ports between wireless and wireline providers.[14]  The Commission also sought comment on what the reduced porting interval should be and sought input from the NANC on this issue.[15]  In response to the Further Notice of Proposed Rulemaking, the NANC submitted a report that provided several options for reducing the intermodal porting interval.[16]  The Commission sought comment on the NANC's recommendations for reducing the time interval for intermodal porting and alternative mechanisms for reducing the intermodal porting interval in a Second Further Notice of Proposed Rulemaking (*Second Intermodal FNRPM*).[17]

5.  In 2007, after the industry had been unable to reach consensus on an updated industry standard for simple wireline-to-wireline and simple intermodal ports, the Commission tentatively concluded that it should adopt a rule reducing the porting interval for simple port requests and allow the industry to work through the actual implications of such a timeline.[18]  In particular, the Commission tentatively concluded that it should adopt a rule reducing the porting interval for simple wireline-to-wireline and simple intermodal port requests to 48 hours.[19]  The Commission sought comment on its tentative conclusions, and whether there were any technical impediments or advances that affect the overall length of the porting interval such that it should adopt different porting intervals for particular

---

[11] *See Intermodal Porting Order and FNPRM*, 18 FCC Rcd at 23712-13, para. 38; *see also Telephone Number Portability*, CC Docket No. 95-116, Second Further Notice of Proposed Rulemaking, 19 FCC Rcd 18515, 18519, para. 10 (2004) (*Second Intermodal FNRPM*).  As the Commission previously has explained, simple ports are those ports that:  (1) do not involve unbundled network elements; (2) involve an account only for a single line; (3) do not include complex switch translations (*e.g.*, Centrex, ISDN, AIN services, remote call forwarding, or multiple services on the loop); and (4) do not include a reseller.  *See, e.g.*, *Intermodal Porting Order and FNPRM*, 18 FCC Rcd at 23715, para. 45 n.112 (citing North American Numbering Council Local Number Portability Administration Working Group Third Report on Wireless Wireline Integration, Sept. 30, 2000, CC Docket No. 95-116 (filed Nov. 29, 2000)).

[12] *See* North American Numbering Council Local Number Portability Administration Working Group Report on Wireless Wireline Integration, May 8, 1998, CC Docket No. 95-116 (filed May 18, 1998); North American Numbering Council Wireless Number Portability Subcommittee Report on Wireless Number Portability Technical, Operational, and Implementation Requirements Phase II, CC Docket No. 95-116 (filed Sept. 26, 2000); ATIS Operations and Billing Forum, Wireless Intercarrier Communications:  Interface Specification for Local Number Portability, Version 2, at 6, para. 2 (Jan. 2003).

[13] *See generally Intermodal Porting Order and FNPRM*, 18 FCC Rcd 23697.

[14] *See id.* at 23717, para. 49.

[15] *Id.*

[16] *See* Letter from Robert C. Atkinson, Chairman, NANC, to William Maher, Chief, Wireline Competition Bureau, Federal Communications Commission, CC Docket No. 95-116 (dated May 3, 2004) (Porting Interval Letter); *NANC Report and Recommendation on Intermodal Porting Intervals*, Prepared for the NANC by the Intermodal Porting Interval Issue Management Group at 4 (dated May 3, 2004) (2004 NANC Report).  The NANC Report can be viewed at http://www.nanc-chair.org/docs/nowg/May04_Intermodal_Porting_Report.doc.

[17] *See Second Intermodal FNRPM*, 19 FCC Rcd at 18519, para. 10.

[18] *See 2007 LNP NPRM*, 22 FCC Rcd at 19561-62, paras. 59, 63.

[19] *See id.* at 19561, para. 60.

types of ports.[20]  The Commission also sought comment on the benefits and burdens, including the burdens on small entities, of adopting rules regarding porting intervals for all types of simple port requests.[21]

## III.  DISCUSSION

6.  As the Commission has found previously, it is critical that customers be able to port their telephone numbers in an efficient manner in order for LNP to fulfill its promise of giving "customers flexibility in the quality, price, and variety of telecommunications services."[22]  Through the LNP process, consumers have the ability to retain their phone number when switching telecommunications service providers, enabling them to choose a provider that best suits their needs and enhancing competition. Although customers have had the option to port numbers between their telephone service providers for a number of years, the current four-business day porting interval may hinder the effectiveness of such options.  Delays in porting cost consumers time and money and limit consumer choice and competition because when consumers get frustrated with slow porting, they often abandon efforts to switch providers.[23]  We find this to be a significant concern due to the Commission's efforts generally to ensure "the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another,"[24] as well as due to the important role intermodal providers play in telecommunications competition.[25]  As the Commission has stated previously, LNP "eliminates one major disincentive to switch carriers" and thus facilitates "the successful entrance of new service providers,"[26] which in turn "stimulate[s] the development of new services and technologies, and create[s] incentives for carriers to lower prices and costs."[27]  Thus, to promote competition and the deregulation that can result from it, the Commission must ensure the efficiency and effectiveness of LNP.

7.  The four-business day porting interval for simple wireline port requests was adopted over 10 years ago as an interim measure.  Since that time, the telecommunications landscape has changed dramatically, and technological advances have enabled number porting to be accomplished in a much shorter time period, as evidenced by the voluntary two and one-half hour wireless interval standard.  We

---

[20] *See id.* at 19562, para. 63.

[21] *See id.* at 19563, para. 64.

[22] *First Number Portability Order*, 11 FCC Rcd at 8368, para. 30.

[23] *See, e.g.*, Letter from Sara F. Leibman, Director, Federal Regulatory Affairs, T-Mobile, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, CC Docket No. 95-116, Attach. at 3 (Feb. 12, 2009) (Feb. 12, 2009 T-Mobile *Ex Parte* Letter) (stating that when consumers become frustrated with slow porting, they often abandon efforts to switch providers); AT&T Comments at 6 (stating that speedier porting would "produce benefits for consumers and further strengthen competition among service providers"); Charter Comments at 3 (stating that delay and interruption of normal porting processes dramatically affects the consumer's expectations and experience and that guided by their experience with wireless services, many consumers expect ports to occur very quickly); NCTA Comments at 2-3 (arguing that adopting a shorter porting interval promotes competition, and the longer the porting interval, the greater the opportunity for the incumbent to interfere with transitioning the customer to the new provider).

[24] 47 U.S.C. § 153(30); 47 C.F.R. § 52.21(l).

[25] The Commission has consistently held that intermodal number portability is an important part of competition in the telecommunications arena.  *See, e.g.*, *First Number Portability Order*, 11 FCC Rcd at 8433, para. 155; *see also First Number Portability Order on Reconsideration*, 12 FCC Rcd at 7312-13, para. 135; *Telephone Number Portability*, CC Docket No. 95-116, Third Report and Order, 13 FCC Rcd 11701,11712-13, para. 18 (1998).

[26] *First Number Portability Order*, 11 FCC Rcd at 8434, para. 157.

[27] *Id.* at 8435, para. 158.

find that there are no significant technological impediments to reducing the porting interval for simple wireline-to-wireline and simple intermodal ports to one business day, as a general matter.[28] The record reflects that for many providers, particularly those employing an electronic interface, number porting can be accomplished in significantly less time than the current four-business day porting interval allows.[29] As such, we find that the record supports Commission action to reduce the current porting interval for simple wireline-to-wireline and simple intermodal port requests to one business day.[30] We believe that a porting

---

[28] *See, e.g.*, Letter from Samuel L. Feder to Marlene Dortch, Secretary, FCC, WC Docket Nos. 07-243, 07-244 and 04-36, CC Docket Nos. 95-116 and 99-200, at 1 (May 5, 2009) (Charter May 5, 2009 *Ex Parte* Letter) (stating that Charter currently completes approximately 13,000 ports per week using manual processes within one business day for all residential ports and all business ports of 20 lines or less).

[29] We note that the 2004 NANC Report also demonstrates that a porting interval significantly shorter than the current four-business day standard was economically and technologically feasible more than five years ago. *See also, e.g.*, Letter from Lezlee Westine, President and CEO, TechNet, to the Honorable Kevin J. Martin, FCC, WC Docket No. 07-244, CC Docket No. 95-116 (June 24, 2008) (stating that there is no technological reason for delays in number porting); Comcast Comments at 9 (commenting that Comcast has voluntarily offered and manually processed porting-out requests from any provider by the next day after receipt of a valid Local Service Request (LSR) since July 2004); Sprint Nextel Comments at 27-31 (commenting that wireline providers should be able to complete the port activation process in two hours).

[30] Many commenters support the Commission's tentative conclusion to reduce the porting interval for simple wireline-to-wireline and simple intermodal ports, which currently is four business days. *See, e.g.*, NARUC Comments at 2 (stating that the Commission should establish a one-business day interval for simple ports that are requested by electronic interface); T-Mobile Comments at 3, 7-8 (supporting a one-day porting interval for simple intermodal ports); Comcast Comments at 5-9 (stating that the Commission should require next-day number porting for providers that have implemented electronic bonding solutions); Letter from K.C. Halm on behalf of Sprint Nextel Corporation, Cequel Communications, LLC d/b/a Suddenlink, and Mediacom Communications Corporation, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, at 2 (Sept. 9, 2008) (expressing support for a 24 hour porting interval); Letter from Scott R. Freiermuth, Counsel, Government Affairs, Sprint Nextel, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, at 1 (Apr. 24, 2009) (supporting a 24-hour porting interval for intermodal and wireline-to-wireline ports); Letter from Lauren M. Van Wazer, Chief Policy and Technology Counsel, Cox Enterprises, Inc., *et al.* to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, at 1 (May 6, 2009) (Joint Cable Voice Providers May 6, 2009 *Ex Parte* Letter) (supporting a proposal to adopt a porting interval between 48 hours and the next business day, depending on whether providers employ e-bonding or manual porting solutions); Letter from Kathryn Zachem, Comcast Corporation, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-243, 07-244, 04-36, CC Docket Nos. 96-115, 99-200, at 1 (May 1, 2009) (Comcast May 1, 2009 *Ex Parte* Letter) (urging the Commission to reduce the porting interval for simple wireline ports to next day for providers that employ e-bonded solutions and proposing that for non-rural providers that do not employ e-bonded solutions, the porting interval should be reduced to two days with a schedule for reducing the interval for those providers to next day); Letter from Sara F. Leibman, Director, Federal Regulatory Affairs, T-Mobile, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, at 1 (May 6, 2009) (urging the Commission to shorten the wireline and intermodal porting interval to one business day).  Also, a number of state Commissions filed letters urging the FCC to adopt NARUC's proposal shortening the wireline porting interval to one business day for simple ports that are requested by electronic interface. *See* Letter from Ronald J. Biz, James K. Tarpey, and Matt Baker, Colorado Public Utilities Commission, to the Honorable Kevin J. Martin, Chairman, FCC, WC Docket No. 07-244 (July 18, 2008); Letter from Edward S. Finley, Jr., Chair, North Carolina Utilities Commission, to Kevin J. Martin, FCC, WC Docket No. 07-244 (June 25, 2008); Letter from Larry S. Landis, Commissioner, Indiana Utility Regulatory Commission, to Kevin J. Martin, FCC, WC Docket No. 07-244 (June 23, 2008); and Letter from Ray Baum, Commissioner, Oregon Public Utility Commission, to Kevin J. Martin, Chairman, FCC, WC Docket No. 07-244 (June 10, 2008). *See also* Charter Comments at 2-3 (arguing that there is a strong basis to support the Commission's tentative conclusion that there is sufficient justification to adopt a rule to reduce the porting interval for simple wireline-to-wireline and simple intermodal port requests); MetroPCS Comments at 6 (proposing that the Commission adopt a rule that intermodal ports achieve parity with wireless ports over 24 months); Sprint Nextel Comments at 6, 22-31 (asserting that wireline carriers should be able to complete the activation process in two and one half hours); NCTA Comments at 3 (supporting shorter porting intervals for all ports because it promotes customer choice and competition); Nebraska Commission Comments at 3 (stating that 48 hours should be considered the ceiling for a porting interval

(continued....)

interval of one business day strikes the appropriate balance, based on the current record, between enabling consumers to realize the benefits of LNP and the current technological and business capabilities of service providers.

8.    We conclude that reducing the porting interval for simple wireline-to-wireline and simple intermodal ports to one business day is necessary to enable customers to port their numbers in a timely fashion and to enhance competition.[31]  We believe that, in conjunction with the Commission's clarification in 2007 that providers may require no more than four information fields to validate simple port requests,[32] the steps we take today will significantly streamline the simple porting process for service providers and consumers and will enhance competition.  We adopt a porting interval in terms of a business day, as opposed to adopting our tentative conclusion that was in terms of hours, to accommodate providers that may not have adequate staffing to handle port requests outside of regular business hours.[33]  Thus, we require all entities subject to our LNP rules, including interconnected VoIP providers and their numbering partners, to complete port requests for simple wireline-to-wireline and simple intermodal ports

---

(...continued from previous page)

with perhaps the wireless interval to serve as the goal by which all porting intervals should be achieved); Cablevision Reply Comments at 2-3 (supporting a shorter interval subject to a reasonable transition period); California Commission Comments at 10 and Connecticut DPUC Comments at 4 (supporting shorter porting intervals because shorter porting intervals benefit customers and promote competitive choice).

[31] *See, e.g.*, Letter from Chris Murray, Senior Counsel, Consumers Union and Gigi Sohn, President, Public Knowledge, to Michael J. Copps, Acting Chairman, FCC, WC Docket No. 07-244 (Apr. 17, 2009) (asserting that when "consumers can take their numbers with them without undue inconvenience or expense, the result is better quality and lower prices for phone service," but when the porting interval in unnecessarily long, "the process can be gamed by incumbent phone companies to hobble competition and discourage innovation").  Reducing the porting interval may also have the added benefit of reducing the potential for retention marketing in violation of the Act and the Commission's rules.  *See* 47 U.S.C. § 222(b); *Implementation of the Telecommunications Act of 1996; Telecommunications Carriers' Use of Customer Proprietary Network Information; Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended*, Order on Reconsideration and Petitions for Forbearance, 14 FCC Rcd 14409, 14443-14450, paras. 65-79 (1999); *see also* NCTA Comments at 3 (stating that shorter porting intervals eliminate the potential for misconduct on the part of porting out providers); TWC Comments at 2 (arguing that narrowing the porting interval will limit the losing provider's ability to interfere with the port); Cablevision Reply at 4 (arguing that shorter porting times protect competition by limiting opportunities for a customer's existing provider to interfere with the customer's decision to change providers).

[32] *See VoIP LNP Order*, 22 FCC Rcd at 19556-57, paras. 46-49 (concluding that LNP validation should be based on no more than four information fields for simple ports, and that those fields should be: (1) 10-digit telephone number; (2) customer account number; (3) 5-digit zip code; and (4) passcode (if applicable)).

[33] *See, e.g.*, AT&T Comments at n.6 (stating that a disproportionately large number of porting requests originate on weekends and holidays, when end users visit shopping malls and other retail sales locations); ITTA Comments at 4 (stating that it would be imprudent for a telephone company that does not have sufficient porting requests on an ongoing basis to justify implementation of either mechanized systems or staffing levels necessary to meeting 48 hour porting intervals); MIC Comments at 2 (stating that rural companies do not staff business offices to process customer orders or staff central office facilities outside typical business hours, except to dispatch technicians to respond to reported network outages or other emergencies, and arguing that it would be unreasonable to require rural companies to expand operations beyond normal business hours in order to perform ports); OPASTCO/WTA Comments at 3 (stating that porting intervals should not be addressed in terms of hours, but rather in business days, and that it is unrealistic to expect incumbent LECs with limited staffing resources to routinely fulfill a port request received on a Friday afternoon before the next business week has begun); RCN Comments at 5 (urging that any porting interval adopted by the Commission be defined not in hours but in terms of business days); Verizon Comments at 10 (stating that if the Commission reduces the standard interval, it should continue to be measured in business days, rather than hours).

within one business day, unless a longer period is requested by the new provider or the customer elects otherwise.[34]

9.   AT&T asserts that some cable VoIP providers claim that they are not subject to the porting interval for simple ports because they are "resellers" in that they "resell" a service purchased from an affiliated or unaffiliated competitive LEC and also that they are not subject to the interval for simple ports when their customers subscribe to double-play or triple-play packages because those packages involve "multiple services on the loop."[35]  The Commission's 2007 *VoIP LNP Order* made clear that interconnected VoIP providers are obligated to take all steps necessary to initiate or allow a port-in or port-out itself or through its numbering partner on behalf of the interconnected VoIP customer.[36]  The Commission also made clear that when an interconnected VoIP provider obtains its NANP telephone numbers through commercial arrangements with one or more traditional telecommunications carriers, the intervals that would be applicable to ports between the numbering partner and the other provider, if the port were not related to an interconnected VoIP service, will apply to the port of the NANP telephone number between the numbering partner and the other provider when the end user with porting rights is a customer of the interconnected VoIP provider.[37]  The Commission also found that interconnected VoIP providers and their numbering partners may not enter into agreements that would prohibit or unreasonably delay an interconnected VoIP service end user from porting between interconnected VoIP providers, or to or from a wireless carrier or covered CMRS provider.[38]

10.   We leave it to the industry to work through the mechanics of this new interval.  In particular, we direct the NANC to develop new LNP provisioning process flows that take into account this shortened porting interval.  In developing these flows, the NANC must address how a "business day" should be construed for purposes of the porting interval, and generally how the porting time should be measured.[39]  The NANC must submit these flows to the Commission no later than 90 days after the effective date of this Order.

---

[34] In this Order, we do not address whether it is necessary for the Commission to adopt a rule codifying the wireless industry's voluntary two and one-half hour standard for wireless-to-wireless ports.  This issue remains pending before the Commission.  *See 2007 LNP NPRM*, 22 FCC Rcd at 19561, para. 59.  We also do not address the porting interval for wireless-to-wireline ports where the location of the wireline facilities serving the customer requesting the port is not in the rate center where the wireless number is assigned.  Currently, porting from wireless-to-wireline carriers is not required in these circumstances and the question of how to facilitate porting in such cases remains pending before the Commission.  *See Intermodal Porting Order and FNPRM*, 18 FCC Rcd at 23713-17, paras. 41-51.

[35] *See* Letter from Robert W. Quinn, Jr., Senior Vice President, Federal Regulatory, AT&T, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, at 2-3 (May 6, 2009).

[36] *See VoIP LNP Order*, 22 FCC Rcd at 19548-49, para. 32.

[37] *See id.* at 19549-51, paras. 34-36, n. 121 ("For example, if the interconnected VoIP provider's numbering partner is a wireline carrier and the porting-in provider is a wireline carrier, the wireline-to-wireline porting interval would apply to the port between the two carriers").

[38] *Id.* at 19549, para. 33.

[39] *See, e.g.*, MetroPCS Comments at 7 (proposing that business hours would mean 8 a.m. local time until 9 p.m. local time, Monday through Saturday and noon to 6 p.m. on Sundays); One Communications Comments at 3, n.8 (noting that Number Portability Administrative Center/Service Management System "business hours" are 8 a.m. to 8 p.m., Eastern time, and proposing that the clock on the porting interval should only start if the request is received between the hours of 8 a.m. and 3 p.m., Eastern time, Monday through Friday); RCN Comments at 5 (supporting a business day definition of Monday through Friday, exclusive of weekends and holidays, and a proposal that requests received after 2 p.m. would be considered received on the next business day).

11. We further conclude that nine months is sufficient time for affected entities to implement and comply with the one-business day porting interval, and therefore require all providers subject to our LNP rules to comply with the one-business day porting interval within nine months from the date that the NANC submits its revised provisioning flows to the Commission, as discussed above, except as described below with regard to small providers.[40] We believe that nine months provides adequate time for providers to make the necessary software changes and upgrades and to accommodate changes to internal processes and policies.[41]

12. In the *2007 LNP NPRM*, the Commission specifically sought comment on the benefits and burdens, including the burdens on small entities, of adopting porting interval rules for all types of simple port requests.[42] A number of commenters representing small and rural provider interests argue that imposing a reduced porting interval on small and rural providers would place an undue burden on these providers and cause them economic harm.[43] These commenters urge the Commission to leave the current porting intervals in place.[44] We disagree. We believe that the benefits to consumers and competition discussed above outweigh the costs associated with implementing a shorter porting interval for simple wireline and simple intermodal ports.[45] However, we recognize that some providers that do not employ automated systems for handling port requests and have limited resources to upgrade their systems may have to make more significant changes or upgrades than other providers that already employ automated porting interfaces.[46] To address this disparity, we allow small providers, as defined below for purposes of

---

[40] *See infra* para. 12.

[41] *See, e.g.*, Letter from Susanne A. Guyer, Senior Vice President, Federal Regulatory Affairs, Verizon, to Michael J. Copps, Acting Chairman, FCC, WC Docket No. 07-244, MB Docket Nos. 07-29, 07-198, at 3 (Apr. 22, 2009) (arguing that the Commission should allow adequate time for all concerned to implement the systems and processes required to meet a reduced porting interval); Letter from Melissa E. Newman, Vice President-Federal Relations, Qwest Communications International Inc. to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244 (Apr. 23, 2009) (stating that an implementation period of 180 days or more is needed to ensure that all systems are working properly to ensure the fewest customer impacts).

[42] *See 2007 LNP NPRM*, 22 FCC Rcd at 19563, para. 64.

[43] *See, e.g.*, Windstream Comments at 2-6 (describing the complexity and costs of upgrading a manual porting system and provisioning wireline-to-wireline ports); RCN Comments at 1-2 (stating that a hybrid manual and electronic port processing system would be costly to upgrade); One Communications Comments at 4 (arguing that implementing a 48-hour interval would require major changes to companies' internal systems and industry practices). These providers generally argue that small and rural providers, which would otherwise use their financial resources and limited personnel to spur development of new advanced communications technologies and broadband deployment, will be forced instead to use those funds to develop or upgrade automated systems to support a shortened porting interval. *See, e.g.*, Letter from Daniel Mitchell, Vice President, Legal & Industry, and Karlen Reed, Regulatory Counsel, NTCA, to Marlene Dortch, Secretary, FCC, WC Docket No. 07-244, CC Docket Nos. 95-116, 99-200, at 2 (July 14, 2008) (NTCA July 14, 2008 *Ex Parte* Letter).

[44] *See* Embarq Comments at 8-11; ITTA Comments at 3; MIC Comments at 1; OPASTCO/WTA Comments at 2-3; RCN Comments at 2; Verizon Comments at 3, 5-8; Verizon Wireless Comments at 2-3; Windstream Comments at 2-4; RCN Reply at 1-3.

[45] *See, e.g.*, California PUC Comments at 8 (recommending against the Commission adopting an exemption for small entities from "a prompt and expeditious porting process"); *see also, e.g.*, Letter from Tina Pidgeon, GCI, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244 (dated May 5, 2009) (stating that in GCI's experience, especially for carriers serving few lines, porting requests do not rise to an unmanageable volume of orders, even when processed manually).

[46] *See, e.g.*, Letter from Genie Barton, Vice President & General Counsel, USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, CC Docket No. 95-116, at 1-2 (July 1, 2008) (USTelecom July 1, 2008 *Ex Parte* Letter) (arguing that reducing the porting interval to 48 hours would require all providers to upgrade to an automated system for port requests); Letter from Jennie B. Chandra, Director Federal Regulatory Affairs,

(continued....)

this Report and Order, a longer period of time for implementing the porting interval of one business day.[47] Thus, small providers are required to implement the reduced porting interval of one business day for simple wireline and simple intermodal ports no later than 15 months from the date that the NANC submits its revised provisioning flows to the Commission. For purposes of this Order, we consider providers with fewer than 2 percent of the nation's subscriber lines installed in the aggregate nationwide[48] and Tier III wireless carriers, as defined in the *E911 Stay Order*,[49] to be small providers. We believe that these categories encompass the providers whose systems will most likely require significant upgrades, and who also may have limited resources to make those upgrades. Thus, these providers may require the extended 15-month implementation period.

13. We are unpersuaded by the commenters that urge the Commission to implement a specific cost recovery mechanism for carrier-specific costs associated with implementing the reduced porting interval.[50] Windstream, for example, contends that small and mid-size incumbent LECs "have not had sufficient cause to invest in automated systems capable of consistently processing requests" in shorter

---

(...continued from previous page)

Windstream Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, CC Docket No. 95-116 (July 31, 2008) (Windstream July 31, 2008 *Ex Parte* Letter) (stating that adoption of the proposed 48-hour porting interval would require Windstream to automate its porting systems or hire additional staff); Windstream Comments at 2-4 (stating that a shorter interval would impose substantial new costs on companies that do not have a fully automated porting process); Letter from Stephen Pastorkovich, Business Development Director/Senior Policy Analyst, OPASTCO, and Derrick B. Owens, Director of Government Affairs, WTA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, at 1 (Aug. 8, 2008) (OPASTCO/WTA Aug. 8, 2008 *Ex Parte* Letter) (arguing that an automated porting system is necessary to ensure compliance with a 48-hour porting interval and that investment in these systems by providers with few port requests would be economically irrational); OPASTCO/WTA Comments at 2-3; NTCA Reply at 3.

[47] *See* One Communications Comments at 4 (recommending a 12-month implementation period if the Commission reduces the interval); RCN Comments at 3-4 (urging the Commission to adopt a 12-month implementation period to create an upgraded system and train employees if it reduces the porting interval); AT&T Reply at 3 (commenting that, rather than provide a blanket exemption, the Commission should provide a sufficient amount of time for providers to implement a reduced porting interval).

[48] *See* 47 U.S.C. § 251(f)(2). For purposes of this Order, what constitutes a 2 percent provider will be calculated based on an aggregate of incumbent LEC and competitive LEC lines, based on the Commission's most recent industry statistics available as of the effective date of this Order. *See Trends in Telephone Service*, Industry Analysis and Technology Division, Wireline Comp. Bur., Report, at Tables 7.1, 7.3 (Aug. 2008), *available at*: http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-284932A1.pdf.

[49] In the *E911 Stay Order*, the Commission classified CMRS carriers with 500,000 subscribers or fewer as of the end of 2001 as Tier III wireless carriers. *See Revision of the Commission's Rules to Ensure Compatibility with the Enhanced 911 Emergency Calling Systems*, CC Docket No. 94-102, Order to Stay, 17 FCC Rcd 14841 (2002) (*E911 Stay Order*). The Small Business Administration (SBA) has approved the Tier III wireless classification as a small business size standard. *See* Letter from Hector V. Barreto, Administrator, SBA, to Blaise Scinto, Acting Chief, Policy Division, Wireless Telecommunications Bureau, FCC (dated Jan. 21, 2003).

[50] *See, e.g.*, AT&T Reply at 11-12 (stating that if the Commission adopts reduced porting intervals, it must enable providers to recover the reasonable costs of complying); Windstream Reply at 5-12 (arguing that the Commission should implement a cost recovery system for reduced porting intervals, pool carrier-specific costs, and allow for a separate line item for cost recovery); Windstream July 31, 2008 *Ex Parte* Letter (requesting the Commission to allow carriers to recover implementation costs of a reduced porting interval, preferably by pooling carrier-specific costs); USTelecom July 1, 2008 *Ex Parte* Letter at 8-9 (urging the Commission to waive the five-year cost recovery period).

than four business days and that Windstream would have to expend significant resources to automate its systems.[51]

14. As an initial matter, we note that there are several options for carriers to recover their costs of implementing the reduced porting interval. For one, we note that many small carriers have not yet filed for recovery of costs for implementing long-term number portability under our LNP cost recovery mechanism.[52] To the extent that such carriers incur costs to implement the one-business day porting interval that meet the standard for the LNP cost recovery mechanism, our rules give carriers five years to recover those costs through end-user charges.[53] Once incumbent LECs have recovered their initial LNP implementation costs through the LNP cost recovery mechanism, the Commission intended carriers to recover ongoing costs incurred to provide number portability as a normal network feature through existing mechanisms available for the recovery of general costs of providing service.[54] Under rate-of-return regulation, carriers are allowed to recover their costs plus a prescribed rate of return on investment. Under price cap regulation, rather than earning a specific rate of return on their costs, carriers are permitted to earn returns significantly higher if they can operate efficiently, but are not guaranteed recovery of all costs. Price cap regulation includes an exogenous cost adjustment mechanism.[55] We also note that under the Commission's rules, price cap carriers may file proposed tariff rates that would exceed applicable price cap indices, if necessary to recover costs, with the requisite LNP-specific cost showing.[56]

15. Further, small carriers have options for seeking modification of the new LNP interval requirements. For example, under section 251(f)(2) of the Act, a LEC "with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for suspension or modification of the application of the requirements" of section 251(b), which includes the "duty to provide, to the extent technically feasible, number portability in accordance with the requirements prescribed by the Commission."[57] These safeguards further address commenters' concerns regarding the costs that small entities may incur to implement the one-business day porting interval.[58]

---

[51] Windstream Comments at 4; Windstream Reply at 9-10. The Commission has also explained that some system upgrades will enhance carriers' services generally and may not be directly related to providing number portability. *See, e.g., Telephone Number Portability*, CC Docket No. 95-116, Third Report and Order, 13 FCC Rcd 11701, 11740, para. 73 (1998) (*Cost Recovery Order*), *aff'd, Telephone Number Portability*, CC Docket No. 95-116, Memorandum Opinion and Order on Reconsideration and Order on Application for Review, 17 FCC Rcd 2578 (2002). Based on Windstream's description of its porting process and volumes, any need to automate its porting process may be necessitated by its porting volumes, not the modified interval adopted here. *See* Windstream Comments at 3-4.

[52] *See* 47 C.F.R. § 52.33.

[53] *See id.* We note that whether costs meet the standard for the LNP cost recovery mechanism – costs that are carrier-specific and incremental costs directly related to providing LNP – is a fact-specific inquiry.

[54] *See Cost Recovery Order*, 13 FCC Rcd at 11777, para. 144.

[55] *See* 47 C.F.R. § 61.45(d).

[56] *See* 47 C.F.R. § 61.49(d).

[57] *See* 47 U.S.C. § 251(f)(2), 251(b).

[58] *See National Telephone Cooperative Assoc. v. FCC*, No. 08-1071, slip op. at 10 (D.C. Cir. Apr. 28, 2009) (finding that the FCC reasonably concluded that mitigating measures were unnecessary where it reasonably determined that its Order fulfilled statutory objectives by advancing both competition and the interests of consumers and would not impose significant implementation costs on small businesses).

16. Further, because we recognize that some providers may find it unduly burdensome to implement a one-business day porting interval even with an extended implementation period,[59] providers may also apply for a waiver of the one-business day porting interval under the Commission's rules.[60] To demonstrate the good cause required by the Commission's waiver rule,[61] a provider must show with particularity that it would be unduly economically burdensome for the provider to implement the reduced porting interval. In making this showing, a provider should address the number of port requests it typically receives on a monthly basis as well as the specific costs that complying with the reduced porting interval would impose. Waiver requests will be considered on a case-by-case basis. In making a determination on waiver requests, the Commission may, in its judgment, set the porting interval length between one business day and four business days, or longer, as individually warranted. Further, the Commission will determine the length of the waiver period based on the particular facts presented. We are concerned by evidence in the record that some providers may not be complying with the Commission's current rules regarding porting intervals, however.[62] So there is no possible confusion regarding this requirement, we clarify that providers that obtain a waiver of the Commission's one-business day porting interval must comply with the current rules regarding a four-business day porting interval at a minimum, unless told otherwise. We delegate authority to the Chief, Wireline Competition Bureau to review and decide these waiver requests.

17. Windstream also contends that the statutory requirement of competitive neutrality would be violated if it is not allowed additional LNP recovery.[63] Section 251(e)(2) mandates that the costs of establishing LNP be "borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission."[64] The Commission, accordingly, established principles of competitive neutrality for cost distribution and recovery mechanisms related to number portability.[65] Competitive neutrality requires that "the cost of number portability borne by each carrier does not affect significantly any carrier's ability to compete with other carriers for customers in the marketplace," and the Commission adopted a two-part test for making this determination.[66] Under this test, number portability cost distribution and recovery mechanisms: (1) must not give one service provider an appreciable,

---

[59] We do not decide here whether any waivers are appropriate, but there are allegations in the record that a shortened porting interval would be burdensome. *See* ITTA Comments at 3 (stating that shortening the interval would impose undue costs on companies that would be required to either boost staffing levels, implement system upgrades, or both); NTCA Reply at 2-3; MIC Comments at 3 (arguing that it would be unreasonable to require rural companies to expand operations beyond normal business hours in order to perform ports, as a typical rural company has few business office or plant employees and very few are likely to be trained to complete port requests).

[60] 47 C.F.R. § 1.3.

[61] *Id.*

[62] *See, e.g.*, Embarq Comments at 10-11 (explaining that Embarq experiences significant delays when porting in numbers from other carriers and when asked, many, if not most, carriers state that the intervals are not mandatory or do not apply to them); Verizon Comments at 5-8 (explaining that some providers currently do not meet the standard porting intervals and may even have non-compliant business rules that do not observe the standard interval); Letter from K.C. Halm, Counsel for Suddenlink Communications, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, at 2 (Apr. 15, 2009) (asserting that at least one large incumbent LEC does not return the Firm Order Commitment, or FOC, within 24 hours, as required by the Commission's rules).

[63] Windstream Reply at 5-8.

[64] 47 U.S.C. § 251(e)(2).

[65] *Cost Recovery Order*, 13 FCC Rcd at 11720, para. 28 n.112 (citing *First Number Portability Order*, 11 FCC Rcd at 8417, para. 126). The U.S. Supreme Court also recognized that the Commission has rulemaking authority to carry out section 251 of the Act. *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 378 (1999).

[66] *Cost Recovery Order*, 13 FCC Rcd at 11731, 11734, paras. 52, 60.

incremental cost advantage over another service provider when competing for a specific subscriber; and (2) must not disparately affect the ability of competing service providers to earn a normal return.[67]

18. Despite its allegations, Windstream provides no analysis to show how either prong of the competitive neutrality test is violated. Indeed, in the *Cost Recovery Order*, the Commission explicitly rejected arguments that competitive neutrality requires it "to ensure that carriers recover all their number portability costs," emphasizing that "'[n]othing in section 251(e)(2) states that the Commission must guarantee recovery of such costs."[68] Instead, this section requires the Commission to ensure that the manner in which all carriers bear the costs of providing number portability is competitively neutral. Thus, the Commission explained that "[e]ven if a carrier does not recover all its costs, the Commission's rules will satisfy section 251(e)(2) so long as that carrier's ability to compete for subscribers is not significantly affected."[69]

## IV. FURTHER NOTICE OF PROPOSED RULEMAKING

19. Today, we require providers subject to our LNP rules to complete simple wireline-to-wireline and simple intermodal ports within one business day. We believe that a one-business day porting interval is a much needed improvement over the previous four-business day interval – one that will provide considerable immediate benefits to consumers. It is important, however, that the Commission remain vigilant in its efforts to improve the effectiveness and efficiency of the porting process as technological and market developments demand. Therefore, and in light of the actions taken in today's Order, we ask commenters to refresh the record on what further steps the Commission should take, if any, to improve the process of changing providers and provide any new ideas that reflect and build upon the new one-business day interval. We ask parties to address whether there are additional ways to streamline the number porting processes or improve efficiencies for simple and non-simple ports. For example, should the Commission modify the definition of simple ports? Are different or additional information fields necessary for completing simple ports?[70] Is it appropriate to standardize Local Service Request forms and, if so, how should that be accomplished? Is a single standard time interval in which providers must return Customer Service Record requests appropriate? Finally, what are the benefits and burdens, especially the burdens on small entities, of adopting any new rules regarding the porting process?

## V. PROCEDURAL MATTERS

### A. Regulatory Flexibility

20. As required by the Regulatory Flexibility Act of 1980, *see* 5 U.S.C. § 604, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) of the possible significant economic impact

---

[67] *Id.* at 11731-32, 11774, paras. 53, 136. The Commission explained that "number portability costs should not disproportionately burden one carrier over another" and that its competitive neutrality test "ensures this by evaluating the effect on a carrier's abilities to compete and earn a normal return." *Id.* at 11733, para. 57. The Commission adopted a competitive neutrality standard that considered a carrier's ability to earn a normal overall rate of return so that LNP cost recovery mechanisms did not drive a carrier out of the market or prevent it from entering. *Id.* at 11728, 11732, paras. 44, 54 (citing *First Number Portability Order*, 11 FCC Rcd at 8421, para. 135).

[68] *Id.* at 11733, para. 59.

[69] *Id.* at 11733-34, para. 59. Carriers not subject to rate regulation were also only given the opportunity to recover their number portability costs. *Id.* at 11774-75, 11780, paras. 136, 139, 149. Whether they actually could recover those costs would depend on market conditions.

[70] We note that this issue is before the Commission in One Communications Corp.'s Petition for Clarification and For Limited Waiver For Extension of Time, WC Docket Nos. 07-243, 07-244, 04-36, CC Docket No. 95-116, 99-200 (filed Feb. 5, 2009) (requesting that the Commission clarify the amount of data carriers may request for both validating and accomplishing simple ports).

on small entities of the polices and rules, as proposed, addressed in this document. The FRFA is set forth in Appendix C.

21. As required by the Regulatory Flexibility Act, 5 U.S.C. § 603, the Commission has prepared an Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on small entities of the policies and rules addressed in this Further Notice. The IRFA is set forth in Appendix D. Written public comments are requested on the IRFA. These comments must be filed in accordance with the same filing deadlines as comments filed in response to the Further Notice and must have a separate and distinct heading designating them as responses to the IRFA.

## B.    Paperwork Reduction Act

22. This document does not contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  In addition, therefore, it does not contain any new or modified "information collection burden for small business concerns with fewer than 25 employees," pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. 3506(c)(4).

23. This document does not contain proposed information collection(s) subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  In addition, therefore, it does not contain any new or modified "information collection burden for small business concerns with fewer than 25 employees," pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. 3506(c)(4).

## C.    Congressional Review Act

24. The Commission will send a copy of this Report and Order and Further Notice of Proposed Rulemaking in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. 801(a)(1)(A).

## D.    Other Procedural Matters

### 1.    *Ex Parte* Presentations

25. The rulemaking this Further Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[71]  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentations must contain summaries of the substance of the presentations and not merely a listing of the subjects discussed.  More than a one or two sentence description of the views and arguments presented generally is required.[72]  Other requirements pertaining to oral and written presentations are set forth in section 1.1206(b) of the Commission's rules.[73]

### 2.    Comment Filing Procedures

26. Pursuant to sections 1.415 and 1.419 of the Commission's rules,[74] interested parties may file comments and reply comments regarding the Further Notice on or before the dates indicated on the first page of this document.  **All filings related to this Further Notice of Proposed Rulemaking should refer to WC Docket No. 07-244 and CC Docket No. 95-116.**  Comments may be filed using:  (1) the

---

[71] 47 C.F.R. §§ 1.200 *et seq.*

[72] *See* 47 C.F.R. § 1.1206(b)(2).

[73] 47 C.F.R. § 1.1206(b).

[74]  47 C.F.R. §§ 1.415, 1.419.

Commission's Electronic Comment Filing System (ECFS), (2) the Federal Government's eRulemaking Portal, or (3) by filing paper copies. *See* Electronic Filing of Documents in Rulemaking Proceedings, 63 FR 24121 (1998).

- Electronic Filers: Comments may be filed electronically using the Internet by accessing the ECFS: http://www.fcc.gov/cgb/ecfs/ or the Federal eRulemaking Portal: http://www.regulations.gov. Filers should follow the instructions provided on the website for submitting comments.

  - ECFS filers must transmit one electronic copy of the comments for WC Docket No. 07-244 and CC Docket No. 95-116. In completing the transmittal screen, filers should include their full name, U.S. Postal Service mailing address, and the applicable docket number. Parties may also submit an electronic comment by Internet e-mail. To get filing instructions, filers should send an e-mail to ecfs@fcc.gov, and include the following words in the body of the message, "get form." A sample form and directions will be sent in response.

- Paper Filers: Parties who choose to file by paper must file an original and four copies of each filing. Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail (although we continue to experience delays in receiving U.S. Postal Service mail). All filings must be addressed to the Commission's Secretary, Marlene H. Dortch, Office of the Secretary, Federal Communications Commission, 445 12th Street, S.W., Washington, D.C. 20554.

  - The Commission's contractor will receive hand-delivered or messenger-delivered paper filings for the Commission's Secretary at 236 Massachusetts Avenue, N.E., Suite 110, Washington, D.C. 20002. The filing hours at this location are 8:00 a.m. to 7:00 p.m. All hand deliveries must be held together with rubber bands or fasteners. Any envelopes must be disposed of <u>before</u> entering the building.

  - Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD 20743.

  - U.S. Postal Service first-class, Express, and Priority mail should be addressed to 445 12th Street, S.W., Washington D.C. 20554.

27. Parties should send a copy of their filings to Competition Policy Division, Wireline Competition Bureau, Federal Communications Commission, Room 5-C140, 445 12th Street, S.W., Washington, D.C. 20554, or by e-mail to cpdcopies@fcc.gov. Parties shall also serve one copy with the Commission's copy contractor, Best Copy and Printing, Inc. (BCPI), Portals II, 445 12th Street, S.W., Room CY-B402, Washington, D.C. 20554, (202) 488-5300, or via e-mail to fcc@bcpiweb.com.

28. Documents in WC Docket No. 07-244 and CC Docket No. 95-116 will be available for public inspection and copying during business hours at the FCC Reference Information Center, Portals II, 445 12th Street, S.W., Room CY-A257, Washington, D.C. 20554. The documents may also be purchased from BCPI, telephone (202) 488-5300, facsimile (202) 488-5563, TTY (202) 488-5562, e-mail fcc@bcpiweb.com.

### 3. Accessible Formats

29. To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at (202) 418-0531 (voice), (202) 418-7365 (TTY).

## VI.      ORDERING CLAUSES

30.  Accordingly, IT IS ORDERED that, pursuant to sections 1, 4(i), 4(j), 251, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i)-(j), 251, 303(r), this Report and Order in WC Docket No. 07-244 and CC Docket No. 95-116 IS ADOPTED, and that Part 52 of the Commission's Rules, 47 C.F.R. Part 52, IS AMENDED as set forth in Appendix B.  The Report and Order SHALL BECOME EFFECTIVE 30 days after publication in the Federal Register.

31.  IT IS FURTHER ORDERED that pursuant to sections 1, 4(i), 4(j), 251, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i)-(j), 251, 303(r), the Further Notice of Proposed Rulemaking in WC Docket No. 07-244 and CC Docket No. 95-116 IS ADOPTED.

32.  IT IS FURTHER ORDERED that, pursuant to sections 1, 4(i), 4(j),  251, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i)-(j), 251, 303(r), and sections 52.11(b) and 52.25(d) of the Commission's rules, 47 C.F.R. §§ 52.11(b), 52.25(d), the North American Numbering Council SHALL SUBMIT its recommendations to the Commission within 90 days of the effective date of the Report and Order as discussed in paragraph 10 of this Report and Order.

33.  IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Report and Order and Further Notice of Proposed Rulemaking, including the Final Regulatory Flexibility Analysis and the Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**APPENDIX A**

**List of Commenters**

**WC Docket No. 07-244**

| Commenter | Abbreviation |
|---|---|
| Alliance for Telecommunications Industry Solutions | ATIS |
| AT&T Inc. | AT&T |
| California Public Utilities Commission and the People of the State of California | California Commission |
| Charter Communications, Inc. | Charter |
| Comcast Corporation | Comcast |
| Connecticut Department of Public Utility Control | Connecticut DPUC |
| Embarq | Embarq |
| General Communications, Inc. | GCI |
| Independent Telephone & Telecommunications Alliance | ITTA |
| MetroPCS Communications, Inc. | MetroPCS |
| Minnesota Independent Coalition | MIC |
| National Association of Regulatory Utility Commissioners | NARUC |
| National Cable & Telecommunications Association | NCTA |
| National Emergency Number Association | NENA |
| Nebraska Public Service Commission | Nebraska Commission |
| One Communications Corp. | One Communications |
| Organization for the Promotion and Advancement of Small Telecommunications Companies and the Western Telecommunications Alliance | OPASTCO/WTA |
| Public Utilities Commission of Ohio | Ohio Commission |
| Qwest Communications Corporation | Qwest |
| RCN Telecom Services, Inc. | RCN |
| Socket Telecom, LLC | Socket |
| Sprint Nextel Corporation | Sprint Nextel |
| Texas 9-1-1 Alliance and the Texas Commission on State Emergency Communications | Texas |
| Time Warner Cable Inc. | TWC |
| T-Mobile USA, Inc. | T-Mobile |
| Verizon | Verizon |
| Verizon Wireless | Verizon Wireless |
| Voice on the Net ("VON") Coalition | VON Coalition |
| Windstream Corporation | Windstream |

| Reply Comments | Abbreviation |
|---|---|
| AT&T Inc. | AT&T |
| Cablevision Lightpath, Inc. | Cablevision |
| Cequel Communications, LLC and MCC Telephony, LLC | Cequel/MCC |
| Charter Communications, Inc. | Charter |

| Cleartalk of Idaho | Cleartalk |
|---|---|
| Comcast Corporation | Comcast |
| Earthlink, Inc. | Earthlink |
| National Cable & Telecommunications Association | NCTA |
| National Telecommunications Cooperative Association | NTCA |
| One Communications Corp. | One Communications |
| RCN Telecom Services, Inc. | RCN |
| Socket Telecom, LLC | Socket |
| TeleCommunications Systems, Inc. | TCS |
| T-Mobile USA, Inc. | T-Mobile |
| Verizon | Verizon |
| Windstream Communications, Inc. | Windstream |

**APPENDIX B**

**Final Rules**

Part 52 of Title 47 of the Code of Federal Regulations is amended to read as follows:

**PART 52 – NUMBERING**

1.	The authority citation for Part 52 continues to read as follows:

	Authority:  Secs. 1, 2, 4, 5, 48 Stat. 1066, as amended; 47 U.S.C. 151, 152, 154 and 155 unless otherwise noted.  Interpret or apply secs. 3, 4, 201-205, 207-09, 218, 225-27, 251-52, 271 and 332, 48 Stat. 1070, as amended, 1077; 47 U.S.C. 153, 154, 201-05, 207-09, 218, 225-27, 251-52, 271 and 332 unless otherwise noted.

2.	Section 52.21 is amended by adding paragraph (w) as follows:

	**§ 52.21  Definitions**

	\*\*\*\*\*

	(w) The term *2009 LNP Porting Intervals Order* refers to In the Matters of Local Number Portability Porting Interval and Validation Requirements; Telephone Number Portability, WC Docket No. 07-244, CC Docket No. 95-116, Report and Order and Further Notice of Proposed Rulemaking, FCC 09-41 (2009).

3.	Section 52.26 is amended by revising paragraphs (a) and (c) as follows:

	**§ 52.26 NANC Recommendations on Local Number Portability Administration.**

	(a) Local number portability administration must comply with the recommendations of the North American Numbering Council (NANC) as set forth in the report to the Commission prepared by the NANC's Local Number Portability Administration Selection Working Group, dated April 25, 1997 (*Working Group Report*) and its appendices, which are incorporated by reference pursuant to 5 U.S.C. 552(a) and 1 CFR part 51.  *Except that:* Section 7.10 of Appendix D is *not* incorporated herein and all references to the porting intervals for simple wireline and simple intermodal port requests in the *Working Group Report* are *not* incorporated herein after section 52.35 becomes effective as described in section 52.35(a).

	\* \* \* \* \*

	(c) The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51.  Copies of the *Working Group Report* and its appendices can be obtained from the Commission's contract copier, Best Copy and Printing, Inc. (BCPI), Portals II, 445 12th Street, SW, Room CY-B402, Washington, DC 20554, (202) 488-5300, or via e-mail at fcc@bcpiweb.com, and can be inspected during normal business hours at the following locations:  Reference Information Center, 445 12th Street, SW., Room CY--A257, Washington, D.C. 20554 or at the National Archives and Records Administration (NARA).  For information on the availability of this material at NARA, call (202) 741-6030, or go to: http://www.archives.gov/federal-register/cfr/ibr-locations.html.  The *Working Group Report* and its appendices are also available on the Internet at http://www.fcc.gov/wcb/cpd/Nanc/lnpastuf.html.

4.       Section 52.35 is added to read as follows:

**§ 52.35 Porting Intervals**

(a)  Nine months after the NANC submits its port provisioning process flows to the Commission as provided in the *2009 LNP Porting Interval Order*, all telecommunications carriers required by the Commission to port telephone numbers must complete a simple wireline-to-wireline or simple intermodal port request within one business day unless a longer period is requested by the new provider or by the customer.  Small providers, as described in the *2009 LNP Porting Interval Order*, must comply with this section 15 months after the NANC submits its port provisioning process flows to the Commission as provided in the *2009 LNP Porting Interval Order*.  For purposes of this section, simple intermodal ports include (1) wireline-to-wireless ports, (2) wireless-to-wireline ports, and (3) ports involving interconnected Voice over Internet Protocol (VoIP) service.

(b)  Unless directed otherwise by the Commission, any telecommunications carrier granted a waiver by the Commission of the one-business day porting interval described in subsection (a) must complete a simple wireline-to-wireline or simple intermodal port within four business days unless a longer period is requested by the new provider or by the customer.

(c)  For purposes of this section, the term "telecommunications carrier" includes an interconnected VoIP provider as that term is defined in § 52.21(h).

(d)  Once effective as described in subsection (a), this section supersedes any porting interval requirements for simple wireline or simple intermodal port requests incorporated by reference in § 52.26.

**APPENDIX C**

**Final Regulatory Flexibility Analysis**

**WC Docket No. 07-244, CC Docket No. 95-116**

1. As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *2007 LNP NPRM* in WC Docket 07-244.[2] The Commission sought written public comment on the proposals in the Notice, including comment on the IRFA.[3] We received comments on the Notice and also received comments specifically directed toward the IRFA from two commenters in WC Docket No. 07-244. These comments are discussed below. This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[4]

A.      **Need for, and Objectives of, the Rules**

2. This Report and Order (Order) reduces the porting interval for simple wireline and simple intermodal port requests. Specifically, this Order requires all entities subject to the Commission's local number portability (LNP) rules to complete simple[5] wireline-to-wireline and simple intermodal port requests within one business day, unless a longer period is requested by the new provider or the customer elects otherwise. The Order directs the NANC to develop new LNP provisioning process flows that take into account this shortened porting interval. In developing these flows, the NANC must address how a "business day" should be construed for purposes of the porting interval, and generally how the porting time should be measured. The NANC must submit these flows to the Commission no later than 90 days after the effective date of the Report and Order. The Order requires all providers subject to the Commission's LNP rules to comply with the new porting interval within nine months of the date that the NANC submits the revised provisioning flows to the Commission, except with regard to small providers. Small providers are required to implement the reduced porting interval of one business day for simple wireline and simple intermodal ports no later than 15 months from the date that the NANC submits the revised provisioning flows to the Commission. For purposes of this Order, the Commission considers small providers to be providers with fewer than 2 percent of the nation's subscriber lines installed in the aggregate nationwide[6] and Tier III wireless carriers, as defined in the *E911 Stay Order*.[7]

---

[1] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. §§ 601-12, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See Telephone Number Requirements for IP-Enabled Services Providers; Local Number Portability Porting Interval and Validation Requirements; IP-Enabled Services; Telephone Number Portability; Numbering Resource Optimization*, WC Docket Nos. 07-243, 07-244, 04-36, CC Docket Nos. 95-116, 99-200, Report and Order, Declaratory Ruling, Order on Remand, and Notice of Proposed Rulemaking, 22 FCC Rcd 19531, 19565, para. 73 & Appendix E (2007) (*2007 LNP NPRM*), *aff'd sub nom. National Telecomms. Cooperative Ass'n v. FCC* (D.C. Cir. Apr. 28, 2009).

[3] *See id* at 19565, para. 73 & Appendix E.

[4] *See* 5 U.S.C. § 604.

[5] As the Commission previously has explained, simple ports are those ports that: (1) do not involve unbundled network elements; (2) involve an account only for a single line; (3) do not include complex switch translations (*e.g.*, Centrex, ISDN, AIN services, remote call forwarding, or multiple services on the loop); and (4) do not include a reseller. *See, e.g.*, *Telephone Number Portability*, CC Docket No. 95-116, Memorandum Opinion and Order and Further Notice of Proposed Rulemaking, 18 FCC Rcd 23697, 23715, para. 45 n.112 (*Intermodal Porting Order and FNPRM*) (citing North American Numbering Council Local Number Portability Administration Working Group Third Report on Wireless Wireline Integration, Sept. 30, 2000, CC Docket No. 95-116 (filed Nov. 29, 2000)).

[6] *See* 47 U.S.C. § 251(f)(2).

3.    Providers may also apply for a waiver of the one-business day porting interval under the Commission's rules.[8]  To demonstrate the good cause required by the Commission's waiver rule,[9] a provider must show with particularity that it would be unduly economically burdensome for the provider to implement the reduced porting interval.  In making this showing, a provider should address the number of port requests it typically receives on a monthly basis as well as the specific costs that complying with the reduced porting interval would impose.  The Order clarifies that providers that obtain a waiver of the Commission's one-business day porting interval must comply with the current rules regarding a four-business day porting interval for simple ports, at a minimum, unless told otherwise.  Waiver requests will be considered on a case-by-case basis, and the Commission will determine the length of the waiver period based on the particular facts presented.

4.    Although customers have had the option to port numbers between their telephone service providers for a number of years, the current four-business day porting interval may hinder the effectiveness of such options.  Delays in porting cost consumers time and money and limit consumer choice and competition because when consumers get frustrated with slow porting, they often abandon efforts to switch providers.  The Commission finds this to be a significant concern both due to the Commission's efforts generally to ensure "the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another,"[10] as well as due to the important role intermodal providers play in telecommunications competition.  This Order concludes that reducing the porting interval for simple wireline-to-wireline and simple intermodal ports to one business day is necessary to enable customers to port their numbers in a timely fashion and to enhance competition.

**B.    Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

5.    In this section, we respond to comments filed in response to the IRFA.[11]  To the extent we received comments raising general small business concerns during this proceeding, those comments are discussed throughout the Report and Order.

6.    OPASTCO and WTA comment that the IRFA is deficient, arguing that it contains no description of project compliance requirements, contains no alternatives considered, and impermissibly

---

(...continued from previous page)
[7] In the *E911 Stay Order*, the Commission classified CMRS carriers with 500,000 subscribers or fewer as of the end of 2001 as Tier III wireless carriers.  *See Revision of the Commission's Rules to Ensure Compatibility with the Enhanced 911 Emergency Calling Systems*, CC Docket No. 94-102, Order to Stay, 17 FCC Rcd 14841 (2002) (*E911 Stay Order*).  The Small Business Administration (SBA) has approved the Tier III wireless classification as a small business size standard.  *See* Letter from Hector V. Barreto, Administrator, SBA, to Blaise Scinto, Acting Chief, Policy Division, Wireless Telecommunications Bureau, FCC (dated Jan. 21, 2003).

[8] 47 C.F.R. § 1.3.

[9] *Id.*

[10] 47 U.S.C. § 153(30); 47 C.F.R. § 52.21(l).

[11] *See* OPASTCO/WTA Comments at 5-6; Windstream Reply at n.8.  The Commission also received three letters outside the comment period commenting on the IRFA.  *See* Letter from Genie Barton, Vice President & General Counsel, USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, CC Docket No. 95-116, at 3 (July 1, 2008) (USTelecom July 1, 2008 *Ex Parte* Letter); Letter from Stephen Pastorkovich, Business Development Director/Senior Policy Analyst, OPASTCO, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, Attach. at 2 (July 24, 2008) (OPASTCO July 24, 2008 *Ex Parte* Letter); Letter from Daniel Mitchell, Vice President, Legal & Industry, and Karlen Reed, Regulatory Counsel, NTCA, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, CC Docket Nos. 95-116, 99-200, at 2 (July 14, 2008) (NTCA July 14, 2008 *Ex Parte* Letter).

shifts the burden of providing required estimated compliance descriptions and compliance cost projections to commenting parties.[12]  Windstream, USTelecom, and NTCA agree with OPASTCO's and WTA's comments regarding the deficiency of the IRFA.[13]

7.  We disagree with these assertions as we find that small entities have received sufficient notice of the issues addressed in today's Report and Order.[14]  Further, the Commission has considered the economic impact on small entities and what ways are feasible to minimize the burdens imposed on those entities.  To the extent feasible, we have implemented those less burdensome alternatives, and we discuss these alternatives in section E, *infra*.

### C.     Description and Estimate of the Number of Small Entities to Which Rules Will Apply

8.  The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[15]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[16]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[17]  A small business concern is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[18]

9.  *Small Businesses*.  Nationwide, there are a total of approximately 22.4 million small businesses according to SBA data.[19]

10.  *Small Organizations*.  Nationwide, there are approximately 1.6 million small organizations.[20]

### 1.     Telecommunications Service Entities

#### a.     Wireline Carriers and Service Providers

11.  We have included small incumbent local exchange carriers (LECs) in this present RFA analysis.  As noted above, a "small business" under the RFA is one that, *inter alia*, meets the pertinent small business size standard (*e.g.*, a telephone communications business having 1,500 or fewer

---

[12] *See* OPASTCO/WTA Comments at 5-6.

[13] *See* Windstream Reply at n.8; USTelecom July 1, 2008 *Ex Parte* Letter at 3; OPASTCO July 24, 2008 *Ex Parte* Letter at 2; NTCA July 14, 2008 *Ex Parte* Letter at 2.

[14] *See 2007 LNP NPRM*, 22 FCC Rcd at 19565, para. 73 & Appendix E (seeking comment on the benefits and burdens on small entities of adopting rules regarding porting intervals).

[15] 5 U.S.C. §§ 603(b)(3), 604(a)(3).

[16] 5 U.S.C. § 601(6).

[17] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such terms which are appropriate to the activities of the agency and publishes such definitions(s) in the Federal Register."

[18] 15 U.S.C. § 632.

[19] *See* SBA, Programs and Services, SBA Pamphlet No. CO-0028, at page 40 (July 2002).

[20] Independent Sector, The New Nonprofit Almanac & Desk Reference (2002).

employees), and "is not dominant in its field of operation."[21] The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent LECs are not dominant in their field of operation because any such dominance is not "national" in scope.[22] We have therefore included small incumbent LECs in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

12. *Incumbent LECs.* Neither the Commission nor the SBA has developed a small business size standard specifically for incumbent local exchange services. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[23] According to Commission data,[24] 1,303 carriers have reported that they are engaged in the provision of incumbent local exchange services. Of these 1,303 carriers, an estimated 1,020 have 1,500 or fewer employees and 283 have more than 1,500 employees. Consequently, the Commission estimates that most providers of incumbent local exchange service are small businesses that may be affected by our action.

13. *Competitive LECs, Competitive Access Providers (CAPs), "Shared-Tenant Service Providers," and "Other Local Service Providers."* Neither the Commission nor the SBA has developed a small business size standard specifically for these service providers. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[25] According to Commission data,[26] 859 carriers have reported that they are engaged in the provision of either competitive access provider services or competitive LEC services. Of these 859 carriers, an estimated 741 have 1,500 or fewer employees and 118 have more than 1,500 employees. In addition, 16 carriers have reported that they are "Shared-Tenant Service Providers," and all 16 are estimated to have 1,500 or fewer employees. In addition, 44 carriers have reported that they are "Other Local Service Providers." Of the 44, an estimated 43 have 1,500 or fewer employees and one has more than 1,500 employees. Consequently, the Commission estimates that most providers of competitive local exchange service, competitive access providers, "Shared-Tenant Service Providers," and "Other Local Service Providers" are small entities.

14. *Local Resellers.* The SBA has developed a small business size standard for the category of Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[27] According to Commission data,[28] 184 carriers have reported that they are engaged in the provision of local resale services. Of these, an estimated 181 have 1,500 or fewer employees and three

---

[21] 15 U.S.C. § 632.

[22] Letter from Jere W. Glover, Chief Counsel for Advocacy, SBA, to William E. Kennard, Chairman, FCC (May 27, 1999). The Small Business Act contains a definition of "small-business concern," which the RFA incorporates into its own definition of "small business." *See* 15 U.S.C. § 632(a) (Small Business Act); 5 U.S.C. § 601(3) (RFA). SBA regulations interpret "small business concern" to include the concept of dominance on a national basis. *See* 13 C.F.R. § 121.102(b).

[23] 13 C.F.R. § 121.201, NAICS code 517110.

[24] FCC, Wireline Competition Bureau, Industry Analysis and Technology Division, *Trends in Telephone Service* at Table 5.3, page 5-5 (Feb. 2007) (*Trends in Telephone Service*). This source uses data that are current as of October 20, 2005.

[25] 13 C.F.R. § 121.201, NAICS code 517110.

[26] *Trends in Telephone Service* at Table 5.3.

[27] 13 C.F.R. § 121.201, NAICS code 517911.

[28] *Trends in Telephone Service* at Table 5.3.

have more than 1,500 employees. Consequently, the Commission estimates that the majority of local resellers are small entities that may be affected by our action.

15. *Toll Resellers.* The SBA has developed a small business size standard for the category of Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[29] According to Commission data,[30] 881 carriers have reported that they are engaged in the provision of toll resale services. Of these, an estimated 853 have 1,500 or fewer employees and 28 have more than 1,500 employees. Consequently, the Commission estimates that the majority of toll resellers are small entities that may be affected by our action.

16. *Payphone Service Providers (PSPs).* Neither the Commission nor the SBA has developed a small business size standard specifically for payphone services providers. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[31] According to Commission data,[32] 657 carriers have reported that they are engaged in the provision of payphone services. Of these, an estimated 653 have 1,500 or fewer employees and four have more than 1,500 employees. Consequently, the Commission estimates that the majority of payphone service providers are small entities that may be affected by our action.

17. *Interexchange Carriers (IXCs).* Neither the Commission nor the SBA has developed a small business size standard specifically for providers of interexchange services. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[33] According to Commission data,[34] 330 carriers have reported that they are engaged in the provision of interexchange service. Of these, an estimated 309 have 1,500 or fewer employees and 21 have more than 1,500 employees. Consequently, the Commission estimates that the majority of IXCs are small entities that may be affected by our action.

18. *Operator Service Providers (OSPs).* Neither the Commission nor the SBA has developed a small business size standard specifically for operator service providers. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[35] According to Commission data,[36] 23 carriers have reported that they are engaged in the provision of operator services. Of these, an estimated 22 have 1,500 or fewer employees and one has more than 1,500 employees. Consequently, the Commission estimates that the majority of OSPs are small entities that may be affected by our action.

19. *Prepaid Calling Card Providers.* Neither the Commission nor the SBA has developed a small business size standard specifically for prepaid calling card providers. The appropriate size standard under SBA rules is for the category Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[37] According to Commission data,[38] 104 carriers have

---

[29] 13 C.F.R. § 121.201, NAICS code 517911.

[30] *Trends in Telephone Service* at Table 5.3.

[31] 13 C.F.R. § 121.201, NAICS code 517110.

[32] *Trends in Telephone Service* at Table 5.3.

[33] 13 C.F.R. § 121.201, NAICS code 517110.

[34] *Trends in Telephone Service* at Table 5.3.

[35] 13 C.F.R. § 121.201, NAICS code 517110.

[36] *Trends in Telephone Service* at Table 5.3.

[37] 13 C.F.R. § 121.201, NAICS code 517911.

reported that they are engaged in the provision of prepaid calling cards. Of these, 102 are estimated to have 1,500 or fewer employees and two have more than 1,500 employees. Consequently, the Commission estimates that all or the majority of prepaid calling card providers are small entities that may be affected by our action.

20. *800 and 800-Like Service Subscribers.*[39] These toll-free services fall within the broad economic census category of Telecommunications Resellers. This category "comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure."[40] The SBA has developed a small business size standard for this category, which is: all such firms having 1,500 or fewer employees.[41] Census Bureau data for 2002 show that there were 1,646 firms in this category that operated for the entire year.[42] Of this total, 1,642 firms had employment of 999 or fewer employees, and four firms had employment of 1,000 employees or more.[43] Thus, the majority of these firms can be considered small. Additionally, it may be helpful to know the total numbers of telephone numbers assigned in these services. Commission data show that, as of June 2006, the total number of 800 numbers assigned was 7,647,941, the total number of 888 numbers assigned was 5,318,667, the total number of 877 numbers assigned was 4,431,162, and the total number of 866 numbers assigned was 6,008,976.[44]

#### b. International Service Providers

21. The first category, Satellite Telecommunications, "comprises establishments primarily engaged in providing point-to-point telecommunications services to other establishments in the telecommunications and broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications."[45] The size standard for this industry is $15.0 million; the NACIS code is 517410. For this category, Census Bureau data for 2002 show that there were a total of 371 firms that operated for the entire year.[46] Of this total, 307 firms had annual receipts of under $10 million, and 26 firms had receipts of $10 million to $24,999,999.[47] Consequently, we estimate that the majority of Satellite Telecommunications firms are small entities that might be affected by our action.

---

(...continued from previous page)

[38] *Trends in Telephone Service* at Table 5.3.

[39] We include all toll-free number subscribers in this category, including those for 888 numbers.

[40] U.S. Census Bureau, 2007 NAICS Definitions, "517911 Telecommunications Resellers" (partial definition); http://www.census.gov/naics/2007/def/ND517911.HTM#N517911.

[41] 13 C.F.R. § 121.201, NAICS code 517911.

[42] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization," Table 5, NAICS code 517310 (issued Nov. 2005). Prior to 2007, the subject category was numbered 517310.

[43] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[44] *Trends in Telephone Service* at Tables 18.4-18.8.

[45] U.S. Census Bureau, "2002 NAICS Definitions: 517410 Satellite Telecommunications," *available at* http://www.census.gov/epcd/naics02/def/ND517410.HTM (visited Oct. 16, 2007).

[46] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 517410 (issued Nov. 2005).

[47] *Id.* An additional 38 firms had annual receipts of $25 million or more.

22. The second category of Other Telecommunications "comprises establishments primarily engaged in (1) providing specialized telecommunications applications, such as satellite tracking, communications telemetry, and radar station operations; or (2) providing satellite terminal stations and associated facilities operationally connected with one or more terrestrial communications systems and capable of transmitting telecommunications to or receiving telecommunications from satellite systems."[48] The size standard for this category is $25.0 million and the NAICS code is 517919. For this category, Census Bureau data for 2002 show that there were a total of 332 firms that operated for the entire year.[49] Of this total, 274 firms had annual receipts of under $24,999,999.[50] Consequently, we estimate that the majority of Other Telecommunications firms are small entities that might be affected by our action.

### c. Wireless Telecommunications Service Providers

23. Below, for those services subject to auctions, we note that, as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service. Also, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated.

24. *Wireless Service Providers.* The SBA has developed a small business size standard for wireless firms within the two broad economic census categories of "Paging"[51] and "Cellular and Other Wireless Telecommunications."[52] Under both SBA categories, a wireless business is small if it has 1,500 or fewer employees. For the census category of Paging, Census Bureau data for 2002 show that there were 807 firms in this category that operated for the entire year.[53] Of this total, 804 firms had employment of 999 or fewer employees, and three firms had employment of 1,000 employees or more.[54] Thus, under this category and associated small business size standard, the majority of firms can be considered small. For the census category of Cellular and Other Wireless Telecommunications, Census Bureau data for 2002 show that there were 1,397 firms in this category that operated for the entire year.[55] Of this total, 1,378 firms had employment of 999 or fewer employees, and 19 firms had employment of 1,000 employees or more.[56] Thus, under this second category and size standard, the majority of firms can, again, be considered small. We note that that the categories of "Paging" and "Cellular and Other Wireless Telecommunications" are now obsolete, and have been replaced with a new category, "Wireless

---

[48] U.S. Census Bureau, "2002 NAICS Definitions: 517910 Other Telecommunications," *available at* http://www.census.gov/epcd/naics02/def/ND517910.HTM (visited Oct. 16, 2007).

[49] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 517910 (issued Nov. 2005).

[50] *Id.* An additional 14 firms had annual receipts of $25 million or more.

[51] 13 C.F.R. § 121.201, NAICS code 517211 (changed from 513321 in Oct. 2002).

[52] 13 C.F.R. § 121.201, NAICS code 517212 (changed from 513322 in Oct. 2002).

[53] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 5, NAICS code 517211 (issued Nov. 2005).

[54] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is firms with "1000 employees or more."

[55] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 5, NAICS code 517212 (issued Nov. 2005).

[56] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is firms with "1000 employees or more."

Telecommunications Carriers (except Satellite)."[57] Under this new category, a wireless business is small if it has 1,500 or few employees.

25. *Wireless Telephony*. Wireless telephony includes cellular, personal communications services (PCS), and specialized mobile radio (SMR) telephony carriers. As noted above, the SBA has developed a small business size standard for "Wireless Telecommunications Carriers (except Satellite)."[58] Under that SBA small business size standard, a business is small if it has 1,500 or fewer employees.[59] According to Commission data, 432 carriers reported that they were engaged in the provision of wireless telephony.[60] We have estimated that 221 of these are small under the SBA small business size standard.

26. *Broadband Personal Communications Service*. The broadband Personal Communications Service (PCS) spectrum is divided into six frequency blocks designated A through F, and the Commission has held auctions for each block. The Commission defined "small entity" for Blocks C and F as an entity that has average gross revenues of $40 million or less in the three previous calendar years.[61] For Block F, an additional classification for "very small business" was added and is defined as an entity that, together with its affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years."[62] These standards defining "small entity" in the context of broadband PCS auctions have been approved by the SBA.[63] No small businesses, within the SBA-approved small business size standards bid successfully for licenses in Blocks A and B. There were 90 winning bidders that qualified as small entities in the Block C auctions. A total of 93 small and very small business bidders won approximately 40 percent of the 1,479 licenses for Blocks D, E, and F.[64] On March 23, 1999, the Commission re-auctioned 347 C, D, E, and F Block licenses. There were 48 small business winning bidders. On January 26, 2001, the Commission completed the auction of 422 C and F Broadband PCS licenses in Auction No. 35. Of the 35 winning bidders in this auction, 29 qualified as "small" or "very small" businesses. Subsequent events, concerning Auction 35, including judicial and agency determinations, resulted in a total of 163 C and F Block licenses being available for grant.

## 2. Cable and OVS Operators

27. *Cable Television Distribution Services*. Since 2007, these services have been defined within the broad economic census category of Wired Telecommunications Carriers; that category is defined as follows: "This industry comprises establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks. Transmission facilities may be based on

---

[57] NAICS code 517210.

[58] NAICS code 517210.

[59] *Id.*

[60] *Trends in Telephone Service* at Table 5.3.

[61] *See Amendment of Parts 20 and 24 of the Commission's Rules – Broadband PCS Competitive Bidding and the Commercial Mobile Radio Service Spectrum Cap*, WT Docket No. 96-59, Report and Order, 11 FCC Rcd 7824, 61 FR 33859 (July 1, 1996) (*PCS Order*); *see also* 47 C.F.R. § 24.720(b).

[62] *See PCS Order*, 11 FCC Rcd 7824.

[63] *See, e.g.*, *Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, PP Docket No. 93-253, Fifth Report and Order, 9 FCC Rcd 5332, 59 FR 37566 (July 22, 1994).

[64] FCC News, Broadband PCS, D, E and F Block Auction Closes, No. 71744 (rel. Jan. 14, 1997); *see also Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses*, WT Docket No. 97-82, Second Report and Order, 12 FCC Rcd 16436, 62 FR 55348 (Oct. 24, 1997).

a single technology or a combination of technologies."[65]  The SBA has developed a small business size standard for this category, which is:  all such firms having 1,500 or fewer employees.  To gauge small business prevalence for these cable services we must, however, use current census data that are based on the previous category of Cable and Other Program Distribution and its associated size standard; that size standard was:  all such firms having $13.5 million or less in annual receipts.[66]  According to Census Bureau data for 2002, there were a total of 1,191 firms in this previous category that operated for the entire year.[67]  Of this total, 1,087 firms had annual receipts of under $10 million, and 43 firms had receipts of $10 million or more but less than $25 million.[68]  Thus, the majority of these firms can be considered small.

28.  *Cable Companies and Systems.*  The Commission has also developed its own small business size standards, for the purpose of cable rate regulation.  Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers, nationwide.[69]  Industry data indicate that, of 1,076 cable operators nationwide, all but eleven are small under this size standard.[70]  In addition, under the Commission's rules, a "small system" is a cable system serving 15,000 or fewer subscribers.[71]  Industry data indicate that, of 7,208 systems nationwide, 6,139 systems have under 10,000 subscribers, and an additional 379 systems have 10,000-19,999 subscribers.[72]  Thus, under this second size standard, most cable systems are small

29.  *Cable System Operators.*  The Communications Act of 1934, as amended, also contains a size standard for small cable system operators, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than 1 percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[73]  The Commission has determined that an operator serving fewer than 677,000 subscribers shall be deemed a small operator, if its annual revenues, when combined with the total annual revenues of all its affiliates, do not exceed $250 million in the aggregate.[74]  Industry data indicate that, of 1,076 cable operators

---

[65]  U.S. Census Bureau, 2007 NAICS Definitions, "517110 Wired Telecommunications Carriers" (partial definition); http://www.census.gov/naics/2007/def/ND517110.HTM#N517110.

[66]  13 C.F.R. § 121.201, NAICS code 517110.

[67]  U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, Table 4, Receipts Size of Firms for the United States:  2002, NAICS code 517510 (issued November 2005).

[68]  *Id.*  An additional 61 firms had annual receipts of $25 million or more.

[69]  47 C.F.R. § 76.901(e).  The Commission determined that this size standard equates approximately to a size standard of $100 million or less in annual revenues.  *Implementation of Sections of the 1992 Cable Act: Rate Regulation,* Sixth Report and Order and Eleventh Order on Reconsideration, MM Docket Nos. 92-266, 93-215, 10 FCC Rcd 7393, 7408 (1995).

[70]  These data are derived from:  R.R. Bowker, *Broadcasting & Cable Yearbook 2006*, "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); Warren Communications News, *Television & Cable Factbook 2006*, "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

[71]  47 C.F.R. § 76.901(c).

[72]  Warren Communications News, *Television & Cable Factbook 2006*, "U.S. Cable Systems by Subscriber Size," page F-2 (data current as of Oct. 2005).  The data do not include 718 systems for which classifying data were not available.

[73]  47 U.S.C. § 543(m)(2); *see* 47 C.F.R. § 76.901(f) & nn. 1-3.

[74]  47 C.F.R. § 76.901(f); *see FCC Announces New Subscriber Count for the Definition of Small Cable Operator*, Public Notice, DA 01-158, 16 FCC Rcd 2225 (Cable Services Bureau, Jan. 24, 2001).

nationwide, all but ten are small under this size standard.[75]  We note that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million,[76] and therefore we are unable to estimate more accurately the number of cable system operators that would qualify as small under this size standard.

30.  *Open Video Systems (OVS)*.  In 1996, Congress established the open video system (OVS) framework, one of four statutorily recognized options for the provision of video programming services by local exchange carriers (LECs).[77]  The OVS framework provides opportunities for the distribution of video programming other than through cable systems.  Because OVS operators provide subscription services,[78] OVS previously fell within the now obsolete SBA small business size standard of Cable and Other Program Distribution Services, which consists of such entities having $13.5 million or less in annual receipts.[79]  The Commission has certified 25 OVS operators, with some now providing service.  Broadband service providers (BSPs) are currently the only significant holders of OVS certifications or local OVS franchises.[80]  As of June, 2005, BSPs served approximately 1.4 million subscribers, representing 1.5 percent of all MVPD households.[81]  Affiliates of Residential Communications Network, Inc. (RCN), which serves about 371,000 subscribers as of June, 2005, is currently the largest BSP and 14th largest MVPD.[82]  RCN received approval to operate OVS systems in New York City, Boston, Washington, D.C. and other areas.  The Commission does not have financial information regarding the entities authorized to provide OVS, some of which may not yet be operational.  We thus believe that at least some of the OVS operators may qualify as small entities.

### 3.    Internet Service Providers

31.  *Internet Service Providers*.  The SBA has developed a small business size standard for Internet Service Providers (ISPs).  ISPs "provide clients access to the Internet and generally provide related services such as web hosting, web page designing, and hardware or software consulting related to Internet connectivity."[83]  The new size standard is 500 employees.[84]  However, data is not yet available under this new standard.  Under the previous SBA size standard, such a business is small if it has average

---

[75]  These data are derived from:  R.R. Bowker, *Broadcasting & Cable Yearbook 2006*, "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); Warren Communications News, *Television & Cable Factbook 2006*, "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

[76]  The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(f) of the Commission's rules.  *See* 47 C.F.R. § 76.909(b).

[77]  47 U.S.C. § 571(a)(3)-(4).  *See Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, Eleventh Annual Report*, 20 FCC Rcd 2507, 2549, para. 88 (2006) (*2006 Cable Competition Report*).

[78]  *See* 47 U.S.C. § 573.

[79]  13 C.F.R. § 121.201, NAICS code 517510.

[80]  *See 2006 Cable Competition Report*, 20 FCC Rcd at 2549, para. 88.  BSPs are newer firms that are building state-of-the-art, facilities-based networks to provide video, voice, and data services over a single network.

[81]  *See id.* at 2507, para. 14.

[82]  *See 2006 Cable Competition Report*, 20 FCC Rcd at 2549, para. 89.  WideOpenWest is the second largest BSP and 16th largest MVPD, with cable systems serving about 292,000 subscribers as of June, 2005.  The third largest BSP is Knology, serving approximately 170,800 subscribers as of June 2005.  *Id.*

[83]  U.S. Census Bureau, "2002 NAICS Definitions:  518111 Internet Service Providers," *available at* http://www.census.gov/epcd/naics02/def/ND518111.HTM (visited Oct. 16, 2007).

[84]  *See* NAICS code 519130.

annual receipts of $23 million or less.[85]  According to Census Bureau data for 2002, there were 2,529 firms in this category that operated for the entire year.[86]  Of these, 2,437 firms had annual receipts of under $10 million, and an additional 47 firms had receipts of between $10 million and $24,999,999.  Consequently, we estimate that the majority of these firms are small entities that may be affected by our action.

32.  *All Other Information Services*.  "This industry comprises establishments primarily engaged in providing other information services (except new syndicates and libraries and archives)."[87]  The SBA has developed a small business size standard for this category; that size standard is $7.0 million or less in average annual receipts.[88]  However, data has not yet been collected under the new size standard, and so we refer to data collected under the previous size standard, $6.5 million or less in average annual receipts.  According to Census Bureau data for 2002, there were 155 firms in this category that operated for the entire year.[89]  Of these, 138 had annual receipts of under $5 million, and an additional four firms had receipts of between $5 million and $9,999,999.  Consequently, we estimate that the majority of these firms are small entities that may be affected by our action.

### 4.  Equipment Manufacturers

33.  SBA small business size standards are given in terms of "firms."  Census Bureau data concerning computer manufacturers, on the other hand, are given in terms of "establishments."  We note that the number of "establishments" is a less helpful indicator of small business prevalence in this context than would be the number of "firms" or "companies," because the latter take into account the concept of common ownership or control.  Any single physical location for an entity is an establishment, even though that location may be owned by a different establishment.  Thus, the census numbers provided below may reflect inflated numbers of businesses in the given category, including the numbers of small businesses.

34.  *Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing*.  The Census Bureau defines this category as follows:  "This industry comprises establishments primarily engaged in manufacturing radio and television broadcast and wireless communications equipment.  Examples of products made by these establishments are: transmitting and receiving antennas, cable television equipment, GPS equipment, pagers, cellular phones, mobile communications equipment, and radio and television studio and broadcasting equipment."[90]  The SBA has developed a small business size standard for Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing, which is:  all such firms having 750 or fewer employees.[91]

---

[85] 13 C.F.R. § 121.201, NAICS code 518111 (changed from 514191, "On-Line Information Services," in Oct. 2002).

[86] U.S. Census Bureau, 2002 Economic Census, Subject Series:  Information, "Establishment and Firm Size (Including Legal Form of Organization," Table 4, NAICS code 518111 (issued Nov. 2005).

[87] U.S. Census Bureau, "2002 NAICS Definitions:  519190 All Other Information Services," *available at* http://www.census.gov/epcd/naics02/def/ND519190.HTM (visited Oct. 16, 2007).

[88] 13 C.F.R. § 121.201, NAICS code 519190.

[89] U.S. Census Bureau, 1997 Economic Census, Subject Series:  Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 514199 (issued Oct. 2000).  This category was created for the 2002 Economic Census by taking a portion of the superseded 1997 category, "All Other Information Services," NAICS code 514199.  The data cited in the text above are derived from the superseded category.

[90] U.S. Census Bureau, 2002 NAICS Definitions, "334220 Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing," *available at* http://www.census.gov/epcd/naics02/def/NDEF334.HTM#N3342.

[91] 13 C.F.R. § 121.201, NAICS code 334220.

According to Census Bureau data for 2002, there were a total of 1,041 establishments in this category that operated for the entire year.[92] Of this total, 1,010 had employment of under 500, and an additional 13 had employment of 500 to 999.[93] Thus, under this size standard, the majority of firms can be considered small.

35. *Telephone Apparatus Manufacturing.* The Census Bureau defines this category as follows: "This industry comprises establishments primarily engaged in manufacturing wire telephone and data communications equipment. These products may be standalone or board-level components of a larger system. Examples of products made by these establishments are central office switching equipment, cordless telephones (except cellular), PBX equipment, telephones, telephone answering machines, LAN modems, multi-user modems, and other data communications equipment, such as bridges, routers, and gateways."[94] The SBA has developed a small business size standard for Telephone Apparatus Manufacturing, which is: all such firms having 1,000 or fewer employees.[95] According to Census Bureau data for 2002, there were a total of 518 establishments in this category that operated for the entire year.[96] Of this total, 511 had employment of under 1,000, and an additional 7 had employment of 1,000 to 2,499.[97] Thus, under this size standard, the majority of firms can be considered small.

36. *Semiconductor and Related Device Manufacturing.* Examples of manufactured devices in this category include "integrated circuits, memory chips, microprocessors, diodes, transistors, solar cells and other optoelectronic devices."[98] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 500 or fewer employees.[99] According to Census Bureau data, there were 1,032 establishments in this category that operated with payroll during 2002.[100] Of these,

---

[92] U.S. Census Bureau, American FactFinder, 2002 Economic Census, Industry Series, Industry Statistics by Employment Size, NAICS code 334220 (released May 26, 2005); http://factfinder.census.gov. The number of "establishments" is a less helpful indicator of small business prevalence in this context than would be the number of "firms" or "companies," because the latter take into account the concept of common ownership or control. Any single physical location for an entity is an establishment, even though that location may be owned by a different establishment. Thus, the numbers given may reflect inflated numbers of businesses in this category, including the numbers of small businesses. In this category, the Census breaks-out data for firms or companies only to give the total number of such entities for 2002, which was 929.

[93] *Id.* An additional 18 establishments had employment of 1,000 or more.

[94] U.S. Census Bureau, 2002 NAICS Definitions, "334210 Telephone Apparatus Manufacturing," *available at* http://www.census.gov/epcd/naics02/def/NDEF334.HTM#N3342.

[95] 13 C.F.R. § 121.201, NAICS code 334210.

[96] U.S. Census Bureau, American FactFinder, 2002 Economic Census, Industry Series, Industry Statistics by Employment Size, NAICS code 334210 (released May 26, 2005); http://factfinder.census.gov. The number of "establishments" is a less helpful indicator of small business prevalence in this context than would be the number of "firms" or "companies," because the latter take into account the concept of common ownership or control. Any single physical location for an entity is an establishment, even though that location may be owned by a different establishment. Thus, the numbers given may reflect inflated numbers of businesses in this category, including the numbers of small businesses. In this category, the Census breaks-out data for firms or companies only to give the total number of such entities for 2002, which was 450.

[97] *Id.* An additional 4 establishments had employment of 2,500 or more.

[98] U.S. Census Bureau, 2002 NAICS Definitions, "334413 Semiconductor and Related Device Manufacturing," *available at* http://www.census.gov/epcd/nacis02/def/ND334413.HTM#N334413.

[99] 13 C.F.R. § 121.201, NAICS code 334413.

[100] U.S. Census Bureau, 2002 Economic Census, Industry Series: Manufacturing, "Semiconductor and Related Device Manufacturing ," Table 4, NAICS code 334413 (issued Jan. 2005).

950 had employment of under 500, and 42 establishments had employment of 500 to 999. Consequently, we estimate that the majority of these establishments are small entities.

37. *Computer Storage Device Manufacturing.* These establishments manufacture "computer storage devices that allow the storage and retrieval of data from a phase change, magnetic, optical, or magnetic/optical media."[101] The SBA has developed a small business size standard for this category of manufacturing; that size standard is 1,000 or fewer employees.[102] According to Census Bureau data, there were 170 establishments in this category that operated with payroll during 2002.[103] Of these, 164 had employment of under 500, and five establishments had employment of 500 to 999. Consequently, we estimate that the majority of these establishments are small entities.

D.    **Description of Projected Reporting, Recordkeeping and Other Compliance Requirements**

38. This Order does not impose any new or modified reporting, recordkeeping or other compliance requirements.

E.    **Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

39. The RFA requires an agency to describe any significant alternatives that it has considered in reaching its approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[104]

40. In the *2007 LNP NPRM*, the Commission tentatively concluded that it should adopt a rule reducing the porting interval for simple port requests and allow the industry to work through the actual implications of such a timeline.[105] In particular, the Commission tentatively concluded that it should adopt a rule reducing the porting interval for simple wireline-to-wireline and simple intermodal port requests to 48 hours.[106] The Commission sought comment on its tentative conclusions, and whether there were any technical impediments or advances that affect the overall length of the porting interval such that it should adopt different porting intervals for particular types of ports.[107] The Commission also sought comment on the benefits and burdens, including the burdens on small entities, of adopting rules regarding porting intervals for all types of simple port requests.[108]

41. We must assess the interests of small businesses in light of the overriding public interest in ensuring that all consumers benefit from local number portability. In the Order, the Commission found

---

[101] U.S. Census Bureau, "2002 NAICS Definitions: 334112 Computer Storage Device Manufacturing," *available at* http://www.census.gov/epcd/naics02/def/ND334112.HTM (visited Oct. 16, 2007).

[102] 13 C.F.R. § 121.201, NAICS code 334112.

[103] U.S. Census Bureau, 2002 Economic Census, Industry Series: Manufacturing, "Computer Storage Device Manufacturing," Table 4, NAICS code 334112 (issued Dec. 2004).

[104] *See* 5 U.S.C. § 603.

[105] *See 2007 LNP NPRM*, 22 FCC Rcd at 19561-62, paras. 59, 63.

[106] *See id.* at 19561, para. 60.

[107] *See id.* at 19562, para. 63.

[108] *See id.* at 19563, para. 64.

that it is critical that customers be able to port their telephone numbers in an efficient manner in order for LNP to fulfill its promise of giving "customers flexibility in the quality, price, and variety of telecommunications services"[109] and that the current four-business day porting interval may hinder the effectiveness of LNP.  The Commission also found that delays in porting cost consumers time and money and limit consumer choice and competition because when consumers get frustrated with slow porting, they often abandon efforts to switch carriers.  The Commission thus concluded that reducing the porting interval for simple wireline-to-wireline and simple intermodal ports to one business day was necessary to enable customers to port their numbers in a timely fashion and to enhance competition, and found that the benefits to consumers and competition outweigh the costs associated with implementing a shorter porting interval for simple wireline and simple intermodal ports.

42.  In order to reduce the burden on smaller entities, the Commission considered several alternatives, some of which were presented by commenters and some of which the Commission developed based on its own analysis.  For example, the Commission recognized that some providers who do not employ automated systems for handling port requests and have limited resources to upgrade their systems may have to make more significant changes or upgrades than other carriers that already employ automated porting interfaces.  To address this disparity, the Commission allowed small providers a longer period of time for implementing the one-business day porting interval.  Specifically, small providers are required to implement the reduced one-business day porting interval for simple wireline and simple intermodal ports no later than 15 months after the NANC submits the revised provisioning flows to the Commission.  For purposes of the longer implementation period, the Commission considers providers with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide[110] and Tier III wireless carriers, as defined in the *E911 Stay Order*,[111] to be small providers.

43.  The Commission declined to provide for special recovery of costs for implementing the reduced porting interval, noting that there are several options for carriers to recover their costs of implementing the reduced porting interval.  The Commission noted that many small carriers have not yet filed for recovery of costs for implementation of long-term number portability under its LNP cost recovery mechanism.  To the extent that such carriers incur costs to implement the one-business day porting interval that meet the standard for the LNP cost recovery mechanism, the Commission's rules give carriers five years to recover those costs through end-user charges.[112]  Once incumbent LECs have recovered their initial LNP implementation costs through the LNP cost recovery mechanism, the Commission intended carriers to recover ongoing costs incurred to provide number portability as a normal network feature through existing mechanisms available for the recovery of general costs of providing service.[113]  Under rate-of-return regulation, carriers are allowed to recover their costs plus a prescribed rate of return on investment.  Under price cap regulation, rather than earning a specific rate of return on

---

[109] *First Number Portability Order*, 11 FCC Rcd at 8368, para. 30.

[110] *See* 47 U.S.C. § 251(f)(2).

[111] In the *E911 Stay Order*, the Commission classified CMRS carriers with 500,000 subscribers or fewer as of the end of 2001 as Tier III wireless carriers.  *See Revision of the Commission's Rules to Ensure Compatibility with the Enhanced 911 Emergency Calling Systems*, CC Docket No. 94-102, Order to Stay, 17 FCC Rcd 14841 (2002) (*E911 Stay Order*).  The Small Business Administration (SBA) has approved the Tier III wireless classification as a small business size standard.  *See* Letter from Hector V. Barreto, Administrator, SBA to Blaise Scinto, Acting Chief, Policy Division, Wireless Telecommunications Bureau, FCC (dated Jan. 21, 2003).

[112] *See* 47 C.F.R. § 52.33.  We note that whether costs meet the standard for the LNP cost recovery mechanism – costs that are carrier-specific and incremental costs directly related to providing LNP – is a fact-specific inquiry.

[113] *See Telephone Number Portability*, CC Docket No. 95-116, Third Report and Order, 13 FCC Rcd 11701, 11777, para. 144 (1998) (*Cost Recovery Order*), *aff'd, Telephone Number Portability*, CC Docket No. 95-116, Memorandum Opinion and Order on Reconsideration and Order on Application for Review, 17 FCC Rcd 2578 (2002).

their costs, carriers are permitted to earn returns significantly higher if they can operate efficiently but are not guaranteed recovery of all costs.  Price cap regulation includes an exogenous cost adjustment mechanism.

44.  Further, small providers have options for seeking modification of the new LNP interval requirements.  For example, under section 251(f)(2) of the Act, a LEC "with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for suspension or modification of the application of the requirements" of section 251(b), which includes the "duty to provide, to the extent technically feasible, number portability in accordance with the requirements prescribed by the Commission."[114]  The Order also notes that providers may apply for a waiver of the one-business day porting interval under the Commission's rules.[115]  To demonstrate the good cause required by the Commission's waiver rule, a provider must show with particularity that it would be unduly economically burdensome for the provider to implement the reduced porting interval.  In making this showing, a provider should address the number of port requests it receives as well as the specific costs that complying with the reduced porting interval would impose.  The Commission found that these safeguards address commenters' concerns regarding the costs that small entities may incur to implement the one-business day wireline and intermodal porting interval.

45.  **Report to Congress:**  The Commission will send a copy of the Order, including this FRFA, in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act.[116]  A copy of the Order and FRFA (or summaries thereof) will also be published in the Federal Register.[117]

---

[114] *See* 47 U.S.C. §§ 251(f)(2), 251(b).

[115] 47 C.F.R. § 1.3.

[116] *See* 5 U.S.C. § 801(a)(1)(A).

[117] *See* 5 U.S.C. § 604(b).

**APPENDIX D**

**Initial Regulatory Flexibility Analysis**

**WC Docket No. 07-244, CC Docket No. 95-116**

1.    As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Commission has prepared the present Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on small entities that might result from this Further Notice of Proposed Rulemaking (Further Notice).  Written public comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments on the Further Notice provided above.  The Commission will send a copy of the Further Notice, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration.[2]  In addition, the Further Notice and the IRFA (or summaries thereof) will be published in the Federal Register.[3]

**A.        Need for, and Objective of, the Proposed Rules**

2.    Today, we require providers subject to our LNP rules to complete simple wireline-to-wireline and simple intermodal ports within one business day.  We believe that a one-business day porting interval is a much needed improvement over the previous four-business day interval – one that will provide considerable immediate benefits to consumers.  It is important, however, that the Commission remain vigilant in its efforts to improve the effectiveness and efficiency of the porting process as technological and market developments demand.  Therefore, and in light of the actions taken in today's Order, we ask commenters to refresh the record on what further steps the Commission should take, if any, to improve the process of changing providers and provide any new ideas that reflect and build upon the new one-business day interval.  We ask parties to address whether there are additional ways to streamline the number porting processes or improve efficiencies for simple and non-simple ports.  For example, should the Commission modify the definition of simple ports?  Are different or additional information fields are necessary for completing simple ports?[4]  Is it appropriate to standardize Local Service Request (LSR) forms and, if so, how that could should that be accomplished?  Is a single standard time interval in which providers must return Customer Service Record (CSR) requests appropriate?  Finally, what are the benefits and burdens, especially the burdens on small entities, of adopting any new rules regarding the porting process?

**B.        Legal Basis**

3.    The legal basis for any action that may be taken pursuant to this Further Notice is contained in sections 1, 4(i), 4(j), 251, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i)-(j), 251, 303(r).

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See* 5 U.S.C. § 603(a).

[3] *See id.*

[4] We note that this issue has been brought before the Commission in One Communications Corp.'s Petition for Clarification and For Limited Waiver For Extension of Time, WC Docket Nos. 07-243, 07-244, 04-36, CC Docket No. 95-116, 99-200 (filed Feb. 5, 2009) (requesting that the Commission clarify the amount of data carriers may request for both validating and accomplishing simple ports).

C.     **Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply**

4.     The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[5]   The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[6]   In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[7]   A small business concern is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[8]

5.     *Small Businesses*.  Nationwide, there are a total of approximately 22.4 million small businesses according to SBA data.[9]

6.     *Small Organizations*.  Nationwide, there are approximately 1.6 million small organizations.[10]

1.     **Wireline Carriers and Service Providers**

7.     We have included small incumbent local exchange carriers (LECs) in this present RFA analysis.  As noted above, a "small business" under the RFA is one that, *inter alia*, meets the pertinent small business size standard (*e.g.*, a telephone communications business having 1,500 or fewer employees) and "is not dominant in its field of operation."[11]   The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent LECs are not dominant in their field of operation because any such dominance is not "national" in scope.[12]   We have therefore included small incumbent LECs in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

8.     *Incumbent LECs*.  Neither the Commission nor the SBA has developed a small business size standard specifically for incumbent LECs.  The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[13]   According to Commission data,[14] 1,303 carriers have reported that they are

---

[5] 5 U.S.C. §§ 603(b)(3), 604(a)(3).

[6] 5 U.S.C. § 601(6).

[7] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such terms which are appropriate to the activities of the agency and publishes such definitions(s) in the Federal Register."

[8] 15 U.S.C. § 632.

[9] *See* SBA, Programs and Services, SBA Pamphlet No. CO-0028, at page 40 (July 2002).

[10] Independent Sector, The New Nonprofit Almanac & Desk Reference (2002).

[11] 15 U.S.C. § 632.

[12] Letter from Jere W. Glover, Chief Counsel for Advocacy, SBA, to William E. Kennard, Chairman, FCC (May 27, 1999).  The Small Business Act contains a definition of "small-business concern," which the RFA incorporates into its own definition of "small business."  *See* 15 U.S.C. § 632(a) (Small Business Act); 5 U.S.C. § 601(3) (RFA).  SBA regulations interpret "small business concern" to include the concept of dominance on a national basis.  *See* 13 C.F.R. § 121.102(b).

[13] 13 C.F.R. § 121.201, NAICS code 517110.

[14] FCC, Wireline Competition Bureau, Industry Analysis and Technology Division, *Trends in Telephone Service* at Table 5.3, page 5-5 (Feb. 2007) (*Trends in Telephone Service*).  This source uses data that are current as of October 20, 2005.

engaged in the provision of incumbent local exchange services. Of these 1,303 carriers, an estimated 1,020 have 1,500 or fewer employees and 283 have more than 1,500 employees. Consequently, the Commission estimates that most providers of incumbent local exchange service are small businesses that may be affected by our action.

9. *Competitive LECs, Competitive Access Providers (CAPs), "Shared-Tenant Service Providers," and "Other Local Service Providers."* Neither the Commission nor the SBA has developed a small business size standard specifically for these service providers. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[15] According to Commission data,[16] 859 carriers have reported that they are engaged in the provision of either competitive access provider services or competitive LEC services. Of these 859 carriers, an estimated 741 have 1,500 or fewer employees and 118 have more than 1,500 employees. In addition, 16 carriers have reported that they are "Shared-Tenant Service Providers," and all 16 are estimated to have 1,500 or fewer employees. In addition, 44 carriers have reported that they are "Other Local Service Providers." Of the 44, an estimated 43 have 1,500 or fewer employees and one has more than 1,500 employees. Consequently, the Commission estimates that most providers of competitive local exchange service, competitive access providers, "Shared-Tenant Service Providers," and "Other Local Service Providers" are small entities.

10. *Interexchange Carriers (IXCs).* Neither the Commission nor the SBA has developed a small business size standard specifically for providers of interexchange services. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[17] According to Commission data,[18] 330 carriers have reported that they are engaged in the provision of interexchange service. Of these, an estimated 309 have 1,500 or fewer employees and 21 have more than 1,500 employees. Consequently, the Commission estimates that the majority of IXCs are small entities that may be affected by our action.

11. *Local Resellers.* The SBA has developed a small business size standard for the category of Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[19] According to Commission data,[20] 184 carriers have reported that they are engaged in the provision of local resale services. Of these, an estimated 181 have 1,500 or fewer employees and three have more than 1,500 employees. Consequently, the Commission estimates that the majority of local resellers are small entities that may be affected by our action.

12. *Toll Resellers.* The SBA has developed a small business size standard for the category of Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[21] According to Commission data,[22] 881 carriers have reported that they are engaged in the provision of toll resale services. Of these, an estimated 853 have 1,500 or fewer employees and 28 have more than 1,500 employees. Consequently, the Commission estimates that the majority of toll resellers are small entities that may be affected by our action.

---

[15] 13 C.F.R. § 121.201, NAICS code 517110.

[16] *Trends in Telephone Service* at Table 5.3.

[17] 13 C.F.R. § 121.201, NAICS code 517110.

[18] *Trends in Telephone Service* at Table 5.3.

[19] 13 C.F.R. § 121.201, NAICS code 517310.

[20] *Trends in Telephone Service* at Table 5.3.

[21] 13 C.F.R. § 121.201, NAICS code 517310.

[22] *Trends in Telephone Service* at Table 5.3.

13. *Operator Service Providers (OSPs)*. Neither the Commission nor the SBA has developed a small business size standard specifically for operator service providers. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[23] According to Commission data,[24] 23 carriers have reported that they are engaged in the provision of operator services. Of these, an estimated 22 have 1,500 or fewer employees and one has more than 1,500 employees. Consequently, the Commission estimates that the majority of OSPs are small entities that may be affected by our action.

14. *Prepaid Calling Card Providers*. Neither the Commission nor the SBA has developed a small business size standard specifically for prepaid calling card providers. The appropriate size standard under SBA rules is for the category Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[25] According to Commission data,[26] 104 carriers have reported that they are engaged in the provision of prepaid calling cards. Of these, 102 are estimated to have 1,500 or fewer employees and two have more than 1,500 employees. Consequently, the Commission estimates that all or the majority of prepaid calling card providers are small entities that may be affected by our action.

15. *800 and 800-Like Service Subscribers*.[27] These toll-free services fall within the broad economic census category of Telecommunications Resellers. This category "comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure."[28] The SBA has developed a small business size standard for this category, which is: all such firms having 1,500 or fewer employees.[29] Census Bureau data for 2002 show that there were 1,646 firms in this category that operated for the entire year.[30] Of this total, 1,642 firms had employment of 999 or fewer employees, and four firms had employment of 1,000 employees or more.[31] Thus, the majority of these firms can be considered small. Additionally, it may be helpful to know the total numbers of telephone numbers assigned in these services. Commission data show that, as of June 2006, the total number of 800 numbers assigned was 7,647,941, the total number of 888 numbers assigned was 5,318,667, the total number of 877 numbers assigned was 4,431,162, and the total number of 866 numbers assigned was 6,008,976.[32]

---

[23] 13 C.F.R. § 121.201, NAICS code 517110.

[24] *Trends in Telephone Service* at Table 5.3.

[25] 13 C.F.R. § 121.201, NAICS code 517911.

[26] *Trends in Telephone Service* at Table 5.3.

[27] We include all toll-free number subscribers in this category, including those for 888 numbers.

[28] U.S. Census Bureau, 2007 NAICS Definitions, "517911 Telecommunications Resellers" (partial definition); http://www.census.gov/naics/2007/def/ND517911.HTM#N517911.

[29] 13 C.F.R. § 121.201, NAICS code 517911.

[30] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization," Table 5, NAICS code 517310 (issued Nov. 2005). Prior to 2007, the subject category was numbered 517310.

[31] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[32] *Trends in Telephone Service* at Tables 18.4-18.8.

### a.    International Service Providers

16.    The first category, Satellite Telecommunications, "comprises establishments primarily engaged in providing point-to-point telecommunications services to other establishments in the telecommunications and broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications."[33]    The size standard for this industry is $15.0 million; the NACIS code is 517410.    For this category, Census Bureau data for 2002 show that there were a total of 371 firms that operated for the entire year.[34]    Of this total, 307 firms had annual receipts of under $10 million, and 26 firms had receipts of $10 million to $24,999,999.[35]    Consequently, we estimate that the majority of Satellite Telecommunications firms are small entities that might be affected by our action.

17.    The second category of Other Telecommunications "comprises establishments primarily engaged in (1) providing specialized telecommunications applications, such as satellite tracking, communications telemetry, and radar station operations; or (2) providing satellite terminal stations and associated facilities operationally connected with one or more terrestrial communications systems and capable of transmitting telecommunications to or receiving telecommunications from satellite systems."[36]    The size standard for this category is $25.0 million and the NAICS code is 517919.    For this category, Census Bureau data for 2002 show that there were a total of 332 firms that operated for the entire year.[37]    Of this total, 274 firms had annual receipts of under $24,999,999.[38]    Consequently, we estimate that the majority of Other Telecommunications firms are small entities that might be affected by our action.

### 2.    Wireless Telecommunications Service Providers

18.    Below, for those services subject to auctions, we note that, as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service.    Also, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated.

19.    *Wireless Service Providers*.    The SBA has developed a small business size standard for wireless firms within the two broad economic census categories of "Paging"[39] and "Cellular and Other Wireless Telecommunications."[40]    Under both SBA categories, a wireless business is small if it has 1,500 or fewer employees.    For the census category of Paging, Census Bureau data for 2002 show that there were 807 firms in this category that operated for the entire year.[41]    Of this total, 804 firms had

---

[33] U.S. Census Bureau, "2002 NAICS Definitions:  517410 Satellite Telecommunications," *available at* http://www.census.gov/epcd/naics02/def/ND517410.HTM (visited Oct. 16, 2007).

[34] U.S. Census Bureau, 2002 Economic Census, Subject Series:  Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 517410 (issued Nov. 2005).

[35] *Id*.  An additional 38 firms had annual receipts of $25 million or more.

[36] U.S. Census Bureau, "2002 NAICS Definitions:  517910 Other Telecommunications," *available at* http://www.census.gov/epcd/naics02/def/ND517910.HTM (visited Oct. 16, 2007).

[37] U.S. Census Bureau, 2002 Economic Census, Subject Series:  Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 517910 (issued Nov. 2005).

[38] *Id*.  An additional 14 firms had annual receipts of $25 million or more.

[39] 13 C.F.R. § 121.201, NAICS code 517211 (changed from 513321 in Oct. 2002).

[40] 13 C.F.R. § 121.201, NAICS code 517212 (changed from 513322 in Oct. 2002).

[41] U.S. Census Bureau, 2002 Economic Census, Subject Series:  Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 5, NAICS code 517211 (issued Nov. 2005).

employment of 999 or fewer employees, and three firms had employment of 1,000 employees or more.[42] Thus, under this category and associated small business size standard, the majority of firms can be considered small.  For the census category of Cellular and Other Wireless Telecommunications, Census Bureau data for 2002 show that there were 1,397 firms in this category that operated for the entire year.[43] Of this total, 1,378 firms had employment of 999 or fewer employees, and 19 firms had employment of 1,000 employees or more.[44]  Thus, under this second category and size standard, the majority of firms can, again, be considered small.  We note that that the categories of "Paging" and "Cellular and Other Wireless Telecommunications" are now obsolete, and have been replaced with a new category, "Wireless Telecommunications Carriers (except Satellite)."[45]  Under this new category, a wireless business is small if it has 1,500 or few employees.

    20.  *Wireless Telephony*.  Wireless telephony includes cellular, personal communications services (PCS), and specialized mobile radio (SMR) telephony carriers.  As noted above, the SBA has developed a small business size standard for "Wireless Telecommunications Carriers (except Satellite)."[46]  Under that SBA small business size standard, a business is small if it has 1,500 or fewer employees.[47]  According to Commission data, 432 carriers reported that they were engaged in the provision of wireless telephony.[48] We have estimated that 221 of these are small under the SBA small business size standard.

    21.  *Broadband Personal Communications Service*.  The broadband Personal Communications Service (PCS) spectrum is divided into six frequency blocks designated A through F, and the Commission has held auctions for each block.  The Commission defined "small entity" for Blocks C and F as an entity that has average gross revenues of $40 million or less in the three previous calendar years.[49]  For Block F, an additional classification for "very small business" was added and is defined as an entity that, together with its affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years."[50]  These standards defining "small entity" in the context of broadband PCS auctions have been approved by the SBA.[51]  No small businesses, within the SBA-approved small business size standards bid successfully for licenses in Blocks A and B.  There were 90 winning bidders that qualified as small entities in the Block C auctions.  A total of 93 small and very small business bidders won approximately 40 percent of the 1,479 licenses for Blocks D, E, and F.[52]  On March 23, 1999, the

---

[42] *Id.*  The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is firms with "1000 employees or more."

[43] U.S. Census Bureau, 2002 Economic Census, Subject Series:  Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 5, NAICS code 517212 (issued Nov. 2005).

[44] *Id.*  The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is firms with "1000 employees or more."

[45] NAICS code  517210.

[46] NAICS code 517210.

[47] *Id.*

[48] *Trends in Telephone Service* at Table 5.3.

[49] *See Amendment of Parts 20 and 24 of the Commission's Rules – Broadband PCS Competitive Bidding and the Commercial Mobile Radio Service Spectrum Cap*, WT Docket No. 96-59, Report and Order, 11 FCC Rcd 7824, 61 FR 33859 (July 1, 1996) (*PCS Order*); *see also* 47 C.F.R. § 24.720(b).

[50] *See PCS Order*, 11 FCC Rcd 7824.

[51] *See, e.g., Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, PP Docket No. 93-253, Fifth Report and Order, 9 FCC Rcd 5332, 59 FR 37566 (July 22, 1994).

Commission re-auctioned 347 C, D, E, and F Block licenses. There were 48 small business winning bidders. On January 26, 2001, the Commission completed the auction of 422 C and F Broadband PCS licenses in Auction No. 35. Of the 35 winning bidders in this auction, 29 qualified as "small" or "very small" businesses. Subsequent events, concerning Auction 35, including judicial and agency determinations, resulted in a total of 163 C and F Block licenses being available for grant.

22. *Narrowband Personal Communications Services.* The Commission held an auction for Narrowband PCS licenses that commenced on July 25, 1994, and closed on July 29, 1994. A second auction commenced on October 26, 1994 and closed on November 8, 1994. For purposes of the first two Narrowband PCS auctions, "small businesses" were entities with average gross revenues for the prior three calendar years of $40 million or less.[53] Through these auctions, the Commission awarded a total of 41 licenses, 11 of which were obtained by four small businesses.[54] To ensure meaningful participation by small business entities in future auctions, the Commission adopted a two-tiered small business size standard in the Narrowband PCS Second Report and Order.[55] A "small business" is an entity that, together with affiliates and controlling interests, has average gross revenues for the three preceding years of not more than $40 million.[56] A "very small business" is an entity that, together with affiliates and controlling interests, has average gross revenues for the three preceding years of not more than $15 million.[57] The SBA has approved these small business size standards.[58] A third auction commenced on October 3, 2001 and closed on October 16, 2001. Here, five bidders won 317 (Metropolitan Trading Areas and nationwide) licenses.[59] Three of these claimed status as a small or very small entity and won 311 licenses.

23. *220 MHz Radio Service – Phase I Licensees.* The 220 MHz service has both Phase I and Phase II licenses. Phase I licensing was conducted by lotteries in 1992 and 1993. There are approximately 1,515 such non-nationwide licensees and four nationwide licensees currently authorized to operate in the 220 MHz band. The Commission has not developed a small business size standard for small entities specifically applicable to such incumbent 220 MHz Phase I licensees. To estimate the number of such licensees that are small businesses, we apply the small business size standard under the SBA rules applicable to "Cellular and Other Wireless Telecommunications" companies. This category

---

(...continued from previous page)

[52] FCC News, Broadband PCS, D, E and F Block Auction Closes, No. 71744 (rel. Jan. 14, 1997); *see also Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses*, WT Docket No. 97-82, Second Report and Order, 12 FCC Rcd 16436, 62 FR 55348 (Oct. 24, 1997).

[53] *Implementation of Section 309(j) of the Communications Act – Competitive Bidding Narrowband PCS*, Third Memorandum Opinion and Order and Further Notice of Proposed Rulemaking, 10 FCC Rcd 175, 196, para. 46 (1994).

[54] *See Announcing the High Bidders in the Auction of ten Nationwide Narrowband PCS Licenses, Winning Bids Total $617,006,674*, Public Notice, PNWL 94-004 (Aug. 2, 1994); *Announcing the High Bidders in the Auction of 30 Regional Narrowband PCS Licenses; Winning Bids Total $490,901,787*, Public Notice, PNWL 94-27 (rel. Nov. 9, 1994).

[55] *Amendment of the Commission's Rules to Establish New Personal Communications Services, Narrowband PCS*, ET Docket No. 92-100, PP Docket No. 93-253, Second Report and Order and Second Further Notice of Proposed Rule Making, 15 FCC Rcd 10456, 10476, para. 40 (2000).

[56] *Id*.

[57] *Id*.

[58] *See* Letter from Aida Alvarez, Administrator, Small Business Administration, to Amy Zoslov, Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, Federal Communications Commission (dated Dec. 2, 1998).

[59] *See Narrowband PCS Auction Closes*, Public Notice, 16 FCC Rcd 18663 (WTB 2001).

provides that a small business is a wireless company employing no more than 1,500 persons.[60] Census Bureau data for 2002 show that there were 1,397 firms in this category that operated for the entire year.[61] Of this total, 1,378 firms had employment of 999 or fewer employees, and 19 firms had employment of 1,000 employees or more.[62] Thus, under this category and size standard, the majority of firms can be considered small.

24. *220 MHz Radio Service – Phase II Licensees.* The 220 MHz service has both Phase I and Phase II licenses. The Phase II 220 MHz service is a new service and is subject to spectrum auctions. In the *220 MHz Third Report and Order*, we adopted a small business size standard for "small" and "very small" businesses for purposes of determining their eligibility for special provisions such as bidding credits and installment payments.[63] This small business size standard indicates that a "small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $15 million for the preceding three years.[64] A "very small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues that do not exceed $3 million for the preceding three years. The SBA has approved these small business size standards.[65] Auctions of Phase II licenses commenced on September 15, 1998, and closed on October 22, 1998.[66] In the first auction, 908 licenses were auctioned in three different-sized geographic areas: three nationwide licenses, 30 Regional Economic Area Group (EAG) Licenses, and 875 Economic Area (EA) Licenses. Of the 908 licenses auctioned, 693 were sold.[67] Thirty-nine small businesses won licenses in the first 220 MHz auction. The second auction included 225 licenses: 216 EA licenses and 9 EAG licenses. Fourteen companies claiming small business status won 158 licenses.[68] A third auction included four licenses: 2 BEA licenses and 2 EAG licenses in the 220 MHz Service. No small or very small business won any of these licenses.[69]

25. *800 MHz and 900 MHz Specialized Mobile Radio Licenses.* The Commission awards "small entity" and "very small entity" bidding credits in auctions for Specialized Mobile Radio (SMR) geographic area licenses in the 800 MHz and 900 MHz bands to firms that had revenues of no more than $15 million in each of the three previous calendar years, or that had revenues of no more than $3 million in each of the previous calendar years, respectively.[70] These bidding credits apply to SMR providers in the 800 MHz and 900 MHz bands that either hold geographic area licenses or have obtained extended implementation authorizations. The Commission does not know how many firms provide 800 MHz or 900 MHz geographic area SMR service pursuant to extended implementation authorizations, nor how many of these providers have annual revenues of no more than $15 million. One firm has over $15

---

[60] 13 C.F.R. § 121.201, NAICS code 517212.

[61] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization," Table 5, NAICS code 517212 (issued Nov. 2005).

[62] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[63] *220 MHz Third Report and Order*, 12 FCC Rcd at 11068-70, paras. 291-95.

[64] *Id.* at 11068, para. 291.

[65] *See* Letter from A. Alvarez, Administrator, SBA, to D. Phythyon, Chief, Wireless Telecommunications Bureau, FCC (Jan. 6, 1998).

[66] *See generally 220 MHz Service Auction Closes*, Public Notice, 14 FCC Rcd 605 (1998).

[67] *See, e.g.*, *FCC Announces It is Prepared to Grant 654 Phase II 220 MHz Licenses After Final Payment is Made*, Public Notice, 14 FCC Rcd 1085 (1999).

[68] *Phase II 220 MHz Service Spectrum Auction Closes*, Public Notice, 14 FCC Rcd 11218 (1999).

[69] *See Multi-Radio Service Auction Closes*, Public Notice, 17 FCC Rcd 1446 (WTB 2002).

[70] 47 C.F.R. § 90.814(b)(1).

million in revenues. The Commission assumes, for purposes here, that all of the remaining existing extended implementation authorizations are held by small entities, as that term is defined by the SBA. The Commission has held auctions for geographic area licenses in the 800 MHz and 900 MHz SMR bands. There were 60 winning bidders that qualified as small or very small entities in the 900 MHz SMR auctions. Of the 1,020 licenses won in the 900 MHz auction, bidders qualifying as small or very small entities won 263 licenses. In the 800 MHz auction, 38 of the 524 licenses won were won by small and very small entities.

26. *700 MHz Guard Band Licensees.* In the *700 MHz Guard Band Order*, we adopted a small business size standard for "small businesses" and "very small businesses" for purposes of determining their eligibility for special provisions such as bidding credits and installment payments.[71] A "small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $15 million for the preceding three years. Additionally, a "very small business" is an entity that, together with its affiliates and controlling principals, has average gross revenues that are not more than $3 million for the preceding three years. An auction of 52 Major Economic Area (MEA) licenses commenced on September 6, 2000, and closed on September 21, 2000.[72] Of the 104 licenses auctioned, 96 licenses were sold to nine bidders. Five of these bidders were small businesses that won a total of 26 licenses. A second auction of 700 MHz Guard Band licenses commenced on February 13, 2001 and closed on February 21, 2001. All eight of the licenses auctioned were sold to three bidders. One of these bidders was a small business that won a total of two licenses.[73] Subsequently, in the *700 MHz Second Report and Order*, the Commission reorganized the licenses pursuant to an agreement among most of the licensees, resulting in a spectral relocation of the first set of paired spectrum block licenses, and an elimination of the second set of paired spectrum block licenses (many of which were already vacant, reclaimed by the Commission from Nextel).[74] A single licensee that did not participate in the agreement was grandfathered in the initial spectral location for its two licenses in the second set of paired spectrum blocks.[75] Accordingly, at this time there are 54 licenses in the 700 MHz Guard Bands and there is no auction data applicable to determine which are held by small businesses.

27. *39 GHz Service.* The Commission created a special small business size standard for 39 GHz licenses – an entity that has average gross revenues of $40 million or less in the three previous calendar years.[76] An additional size standard for "very small business" is: an entity that, together with affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years.[77] The SBA has approved these small business size standards.[78] The auction of the 2,173 39 GHz licenses began on April 12, 2000 and closed on May 8, 2000. The 18 bidders who claimed small business status won 849 licenses. Consequently, the Commission estimates that 18 or fewer 39 GHz licensees are small entities that may be affected by the rules and polices adopted herein.

---

[71] *See Service Rules for the 746-764 MHz Bands, and Revisions to part 27 of the Commission's Rules*, WT Docket No. 99-168, Second Report and Order, 15 FCC Rcd 5299, 65 FR 17594 (2000).

[72] *See generally 220 MHz Service Auction Closes*, Public Notice, Report No. WT 98-36 (rel. Oct. 23, 1998).

[73] *700 MHz Guard Band Auction Closes*, Public Notice, 16 FCC Rcd 4590 (rel. Feb. 22, 2001).

[74] *See Service Rules for the 698-746, 747-762 and 777-792 MHz Bands*, WT Docket 06-150, Second Report and Order*, 22 FCC Rcd 15289, 15339-15344, paras. 118-134 (2007) (*700 MHz Second Report and Order).*

[75] *Id.*

[76] *See Amendment of the Commission's Rules Regarding the 37.0-38.6 GHz and 38.6-40.0 GHz Bands*, ET Docket No. 95-183, Report and Order and Notice of Proposed Rulemaking, 12 FCC Rcd 18600, 63 FR 6079 (Feb. 6, 1998).

[77] *Id.*

[78] *See* Letter from Aida Alvarez, Administrator, SBA, to Kathleen O'Brien Ham, Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, FCC (Feb. 4, 1998).

28. *Wireless Cable Systems.* Wireless cable systems use 2 GHz band frequencies of the Broadband Radio Service ("BRS"), formerly Multipoint Distribution Service ("MDS"),[79] and the Educational Broadband Service ("EBS"), formerly Instructional Television Fixed Service ("ITFS"),[80] to transmit video programming and provide broadband services to residential subscribers.[81] These services were originally designed for the delivery of multichannel video programming, similar to that of traditional cable systems, but over the past several years licensees have focused their operations instead on providing two-way high-speed Internet access services.[82] We estimate that the number of wireless cable subscribers is approximately 100,000, as of March 2005. Local Multipoint Distribution Service ("LMDS") is a fixed broadband point-to-multipoint microwave service that provides for two-way video telecommunications.[83] As described below, the SBA small business size standard for the broad census category of Cable and Other Program Distribution, which consists of such entities generating $13.5 million or less in annual receipts, appears applicable to MDS, ITFS and LMDS.[84] Other standards also apply, as described.

29. The Commission has defined small MDS (now BRS) and LMDS entities in the context of Commission license auctions. In the 1996 MDS auction,[85] the Commission defined a small business as an entity that had annual average gross revenues of less than $40 million in the previous three calendar years.[86] This definition of a small entity in the context of MDS auctions has been approved by the SBA.[87] In the MDS auction, 67 bidders won 493 licenses. Of the 67 auction winners, 61 claimed status as a small business. At this time, the Commission estimates that of the 61 small business MDS auction winners, 48 remain small business licensees. In addition to the 48 small businesses that hold BTA authorizations,

---

[79] MDS, also known as Multichannel Multipoint Distribution Service ("MMDS"), is regulated by Part 21 of the Commission's rules, *see* 47 C.F.R. Part 21, subpart K, and has been renamed the Broadband Radio Service (BRS). Se*e Amendment of Parts 1, 21, 73, 74 and 101 of the Commission's Rules to Facilitate the Provision of Fixed and Mobile Broadband Access, Educational and Other Advanced Services in the 2150-2162 and 2500-2690 MHz Bands; Part 1 of the Commission's Rules - Further Competitive Bidding Procedures; Amendment of Parts 21 and 74 to Enable Multipoint Distribution Service and the Instructional Television Fixed Service Amendment of Parts 21 and 74 to Engage in Fixed Two-Way Transmissions; Amendment of Parts 21 and 74 of the Commission's Rules With Regard to Licensing in the Multipoint Distribution Service and in the Instructional Television Fixed Service for the Gulf of Mexico; Promoting Efficient Use of Spectrum Through Elimination of Barriers to the Development of Secondary Markets*, WT Docket Nos. 03-66, 03-67, 02-68, and 00-230, MM Docket No. 97-217, RM-10586, RM-9718, Report and Order and Further Notice of Proposed Rulemaking, 19 FCC Rcd 14165 (2004) (*MDS/ITFS Order*).

[80] ITFS systems are regulated by Part 74 of the Commission's rules; *see* 47 C.F.R. Part 74, subpart I. ITFS, an educational service, has been renamed the Educational Broadband Service (EBS). *See MDS/ITFS Order*, 19 FCC Rcd 14165. ITFS licensees, however, are permitted to lease spectrum for MDS operation.

[81] *See Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming,* Eleventh Annual Report, 20 FCC Rcd 2507, 2565, para. 131 (2006) (*2006 Cable Competition Report*).

[82] *Id.*

[83] *See Rulemaking to Amend Parts 1, 2, 21, and 25 of the Commission's Rules to Redesignate the 27.5-29.5 GHz Frequency Band, to Reallocate the 29.5-30.0 GHz Frequency Band, to Establish Rules and Policies for Local Multipoint Distribution Service and for Fix Satellite Services*, CC Docket No. 92-297, Second Report and Order, Order on Reconsideration, and Fifth Notice of Proposed Rulemaking, 12 FCC Rcd 12545 (1997) (*Local Multipoint Distribution Service Order*).

[84] 13 C.F.R. § 121.201, NAICS code 517510.

[85] MDS Auction No. 6 began on November 13, 1995, and closed on March 28, 1996. 67 bidders won 493 licenses.

[86] 47 C.F.R. § 21.961(b)(1).

[87] *See Amendment of Parts 21 and 74 of the Commission's Rules With Regard to Filing Procedures in the Multipoint Distribution Service & in the Instructional Television Fixed Service*, MM Docket No. 94-131, PP Docket No. 93-253, Report and Order, 10 FCC Rcd 9589 (1995).

there are approximately 392 incumbent MDS licensees that have gross revenues that are not more than $40 million and are thus considered small entities.[88] MDS licensees and wireless cable operators that did not receive their licenses as a result of the MDS auction fall under the SBA small business size standard for Cable and Other Program Distribution. Information available to us indicates that there are approximately 850 of these licensees and operators that do not generate revenue in excess of $13.5 million annually. Therefore, we estimate that there are approximately 850 small entity MDS (or BRS) providers, as defined by the SBA and the Commission's auction rules.

30. Educational institutions are included in this analysis as small entities; however, the Commission has not created a specific small business size standard for ITFS (now EBS).[89] We estimate that there are currently 2,032 ITFS (or EBS) licensees, and all but 100 of the licenses are held by educational institutions. Thus, we estimate that at least 1,932 ITFS licensees are small entities.

31. In the 1998 and 1999 LMDS auctions,[90] the Commission defined a small business as an entity that has annual average gross revenues of less than $40 million in the previous three calendar years.[91] Moreover, the Commission added an additional classification for a "very small business," which was defined as an entity that had annual average gross revenues of less than $15 million in the previous three calendar years.[92] These definitions of "small business" and "very small business" in the context of the LMDS auctions have been approved by the SBA.[93] In the first LMDS auction, 104 bidders won 864 licenses. Of the 104 auction winners, 93 claimed status as small or very small businesses. In the LMDS re-auction, 40 bidders won 161 licenses. Based on this information, we believe that the number of small LMDS licenses will include the 93 winning bidders in the first auction and the 40 winning bidders in the re-auction, for a total of 133 small entity LMDS providers as defined by the SBA and the Commission's auction rules.

32. *Local Multipoint Distribution Service.* Local Multipoint Distribution Service (LMDS) is a fixed broadband point-to-multipoint microwave service that provides for two-way video telecommunications.[94] The auction of the 1,030 LMDS licenses began on February 18, 1998 and closed on March 25, 1998. The Commission established a small business size standard for LMDS licensees as an entity that has average gross revenues of less than $40 million in the three previous calendar years.[95] An additional small business size standard for "very small business" was added as an entity that, together with its affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years.[96] The SBA has approved these small business size standards in the context of LMDS

---

[88]  47 U.S.C. § 309(j). Hundreds of stations were licensed to incumbent MDS licensees prior to implementation of Section 309(j) of the Communications Act of 1934, 47 U.S.C. § 309(j). For these pre-auction licenses, the applicable standard is SBA's small business size standards for "other telecommunications" (annual receipts of $13.5 million or less). *See* 13 C.F.R. § 121.201, NAICS code 517910.

[89]  In addition, the term "small entity" under SBREFA applies to small organizations (nonprofits) and to small governmental jurisdictions (cities, counties, towns, townships, villages, school districts, and special districts with populations of less than 50,000). 5 U.S.C. §§ 601(4)-(6). We do not collect annual revenue data on ITFS licensees.

[90]  The Commission has held two LMDS auctions: Auction 17 and Auction 23. Auction No. 17, the first LMDS auction, began on February 18, 1998, and closed on March 25, 1998. (104 bidders won 864 licenses.) Auction No. 23, the LMDS re-auction, began on April 27, 1999, and closed on May 12, 1999. (40 bidders won 161 licenses.)

[91]  *See Local Multipoint Distribution Service Order*, 12 FCC Rcd at 12545.

[92]  *Id.*

[93]  *See* Letter from A. Alvarez, Administrator, SBA, to Daniel Phythyon, Chief, Wireless Telecommunications Bureau, FCC (January 6, 1998).

[94]  *See Local Multipoint Distribution Service Order*, 12 FCC Rcd 12545.

[95]  *Id.*

[96]  *See id.*

auctions.[97]  There were 93 winning bidders that qualified as small entities in the LMDS auctions.  A total of 93 small and very small business bidders won approximately 277 A Block licenses and 387 B Block licenses.  On March 27, 1999, the Commission re-auctioned 161 licenses; there were 40 winning bidders.  Based on this information, we conclude that the number of small LMDS licenses consists of the 93 winning bidders in the first auction and the 40 winning bidders in the re-auction, for a total of 133 small entity LMDS providers.

33.  *218-219 MHz Service.*  The first auction of 218-219 MHz spectrum resulted in 170 entities winning licenses for 594 Metropolitan Statistical Area (MSA) licenses.  Of the 594 licenses, 557 were won by entities qualifying as a small business.  For that auction, the small business size standard was an entity that, together with its affiliates, has no more than a $6 million net worth and, after federal income taxes (excluding any carry over losses), has no more than $2 million in annual profits each year for the previous two years.[98]  In the *218-219 MHz Report and Order and Memorandum Opinion and Order*, we established a small business size standard for a "small business" as an entity that, together with its affiliates and persons or entities that hold interests in such an entity and their affiliates, has average annual gross revenues not to exceed $15 million for the preceding three years.[99]  A "very small business" is defined as an entity that, together with its affiliates and persons or entities that hold interests in such an entity and its affiliates, has average annual gross revenues not to exceed $3 million for the preceding three years.[100]  We cannot estimate, however, the number of licenses that will be won by entities qualifying as small or very small businesses under our rules in future auctions of 218-219 MHz spectrum.

34.  *24 GHz – Incumbent Licensees.*  This analysis may affect incumbent licensees who were relocated to the 24 GHz band from the 18 GHz band and applicants who wish to provide services in the 24 GHz band.  The applicable SBA small business size standard is that of "Cellular and Other Wireless Telecommunications" companies.  This category provides that such a company is small if it employs no more than 1,500 persons.[101]  According to Census Bureau data for 1997, there were 977 firms in this category, total, that operated for the entire year.[102]  Of this total, 965 firms had employment of 999 or fewer employees, and an additional 12 firms had employment of 1,000 employees or more.[103]  Thus, under this size standard, the great majority of firms can be considered small.  These broader census data notwithstanding, we believe that there are only two licensees in the 24 GHz band that were relocated from the 18 GHz band, Teligent[104] and TRW, Inc.  It is our understanding that Teligent and its related companies have less than 1,500 employees, though this may change in the future.  TRW is not a small entity.  Thus, only one incumbent licensee in the 24 GHz band is a small business entity.

---

[97] *See* Letter from Aida Alvarez, Administrator, SBA, from Dan Phythyon, Chief, Wireless Telecommunications Bureau, FCC (Jan. 6, 1998).

[98] *Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, PP Docket No. 93-253, Fourth Report and Order, 9 FCC Rcd 2330, 59 FR 24947 (May 13, 1994).

[99] *Amendment of Part 95 of the Commission's Rules to Provide Regulatory Flexibility in the 218-219 MHz Service*, WT Docket No. 98-169, Report and Order and Memorandum Opinion and Order, 15 FCC Rcd 1497, 64 FR 59656 (Nov. 3, 1999).

[100] *Id.*

[101] 13 C.F.R. § 121.201, NAICS code 517212.

[102] U.S. Census Bureau, 1997 Economic Census, Subject Series:  Information, "Employment Size of Firms Subject to Federal Income Tax:  1997," Table 5, NAICS code 513322 (issued Oct. 2000).

[103] *Id.*  The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is "Firms with 1,000 employees or more."

[104] Teligent acquired the DEMS licenses of FirstMark, the only licensee other than TRW in the 24 GHz band whose license has been modified to require relocation to the 24 GHz band.

35. *24 GHz – Future Licensees.*  With respect to new applicants in the 24 GHz band, the small business size standard for "small business" is an entity that, together with controlling interests and affiliates, has average annual gross revenues for the three preceding years not in excess of $15 million.[105] "Very small business" in the 24 GHz band is an entity that, together with controlling interests and affiliates, has average gross revenues not exceeding $3 million for the preceding three years.[106]  The SBA has approved these small business size standards.[107]  These size standards will apply to the future auction, if held.

### 3.    Cable and OVS Operators

36. *Cable Television Distribution Services.*  Since 2007, these services have been defined within the broad economic census category of Wired Telecommunications Carriers; that category is defined as follows:  "This industry comprises establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks. Transmission facilities may be based on a single technology or a combination of technologies."[108]  The SBA has developed a small business size standard for this category, which is: all such firms having 1,500 or fewer employees.  To gauge small business prevalence for these cable services we must, however, use current census data that are based on the previous category of Cable and Other Program Distribution and its associated size standard; that size standard was:  all such firms having $13.5 million or less in annual receipts.[109]  According to Census Bureau data for 2002, there were a total of 1,191 firms in this previous category that operated for the entire year.[110]  Of this total, 1,087 firms had annual receipts of under $10 million, and 43 firms had receipts of $10 million or more but less than $25 million.[111]  Thus, the majority of these firms can be considered small.

37. *Cable Companies and Systems.*  The Commission has also developed its own small business size standards, for the purpose of cable rate regulation.  Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers, nationwide.[112]  Industry data indicate that, of 1,076 cable operators nationwide, all but eleven are small under this size standard.[113]  In addition, under

---

[105] *Amendments to Parts 1,2, 87 and 101 of the Commission's Rules to License Fixed Services at 24 GHz*, WT Docket No. 99-327, Report and Order, 15 FCC Rcd 16934, 16967, para. 77 (2000); *see also* 47 C.F.R. § 101.538(a)(2).

[106] *Amendments to Parts 1,2, 87 and 101 of the Commission's Rules to License Fixed Services at 24 GHz*, WT Docket No. 99-327, Report and Order, 15 FCC Rcd 16934, 16967, para. 77 (2000); *see also* 47 C.F.R. § 101.538(a)(1).

[107] *See* Letter from Gary M. Jackson, Assistant Administrator, SBA, to Margaret W. Wiener, Deputy Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, FCC (July 28, 2000).

[108]  U.S. Census Bureau, 2007 NAICS Definitions, "517110 Wired Telecommunications Carriers" (partial definition); http://www.census.gov/naics/2007/def/ND517110.HTM#N517110.

[109]  13 C.F.R. § 121.201, NAICS code 517110.

[110]  U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, Table 4, Receipts Size of Firms for the United States:  2002, NAICS code 517510 (issued November 2005).

[111]  *Id.*  An additional 61 firms had annual receipts of $25 million or more.

[112]  47 C.F.R. § 76.901(e).  The Commission determined that this size standard equates approximately to a size standard of $100 million or less in annual revenues.  *Implementation of Sections of the 1992 Cable Act: Rate Regulation,* Sixth Report and Order and Eleventh Order on Reconsideration, MM Docket Nos. 92-266, 93-215, 10 FCC Rcd 7393, 7408 (1995).

[113]  These data are derived from:  R.R. Bowker, *Broadcasting & Cable Yearbook 2006*, "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); Warren Communications News, *Television & Cable Factbook 2006*, "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

the Commission's rules, a "small system" is a cable system serving 15,000 or fewer subscribers.[114] Industry data indicate that, of 7,208 systems nationwide, 6,139 systems have under 10,000 subscribers, and an additional 379 systems have 10,000-19,999 subscribers.[115] Thus, under this second size standard, most cable systems are small

38. *Cable System Operators*. The Communications Act of 1934, as amended, also contains a size standard for small cable system operators, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than 1 percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[116] The Commission has determined that an operator serving fewer than 677,000 subscribers shall be deemed a small operator, if its annual revenues, when combined with the total annual revenues of all its affiliates, do not exceed $250 million in the aggregate.[117] Industry data indicate that, of 1,076 cable operators nationwide, all but ten are small under this size standard.[118] We note that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million,[119] and therefore we are unable to estimate more accurately the number of cable system operators that would qualify as small under this size standard.

39. *Open Video Systems (OVS)*. In 1996, Congress established the open video system (OVS) framework, one of four statutorily recognized options for the provision of video programming services by local exchange carriers (LECs).[120] The OVS framework provides opportunities for the distribution of video programming other than through cable systems. Because OVS operators provide subscription services,[121] OVS previously fell within the now obsolete SBA small business size standard of Cable and Other Program Distribution Services, which consists of such entities having $13.5 million or less in annual receipts.[122] The Commission has certified 25 OVS operators, with some now providing service. Broadband service providers (BSPs) are currently the only significant holders of OVS certifications or local OVS franchises.[123] As of June, 2005, BSPs served approximately 1.4 million subscribers, representing 1.5 percent of all MVPD households.[124] Affiliates of Residential Communications Network,

---

[114] 47 C.F.R. § 76.901(c).

[115] Warren Communications News, *Television & Cable Factbook 2006*, "U.S. Cable Systems by Subscriber Size," page F-2 (data current as of Oct. 2005). The data do not include 718 systems for which classifying data were not available.

[116] 47 U.S.C. § 543(m)(2); *see* 47 C.F.R. § 76.901(f) & nn. 1-3.

[117] 47 C.F.R. § 76.901(f); *see FCC Announces New Subscriber Count for the Definition of Small Cable Operator*, Public Notice, DA 01-158, 16 FCC Rcd 2225 (Cable Services Bureau, Jan. 24, 2001).

[118] These data are derived from: R.R. Bowker, *Broadcasting & Cable Yearbook 2006*, "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); Warren Communications News, *Television & Cable Factbook 2006*, "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

[119] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(f) of the Commission's rules. *See* 47 C.F.R. § 76.909(b).

[120] 47 U.S.C. § 571(a)(3)-(4). *See Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, Eleventh Annual Report,* 20 FCC Rcd 2507, 2549, para. 88 (2006) (*2006 Cable Competition Report*).

[121] *See* 47 U.S.C. § 573.

[122] 13 C.F.R. § 121.201, NAICS code 517510.

[123] *See 2006 Cable Competition Report*, 20 FCC Rcd at 2549, para. 88. BSPs are newer firms that are building state-of-the-art, facilities-based networks to provide video, voice, and data services over a single network.

[124] *See id*. at 2507, para. 14.

Inc. (RCN), which serves about 371,000 subscribers as of June, 2005, is currently the largest BSP and 14th largest MVPD.[125] RCN received approval to operate OVS systems in New York City, Boston, Washington, D.C. and other areas. The Commission does not have financial information regarding the entities authorized to provide OVS, some of which may not yet be operational. We thus believe that at least some of the OVS operators may qualify as small entities.

### 4.        Internet Service Providers

40. *Internet Service Providers.* The SBA has developed a small business size standard for Internet Service Providers (ISPs). ISPs "provide clients access to the Internet and generally provide related services such as web hosting, web page designing, and hardware or software consulting related to Internet connectivity."[126] The new size standard is 500 employees.[127] However, data is not yet available under this new standard. Under the previous SBA size standard, such a business is small if it has average annual receipts of $23 million or less.[128] According to Census Bureau data for 2002, there were 2,529 firms in this category that operated for the entire year.[129] Of these, 2,437 firms had annual receipts of under $10 million, and an additional 47 firms had receipts of between $10 million and $24,999,999. Consequently, we estimate that the majority of these firms are small entities that may be affected by our action.

41. *All Other Information Services.* "This industry comprises establishments primarily engaged in providing other information services (except new syndicates and libraries and archives)."[130] The SBA has developed a small business size standard for this category; that size standard is $7.0 million or less in average annual receipts.[131] However, data has not yet been collected under the new size standard, and so we refer to data collected under the previous size standard, $6.5 million or less in average annual receipts. According to Census Bureau data for 2002, there were 155 firms in this category that operated for the entire year.[132] Of these, 138 had annual receipts of under $5 million, and an additional four firms had receipts of between $5 million and $9,999,999. Consequently, we estimate that the majority of these firms are small entities that may be affected by our action.

---

[125] *See 2006 Cable Competition Report*, 20 FCC Rcd at 2549, para. 89. WideOpenWest is the second largest BSP and 16th largest MVPD, with cable systems serving about 292,000 subscribers as of June, 2005. The third largest BSP is Knology, serving approximately 170,800 subscribers as of June 2005. *Id.*

[126] U.S. Census Bureau, "2002 NAICS Definitions: 518111 Internet Service Providers," *available at* http://www.census.gov/epcd/naics02/def/ND518111.HTM (visited Oct. 16, 2007).

[127] *See* NAICS code 519130.

[128] 13 C.F.R. § 121.201, NAICS code 518111 (changed from 514191, "On-Line Information Services," in Oct. 2002).

[129] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization," Table 4, NAICS code 518111 (issued Nov. 2005).

[130] U.S. Census Bureau, "2002 NAICS Definitions: 519190 All Other Information Services," *available at* http://www.census.gov/epcd/naics02/def/ND519190.HTM (visited Oct. 16, 2007).

[131] 13 C.F.R. § 121.201, NAICS code 519190.

[132] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 514199 (issued Oct. 2000). This category was created for the 2002 Economic Census by taking a portion of the superseded 1997 category, "All Other Information Services," NAICS code 514199. The data cited in the text above are derived from the superseded category.

## 5.    Equipment Manufacturers

42.  SBA small business size standards are given in terms of "firms."  Census Bureau data concerning computer manufacturers, on the other hand, are given in terms of "establishments."  We note that the number of "establishments" is a less helpful indicator of small business prevalence in this context than would be the number of "firms" or "companies," because the latter take into account the concept of common ownership or control.  Any single physical location for an entity is an establishment, even though that location may be owned by a different establishment.  Thus, the census numbers provided below may reflect inflated numbers of businesses in the given category, including the numbers of small businesses.

43.  *Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing.*  The Census Bureau defines this category as follows:  "This industry comprises establishments primarily engaged in manufacturing radio and television broadcast and wireless communications equipment.  Examples of products made by these establishments are: transmitting and receiving antennas, cable television equipment, GPS equipment, pagers, cellular phones, mobile communications equipment, and radio and television studio and broadcasting equipment."[133]  The SBA has developed a small business size standard for Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing, which is:  all such firms having 750 or fewer employees.[134] According to Census Bureau data for 2002, there were a total of 1,041 establishments in this category that operated for the entire year.[135]  Of this total, 1,010 had employment of under 500, and an additional 13 had employment of 500 to 999.[136]  Thus, under this size standard, the majority of firms can be considered small.

44.  *Telephone Apparatus Manufacturing.*  The Census Bureau defines this category as follows: "This industry comprises establishments primarily engaged in manufacturing wire telephone and data communications equipment. These products may be standalone or board-level components of a larger system. Examples of products made by these establishments are central office switching equipment, cordless telephones (except cellular), PBX equipment, telephones, telephone answering machines, LAN modems, multi-user modems, and other data communications equipment, such as bridges, routers, and gateways."[137]  The SBA has developed a small business size standard for Telephone Apparatus Manufacturing, which is:  all such firms having 1,000 or fewer employees.[138]  According to Census Bureau data for 2002, there were a total of 518 establishments in this category that operated for the entire

---

[133]  U.S. Census Bureau, 2002 NAICS Definitions, "334220 Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing," *available at* http://www.census.gov/epcd/naics02/def/NDEF334.HTM#N3342.

[134]  13 C.F.R. § 121.201, NAICS code 334220.

[135]  U.S. Census Bureau, American FactFinder, 2002 Economic Census, Industry Series, Industry Statistics by Employment Size, NAICS code 334220 (released May 26, 2005); http://factfinder.census.gov.  The number of "establishments" is a less helpful indicator of small business prevalence in this context than would be the number of "firms" or "companies," because the latter take into account the concept of common ownership or control.  Any single physical location for an entity is an establishment, even though that location may be owned by a different establishment.  Thus, the numbers given may reflect inflated numbers of businesses in this category, including the numbers of small businesses.  In this category, the Census breaks-out data for firms or companies only to give the total number of such entities for 2002, which was 929.

[136]  *Id.*  An additional 18 establishments had employment of 1,000 or more.

[137]  U.S. Census Bureau, 2002 NAICS Definitions, "334210 Telephone Apparatus Manufacturing," *available at* http://www.census.gov/epcd/naics02/def/NDEF334.HTM#N3342.

[138]  13 C.F.R. § 121.201, NAICS code 334210.

year.[139]  Of this total, 511 had employment of under 1,000, and an additional 7 had employment of 1,000 to 2,499.[140]  Thus, under this size standard, the majority of firms can be considered small.

45. *Semiconductor and Related Device Manufacturing.*  Examples of manufactured devices in this category include "integrated circuits, memory chips, microprocessors, diodes, transistors, solar cells and other optoelectronic devices."[141]  The SBA has developed a small business size standard for this category of manufacturing; that size standard is 500 or fewer employees.[142]  According to Census Bureau data, there were 1,032 establishments in this category that operated with payroll during 2002.[143]  Of these, 950 had employment of under 500, and 42 establishments had employment of 500 to 999.  Consequently, we estimate that the majority of these establishments are small entities.

46. *Computer Storage Device Manufacturing.*  These establishments manufacture "computer storage devices that allow the storage and retrieval of data from a phase change, magnetic, optical, or magnetic/optical media."[144]  The SBA has developed a small business size standard for this category of manufacturing; that size standard is 1,000 or fewer employees.[145]  According to Census Bureau data, there were 170 establishments in this category that operated with payroll during 2002.[146]  Of these, 164 had employment of under 500, and five establishments had employment of 500 to 999.  Consequently, we estimate that the majority of these establishments are small entities.

### D.  Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements

47. Should the Commission decide to adopt any rules to further improve the process of changing providers, such action could potentially result in increased, reduced, or otherwise modified recordkeeping, reporting, or other compliance requirements for affected providers of service.  We seek comment on the effect of any proposals on small entities.  Entities, especially small businesses, are encouraged to quantify the costs and benefits of any reporting, recordkeeping, or compliance requirement that may be established in this proceeding.

---

[139]  U.S. Census Bureau, American FactFinder, 2002 Economic Census, Industry Series, Industry Statistics by Employment Size, NAICS code 334210 (released May 26, 2005); http://factfinder.census.gov.  The number of "establishments" is a less helpful indicator of small business prevalence in this context than would be the number of "firms" or "companies," because the latter take into account the concept of common ownership or control.  Any single physical location for an entity is an establishment, even though that location may be owned by a different establishment.  Thus, the numbers given may reflect inflated numbers of businesses in this category, including the numbers of small businesses.  In this category, the Census breaks-out data for firms or companies only to give the total number of such entities for 2002, which was 450.

[140]  *Id*.  An additional 4 establishments had employment of 2,500 or more.

[141]  U.S. Census Bureau, 2002 NAICS Definitions, "334413 Semiconductor and Related Device Manufacturing," *available at* http://www.census.gov/epcd/nacis02/def/ND334413.HTM#N334413.

[142]  13 C.F.R. § 121.201, NAICS code 334413.

[143]  U.S. Census Bureau, 2002 Economic Census, Industry Series:  Manufacturing, "Semiconductor and Related Device Manufacturing ," Table 4, NAICS code 334413 (issued Jan. 2005).

[144]  U.S. Census Bureau, "2002 NAICS Definitions:  334112 Computer Storage Device Manufacturing," *available at* http://www.census.gov/epcd/naics02/def/ND334112.HTM (visited Oct. 16, 2007).

[145]  13 C.F.R. § 121.201, NAICS code 334112.

[146]  U.S. Census Bureau, 2002 Economic Census, Industry Series:  Manufacturing, "Computer Storage Device Manufacturing," Table 4, NAICS code 334112 (issued Dec. 2004).

E.      **Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

48.  The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others):  (1) the establishment of differing compliance and reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or part thereof, for small entities.[147]

49.  We ask commenters to refresh the record on what further steps the Commission should take to improve the process of changing providers and provide any new ideas that reflect and build upon the new one-business day interval.  We also seek comment on the benefits and burdens, especially the burdens on small entities, of adopting any new rules regarding the porting process.  The Commission expects to consider the economic impact on small entities, as identified in comments filed in response to the Further Notice, in reaching its final conclusions and taking action in this proceeding.

F.      **Federal Rules that may Duplicate, Overlap, or Conflict with the Proposed Rules**

50.  None.

---

[147] *See* 5 U.S.C. § 603(c).

# STATEMENT OF
# ACTING CHAIRMAN MICHAEL J. COPPS

Re:     *Local Number Portability Porting Interval and Validation Requirements*, WC Docket No. 07-244,
        *Telephone Number Portability*, CC Docket No. 95-116

It had its doubters and detractors early on, to be sure, but number portability has been, I do believe, a significant success. Technology has brought consumers so many ways to help us keep in touch, no matter where we are, and one of our important jobs at the FCC is to facilitate consumers being able to use these new products and services—and use them in a timely fashion.

It appears to be the unanimous judgment of this Commission that a one-business day porting interval for simple wireline-to-wireline and intermodal ports best serves consumers and is nevertheless altogether do-able in the time-frame we provide today. I am pleased to support the item.

In the 1996 Telecommunications Act, Congress imposed a number portability obligation on providers so consumers could retain their phone numbers when switching carriers. This was both consumer-friendly and competition-friendly. As a result, gone are the days when you were bound by your existing service provider, regardless of service quality or rates, simply because you had grown to know—and be known by—your telephone number. Gone are the days when making that effort to change service providers would include sending cards or making calls to friends, family, colleagues, and clients—just to make sure others could continue to reach out and touch you. Instead, by easing consumers' ability to change voice service carriers, we encourage providers to become more competitive if they want to keep their customers.

Of course, we learned that when switching voice providers, simply allowing consumers to retain their telephone numbers would not be enough to break down barriers to competition. Unlike changes in other types of services, such as video or broadband, when a number is being ported, the provider winning the customer must communicate with the provider losing the customer. This necessary interaction between competitors requires processing and time, both of which allow providers opportunities to make a change in voice providers unpalatable to just about any consumer. While the wireless industry has adopted a standard 2.5 hour porting interval for wireless-to-wireless ports voluntarily, thereby avoiding most opportunity for mischief, there has been no such industry-wide voluntary interval for wireline-to-wireline and intermodal ports. Thus, the Commission was compelled to implement a mandatory interval so that consumers of all voice services can realize the true benefits intended by local number portability.

Twelve years ago, the Commission implemented a four-business day interval for wireline-to-wireline and intermodal simple ports. Since that time, we have considered shortening the interval for such ports, and have encouraged the industry to update its standard interval—all to no avail. So today, finally, we address the issue, something I proposed we do in the Commission's 2007 Local Number Portability Notice of Proposed Rulemaking. At that time, I was optimistic about moving forward with the proceeding. Well, it took too long, but I believe in this Order we do, albeit belatedly, what I then suggested.

While this item does shorten the porting interval significantly, I recognize that many providers will have to make real-world changes in their porting procedures to fulfill this requirement. So we herein direct the North American Numbering Council (NANC) to develop in 90 days new local number portability process flows that take into account the shortened porting interval. Then we give providers time to implement and comply. Nine months—although it may seem to some a long time to implement a much needed change—strikes me as appropriate, given the significant reduction of the current interval and the difficulties of our current economy.

As much as we strive to put together the best item possible, no Order is perfect, and this one is no exception. We have a few loose ends still to tie-up—other standards surrounding porting processes and "non-simple" ports. In particular, as the Order stands now, the shortened interval still applies only to simple ports. Some of the non-simple ports look no different to consumers than simple ports, yet the shortened interval adopted in this Order will not apply. All consumers should be able to benefit from the shortened porting interval. We do, however, take these matters up in the Further Notice, and I look forward to addressing them in the relatively near future.

Thanks to our FCC team for their hard work over a long time here, and special thanks to my colleagues for pursuing a pro-consumer and achievable position on this item. I welcomed their pro-consumer input. And I look forward to witnessing and experiencing the many benefits that will, I am confident, flow from the Commission's adoption of this item.

# STATEMENT OF
# COMMISSIONER JONATHAN S. ADELSTEIN

Re:     *Local Number Portability Porting Interval and Validation Requirements*, WC Docket No. 07-244, *Telephone Number Portability*, CC Docket No. 95-116

Today, we are moving to help consumers take their numbers from one carrier to another more quickly and conveniently.  Several years ago, we extended our porting requirements to interconnected VoIP providers and asked if we should shorten the current four business day interval for all carriers.  At that time, I called on the Commission to reduce the porting interval even more, so that consumers are left waiting no longer than necessary.  As many in Congress, among consumer groups, and in the industry have said, there is no doubt that we can do better than four business days.  That standard was set more than a decade ago for wireline-to-wireline ports, and four years ago for intermodal ports.  That's practically a lifetime ago in this industry where technology moves forward so fast.

So, I am pleased that today we slash the interval from four business days to one.  For a number of years now, wireless carriers have been porting numbers between themselves in a matter of hours.  While we recognize that there are differences in the back-office systems, the time has come to narrow the gap between wireless-to-wireless ports, and wireline-to-wireline and intermodal ports.  Simply put, consumers should be able to port a number quickly no matter who their carrier is.

At the same time that we take a giant step forward to speed the porting process, I am pleased that we have called upon the North American Numbering Council (NANC) to come up with the best way for carriers to work through the sometimes difficult porting process.  I also support today's Further Notice, which asks what further steps we should take to improve the porting process that will build upon the new one-day interval.  I am optimistic that this will yield an efficient porting system that will alleviate the potential for anti-competitive gaming that can frustrate the consumer experience.  And I am glad that today's order recognizes that all this will not take place overnight.  Larger carriers will have nine months to implement the new interval; smaller carriers, who may not have automated their porting systems, will have fifteen months.  Further, the order recognizes that those carriers that have porting-specific implementation costs will have avenues to recover those costs.

I want to thank Chairman Copps and his staff, particularly Jennifer Schneider, who have worked tirelessly to create a consensus item that will benefit consumers for years to come.  Their leadership has helped us navigate the tricky shoals of this issue.  Thanks also to the incredible staff of the Wireline Competition Bureau for helping us wade through the complex technical aspects of this case.

**STATEMENT OF
COMMISSIONER ROBERT M. McDOWELL**

Re:     *Local Number Portability Porting Interval and Validation Requirements*, WC Docket No. 07-244; *Telephone Number Portability*, CC Docket No. 95-116

I am pleased that the Commission is acting today to modernize our rules to keep pace with technological advances and evolving consumer trends.  By decreasing the length of time all providers have for porting a telephone number – from four business days to one – we are enabling consumers to enjoy the benefits of their market decisions almost as quickly as technology allows.  With myriad innovative service offerings emerging every day as a result of a highly competitive marketplace, consumers may want to take advantage of their new choices at a pace that is faster than what was encouraged by our stale rules of yesteryear.

We also provide a generous and sensible glide path for implementing the change:  nine months after the North American Numbering Council's review for the largest providers, and fifteen months thereafter for the smallest.  I am confident that a one business day interval strikes the proper balance between any costs associated with implementing the change and the economic benefits that will flow to consumers.

At the same time, as I have said in the past, I am sympathetic to calls that we provide greater assurance that providers of similar services are subject to similar rules.  Regulatory parity is critically important if we are to have a competitive and vibrant marketplace.  As always, I welcome additional ideas that may further this goal from interested parties.  Therefore, I am pleased that our Further Notice serves as an opportunity to examine improving the one business day porting interval we adopt today, and to refresh the record on any additional steps the Commission may elect to take to improve the process of changing providers.

Finally, I want to acknowledge and thank my colleagues, Acting Chairman Copps and Commissioner Adelstein.  Thank you for bringing this important matter forward.  The Commission had sat on this matter for far too long.  It was a pleasure to work in a congenial and collaborative manner to reach today's compromise.  Thank you for your assistance and continued good will.