**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matters of | ) | |
| | ) | |
| Local Number Portability Porting Interval and | ) | WC Docket No. 07-244 |
| Validation Requirements | ) | |
| | ) | |
| Telephone Number Portability | ) | CC Docket No. 95-116 |

**REPORT AND ORDER**

**Adopted:  May 20, 2010**                                    **Released:  May 20, 2010**

By the Commission:     Chairman Genachowski and Commissioners Copps, McDowell, Clyburn and
Baker issuing separate statements.

**TABLE OF CONTENTS**

                                                                                        Para.
I.   INTRODUCTION ................................................................................................................. 1
II.  BACKGROUND .................................................................................................................. 2
III. STANDARDIZED DATA FIELDS FOR SIMPLE PORT ORDERING PROCESS ........................... 6
IV. ADOPTION OF PROVISIONING PROCESS FLOWS ................................................................. 18
V.  THE ONE BUSINESS DAY INTERVAL ................................................................................. 25
VI. PROCEDURAL MATTERS ................................................................................................... 29
    A.  Regulatory Flexibility Act ........................................................................................... 29
    B.  Paperwork Reduction Act ............................................................................................ 30
    C.  Congressional Review Act ........................................................................................... 32
    D.  Accessible Formats ..................................................................................................... 33
VII. ORDERING CLAUSES ........................................................................................................ 34
Appendix A – List of Commenters
Appendix B – Final Rules
Appendix C – NANC Business Day Recommendations
Appendix D – Final Regulatory Flexibility Analysis

## I.     INTRODUCTION

1.     The Federal Communications Commission (Commission) has long recognized the
importance of consumers being able to keep their telephone numbers when they switch telephone service
providers.[1]  In this Report and Order (Order), we ensure that service providers can accomplish these

---

[1] Since the Commission began implementing the local competition provisions of the Telecommunications Act of
1996, telephone customers and new service providers have benefited from the ability of a customer to switch
providers without having to obtain a new phone number.  *See* Telecommunications Act of 1996, Pub. L. No. 104-
104, 110 Stat. 56 (1996) (adding section 251 to the Communications Act of 1934, which, among other things, directs
each local exchange carrier "to provide, to the extent technically feasible, number portability in accordance with
requirements prescribed by the Commission"); *Telephone Number Portability*, CC Docket No. 95-116, First Report
and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 8352, 8393, para. 77 (1996) (*First Number
Portability Order*).

transfers quickly. Called local number portability (LNP), the ability to transfer a familiar number to a new carrier enhances competition by enabling a consumer to choose a service provider based on his or her needs, without being deterred by the inconveniences of having to change his or her phone number. Last May, the Commission ordered telephone service providers to reduce the time they take to transfer a customer's telephone number to another provider from four business days to one, and set in motion a process to make that possible.[2] This Order completes the task of facilitating prompt transfers by standardizing the data to be exchanged when transferring a customer's telephone number between two wireline providers; a wireline and wireless provider; or an interconnected Voice over Internet Protocol (VoIP) provider and any other service provider.[3] We also adopt recommendations made to the Commission by the North American Numbering Council (NANC). The deadline for implementing one-business day porting is August 2, 2010 for all but small providers, which must comply by February 2, 2011.

## II. BACKGROUND

2. *Statutory Authority*. Section 251(b)(2) of the Communications Act of 1934, as amended (the Act), requires local exchange carriers (LECs) to "provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission."[4] The Act and the Commission's rules define number portability as "the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another."[5] The Commission has interpreted this language to mean that consumers should be able to change providers while keeping their telephone number as easily as they may change providers without taking their telephone number with them.[6]

3. Section 251(e) of the Act gives the Commission plenary jurisdiction over the North American Numbering Plan (NANP) and related telephone numbering issues in the United States.[7] To implement these congressional mandates in sections 251(b)(2) and 251(e), the Commission required all carriers, including wireline carriers and covered commercial mobile radio service (CMRS) providers, to

---

[2] *See Local Number Portability Porting Interval and Validation Requirements; Telephone Number Portability*, WC Docket No. 07-244, CC Docket No. 95-116, Report and Order and Further Notice of Proposed Rulemaking, 24 FCC Rcd 6084, 6088-89, para. 7 (2009) (*Porting Interval Order and Further Notice*).

[3] *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6095, para. 19 (seeking comment on additional ways to streamline the number porting processes and whether different or additional information fields are necessary for completing simple ports). The one-business day porting interval for simple ports does not apply to transfers between two wireless providers. As the Commission has previously explained, simple ports are those ports that: (1) do not involve unbundled network elements; (2) involve an account only for a single line; (3) do not include complex switch translations (*e.g.*, Centrex, ISDN, AIN services, remote call forwarding, or multiple services on the loop); and (4) do not include a reseller. *See, e.g.*, *Telephone Number Portability*, CC Docket No. 95-116, Memorandum Opinion and Order and Further Notice of Proposed Rulemaking, 18 FCC Rcd 23697, 23715, para. 45, n.112 (2003) (citing North American Numbering Council Local Number Portability Administration Working Group Third Report on Wireless Wireline Integration, Sept. 30, 2000, CC Docket No. 95-116 (filed Nov. 29, 2000)).

[4] 47 U.S.C. § 251(b)(2).

[5] 47 U.S.C. § 153(30); 47 C.F.R. § 52.21(l).

[6] *See Telephone Number Portability*; *Carrier Requests for Clarification of Wireless-Wireless Porting Issues*, CC Docket No. 95-116, Memorandum Opinion and Order, 18 FCC Rcd 20971, 20975, para. 11 (2003) (*Wireless Number Portability Order*), *aff'd*, *Central Tex. Tel. Coop., Inc. v. FCC*, 402 F.3d 205 (D.C. Cir. 2005).

[7] 47 U.S.C. § 251(e).

provide LNP according to a phased deployment schedule.[8]  The Commission found that LNP provided end users options when choosing among telecommunications service providers without having to change their telephone numbers,[9] and established obligations for porting between wireline providers, porting between wireless providers, and intermodal porting (*i.e.*, the porting of numbers from wireline providers to wireless providers, and *vice versa*).[10]  The Commission also directed the NANC, its advisory committee on numbering issues, to make recommendations regarding various LNP implementation issues.[11]

4.    *Porting Intervals.*  On May 13, 2009, the Commission adopted a Report and Order reducing the porting interval for simple[12] wireline and simple intermodal port requests.[13]  Specifically, the Commission required all entities subject to its LNP rules to complete simple wireline-to-wireline and simple intermodal port requests within one business day.[14]  In adopting this new porting interval for simple wireline-to-wireline and simple intermodal ports, the Commission left it to the industry to work through the mechanics of the new interval, and directed the NANC to develop new LNP provisioning process flows that take into account this shortened porting interval.[15]  The Commission also directed the NANC, in developing these flows, to address how within one "business day" should be construed for purposes of the porting interval, and generally how the porting time should be measured.[16]  The Commission requested that the NANC submit its recommendations no later than 90 days after the

---

[8] *See supra* note 1; *see also Telephone Number Portability*, CC Docket No. 95-116, First Memorandum Opinion and Order on Reconsideration, 12 FCC Rcd 7236, 7272, para. 59 (1997) (*First Number Portability Order on Reconsideration*) (concluding that local exchange carriers and covered CMRS providers were required only to deploy LNP to switches for which another carrier has made a specific request for the provision of LNP).

[9] *See First Number Portability Order*, 11 FCC Rcd at 8368, para. 30.

[10] *See id.* at 8401, 8431, 8433, 8440, paras. 93, 152, 155, 166.  Although the Act excludes CMRS providers from the statutory definition of "local exchange carrier," the Commission extended the LNP obligations to CMRS providers under its independent authority in sections 1, 2, 4(i) and 332 of the Act.  *See id.* at 8431, para. 153; *First Number Portability Order on Reconsideration*, 12 FCC Rcd at 7315-17, paras. 140-142 (affirming the Commission's decision to impose number portability obligations on CMRS providers).  In 2007, the Commission extended LNP obligations to interconnected VoIP providers.  *See Telephone Number Requirements for IP-Enabled Services Providers; Local Number Portability Porting Interval and Validation Requirements; IP-Enabled Services; Telephone Number Portability; Numbering Resource Optimization*, WC Docket Nos. 07-243, 07-244, 04-36, CC Docket Nos. 95-116, 99-200, Report and Order, Declaratory Ruling, Order on Remand, and Notice of Proposed Rulemaking, 22 FCC Rcd 19531, 19561-62, paras. 59, 63 (2007) (*VoIP LNP Order* or *2007 LNP NPRM* or *Four Fields Declaratory Ruling*), *aff'd sub nom. National Telecomms. Cooperative Ass'n v. FCC* (D.C. Cir. Apr. 28, 2009).

[11] *See, e.g., First Number Portability Order*, 11 FCC Rcd at 8401, 8403, paras. 93, 99.

[12] *See supra* note 3.

[13] *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6084, para. 1.

[14] *See id.*

[15] *See id.* at 6090, para. 10.

[16] *See id.*

effective date of the *Porting Interval Order*.[17]  Accordingly, the NANC submitted its recommendations to the Commission on November 2, 2009.[18]

5.     In a *Further Notice of Proposed Rulemaking* accompanying the *Porting Interval Order*, the Commission sought comment on whether there were additional ways to streamline the number porting processes or improve efficiencies for simple and non-simple ports.[19]  Among other things, the Commission sought comment on whether different or additional information fields are necessary for completing simple ports.[20]  On November 2, 2009, the NANC's Local Number Portability Administration (LNPA) Working Group submitted a non-consensus recommendation (hereinafter "Working Group Proposal") for Standard Local Service Request Data Fields, to accompany the NANC's Recommended Plan for Implementation of FCC Order 09-41.[21]  The Working Group proposes a set of 14 standard fields that should be required to accomplish simple ports within the one-business day porting interval the Commission mandated for simple wireline-to-wireline and intermodal ports.[22]  On November 19, 2009, the National Cable & Telecommunication Association (NCTA), Cox Communications, and Comcast Corporation submitted an alternative proposal (hereinafter "Cable Proposal") of eight standard fields that should be required to accomplish simple ports within the one-business day porting interval.[23]  On December 8, 2009, the Wireline Competition Bureau issued a Public Notice seeking comment on these two proposals and, specifically, what fields are necessary in order to complete simple ports – wireline-to-wireline and intermodal – within the one-business day interval.[24]

**III.     STANDARDIZED DATA FIELDS FOR SIMPLE PORT ORDERING PROCESS**

6.     As discussed above, in May 2009, the Commission sought comment, *inter alia*, on whether different or additional information fields are necessary for completing simple ports.[25]  In December 2009, in response to two industry proposals, the Wireline Competition Bureau again sought comment on what

---

[17] The *Porting Interval Order* was published in the Federal Register on July 2, 2009 and was effective August 3, 2009.  74 Fed. Reg. 31630 (2009).

[18] *See* Letter from Betty Ann Kane, Chairman, North American Numbering Council, to Sharon Gillett, Chief, Wireline Competition Bureau, FCC, WC Docket No. 07-244, Attachs. (filed Nov. 2, 2009) (NANC Nov. 2, 2009 *Ex Parte* Letter).

[19] *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6095, para. 19.

[20] *See id.*

[21] *See* NANC Nov. 2, 2009 *Ex Parte* Letter, Attach. 4; Letter from Betty Ann Kane, Chairman, North American Numbering Council, to Sharon E. Gillett, Chief, Wireline Competition Bureau, Federal Communications Commission, WC Docket No. 07-244, Attachs. 4-A, 4-B, 4-C (filed Dec. 2, 2009) (NANC Dec. 2, 2009 *Ex Parte* Letter).  While most NANC members communicated support for the LNP Working Group recommendation, time constraints did not permit the recommendation to be discussed and consensus publicly-determined at a publicly-noticed meeting of the full NANC.  *See* NANC Nov. 2, 2009 *Ex Parte* Letter at 3.

[22] *See* NANC Dec. 2, 2009 *Ex Parte* Letter, Attach. 4-B.

[23] *See* Letter from Cindy Sheehan, Senior Director, National Customer Activation & Repair, Comcast Corporation, Jose Jimenez, Executive Director, Regulatory Affairs-Policy, Cox Communications, Inc., Jerome F. Candelaria, NANC Representative, NCTA, to Sharon E. Gillett, Chief, Wireline Competition Bureau, FCC, WC Docket No. 07-244, CC Docket No. 95-116 (dated Nov. 19, 2009) (Comcast *et al.* Nov. 19, 2009 *Ex Parte* Letter).

[24] *See Comment Sought on Proposals for Standardized Data Fields for Simple Port Requests*, WC Docket No. 07-244, Public Notice, 24 FCC Rcd 14423 (WCB 2009); 75 Fed. Reg. 5013 (Feb. 1, 2010).  All cites to comments are in response to the December 8, 2009 Public Notice unless otherwise noted.

[25] *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6095, para. 19.

fields are necessary in order to complete simple ports – wireline-to-wireline and intermodal – within the one-business day interval.[26] The Working Group proposes the following 14 required fields for simple ports:[27]

- Customer Carrier Name Abbreviation (CCNA) – This three-letter code identifies the company that submitted the Local Service Request (LSR) and the company to whom response messages must be returned.[28]

- Purchase Order Number (PON) – This field identifies the customer's unique purchase order or requisition number that authorizes issuance of the request or supplement. This field is required for carriers to track the ongoing progress of the port request and, according to the Working Group, enables a carrier to provide order status to the end user or to make changes to the original request.

- Account Number (AN) – This field identifies the account number assigned by the current service provider.

- Desired Due Date (DDD) – This field identifies the customer's desired due date for the port and, according to the Working Group, is required to differentiate between simple and non-simple ports.

- Requisition Type and Status (REQTYP) – This field specifies the type of order to be processed.

- Activity (ACT) – This field identifies the activity involved in the service request.

- Company Code (CC) – This field identifies the exchange carrier initiating the transaction.

- New Network Service Provider (NNSP) – This field identifies the Number Portability Administration Center (NPAC) Service Provider Identifier (SPI) of the new network service provider.

- Agency Authority Status (AGAUTH) – This field indicates that the customer is acting as an end user's agent and has an authorization on file.

- Number Portability Direction Indicator (NPDI) – This field is used to let the new service provider direct the correct administration of E-911 records.

- Telephone Number (Initiator) (TEL NO (INIT)) – This field provides the telephone number for the initiator of the port request.

- Zip Code (ZIP) – This field identifies the zip code of the end user's service address and is used to validate that the correct end user's telephone number has been sent on the port request.

- Ported Telephone Number (PORTED NBR) – This field identifies the telephone number or consecutive range of telephone numbers residing in the same switch to be ported.

- Version (VER) – This field identifies the submitting service provider's order version number and enables service providers to track orders internally and make changes or modifications

---

[26] *See supra* note 24.

[27] *See* NANC Dec. 2, 2009 *Ex Parte* Letter, Attach. 4-B.

[28] *See also* AT&T Comments at 7.

to the original port request.[29] In combination with the Purchase Order Number field, this field is used by service providers to track the ongoing progress of the port request and to ensure the correct version of the order is being processed.

7.   The Cable Proposal includes the following eight fields:[30]

- Purchase Order Number

- Account Number

- Desired Due Date

- Company Code

- New Network Service Provider

- Zip Code

- Ported Telephone Number

- Version

Therefore, the Cable Proposal includes eight of the same fields recommended by the Working Group, and excludes six of the 14 fields proposed by the Working Group:[31]

- Customer Carrier Name Abbreviation

- Requisition Type and Status

- Activity

- Agency Authority Status

- Number Portability Direction Indicator

- Telephone Number (Initiator)

8.   The Commission's purpose in mandating a one-business day porting interval was to "ensure that consumers are able to port their telephone numbers efficiently and to enhance competition for all communications services."[32] That remains our goal. However, the industry has expressed concern that meeting the Commission's one-business day porting interval for simple ports will be difficult without standardization of information fields for the simple port ordering process.[33] We agree with the industry that there is a need for uniformity and standardization in the exchange of information fields.[34] Too many

---

[29] *See also* ATIS Comments at 15-16.

[30] *See* Comcast *et al.* Nov. 19, 2009 *Ex Parte* Letter.

[31] *See id.*

[32] *Porting Interval Order and Further Notice*, 24 FCC Rcd at 6084, para. 1.

[33] *See* NANC Nov. 2, 2009 *Ex Parte* Letter at 2 ("There was, however, unanimous agreement by the NANC that some number greater than the four LSR data fields currently mandated by the FCC was needed to implement the shortened porting interval and that the LSR data fields should be standardized for all service providers.").

[34] *See* Joint CLEC Commenters FNPRM Reply at 11 (commenting that there should be standardization of the fields necessary to provision ports as well as those necessary to validate the port); Sprint Nextel FNPRM Comments at 5-6 (standardized provisioning fields coupled with standardized validation fields will ensure that the current service provider no longer has the flexibility and control to reject legitimate port requests for spurious reasons); AT&T FNRPM Comments at 6-8; T-Mobile FNPRM Comments at 4-5 (urging the Commission to mandate that a uniform (continued….)

information fields increase the opportunity for errors in the simple port ordering process, as do too few fields.[35] Errors lead to delays, which harm consumers and thwart competition, as consumers may attribute delays to their new service providers.[36]

9.    Timely implementation of the one-business day simple porting interval is crucial so that both consumers and service providers may begin to realize the benefits of the shortened porting interval.[37] For the reasons below, at this time we conclude that 14 information fields are necessary to accomplish a simple port, and mandate that service providers use the 14 fields we describe in this Order – and only those 14 fields – to accomplish a simple port.[38] These 14 fields are: (1) Ported Telephone Number; (2) Account Number; (3) Zip Code; (4) Company Code; (5) New Network Service Provider; (6) Desired Due Date; (7) Purchase Order Number; (8) Version; (9) Number Portability Direction Indicator; (10) Customer Carrier Name Abbreviation; (11) Requisition Type and Status; (12) Activity; (13) Telephone Number (Initiator); and (14) Agency Authority Status. The Commission recognizes that some carriers can accomplish simple ports using fewer than 14 fields, while other carriers have built systems that require more than 14 fields. However, we believe, and the industry agrees, that standardization and uniformity are of greater importance than the precise number and substance of the fields.[39] Further, we believe that the fields we have chosen strike the right balance between minimizing the number of simple ports that fall out of the porting process—or are not completed due to errors—and the burden on the industry, ensuring that consumers are able to reap the most benefit from the shortened one-business day porting interval.

10.    We have chosen as our 14 fields those recommended in the LNP Working Group Proposal. As discussed in more detail below, we find that the additional fields recommended by the LNP Working Group are necessary to help avoid port fallout, misdirected ports, delays, rejections, and loss of automation, as well as to guard against inadvertent ports. As we have stated before, "the porting-out provider may not require more information from the porting-in provider than is actually *reasonable* to validate the port request and accomplish the port."[40] As we discuss further below, we find that it is reasonable to require all providers to use these 14 standardized fields to accomplish simple ports within one business day, and that doing so will minimize errors and port request fallout, streamline the simple port process, and maximize the benefits to consumers. We also select these 14 fields to ensure that the industry achieves timely implementation of the one-business day interval.[41] We note that the LNP

---

(Continued from previous page) ────────────────

set of administration criteria for porting be used and limited to information strictly necessary to complete the port; Joint Commenters Comments at 4; COMPTEL Comments at 2; ATIS Comments at 9; AT&T Comments at 4.

[35] *See* Comcast/Cox Comments at 4.

[36] *See* Charter Comments at 2.

[37] *See, e.g.*, Letter from Mary McManus, Comcast Corporation, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244 (filed Mar. 25, 2010) (strongly urging adherence to the current timeline for implementation of the one-business day simple porting interval).

[38] We note, however, that we permit the passcode field to be an additional required field only if the passcode is requested and assigned by an end user. In most cases, passcode would be an optional field. *See infra* para. 16 for full discussion.

[39] *See supra* notes 33-34.

[40] *Four Fields Declaratory Ruling*, 22 FCC Rcd at 19556, para. 43 (emphasis added).

[41] *See, e.g.*, Letter from Ann D. Berkowitz, Director, Federal Regulatory Advocacy, Verizon, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, CC Docket No. 95-116, at 2 (filed Mar. 15, 2010); Joint Commenters Comments at 6 (stating that if the Commission does not adopt the set of 14 porting fields, the Commission should extend the implementation period); Verizon Reply Comments at 7 (stating that to the extent fewer that 14 fields are (continued….)

Working Group represented a diverse group of providers, including large and mid-sized incumbent LECs, wireless carriers, cable providers, competitive LECs, and VoIP providers.

11. **Consensus On Nine Fields.** There is general agreement in the record and within the industry that at least nine of the proposed fields are necessary to accomplish a simple port within one business day: (1) Ported Telephone Number; (2) Account Number; (3) Zip Code; (4) Company Code; (5) New Network Service Provider; (6) Desired Due Date; (7) Purchase Order Number; (8) Version; and (9) Number Portability Direction Indicator. The first eight of these fields are common to both the Working Group Proposal and the Cable Proposal. Comcast and Cox, proponents of the Cable Proposal, initially objected to the ninth field, the Number Portability Direction Indicator field, but withdrew their objection to inclusion of this field. We agree with Comcast and Cox and recognize the "critical importance of ensuring that all E-911 information is transmitted in the most convenient and efficient manner in every instance, even if the field is only necessary for a small percentage of ports."[42] We therefore conclude that, because the Number Portability Direction Indicator field may play an important public safety role, it should be included among the mandatory standardized fields for the simple port ordering process.

12. **Customer Carrier Name Abbreviation.** Based on the record before us, we also include the Customer Carrier Name Abbreviation field among the standardized fields required to accomplish a simple port. We conclude that this field should be a standard field for accomplishing simple ports because its loss for certain segments of the industry could lead to widespread porting delays, frustrating the Commission's aim to shorten the porting interval for consumers. As a result of mergers and acquisitions in the communications industry, we understand that a service provider may have multiple Customer Carrier Name Abbreviations,[43] and note that these codes may be used for more granular identification of the carrier requesting service, the product being ordered, and the state in which it is ordered, among other things.[44] Commenters argue that loss of this field would cause LSRs to be misdirected and stop all automatic flow-through order processing for those companies that presently rely on this field, causing number porting delays.[45] As some commenters note, and AT&T acknowledges, the Customer Carrier Name Abbreviation field represents the third time in 14 fields that carrier identification information is provided.[46] We appreciate this concern. However, we must balance that against the possibility of misdirected LSRs and porting delays for those companies that presently rely on this field to identify carriers involved in ports.[47] Such a result would ultimately harm consumers and frustrate the Commission's efforts to shorten the interval for simple ports. Therefore, we include the Customer Carrier Name Abbreviation field among the required standard data fields for the simple port ordering process.

13. **Requisition Type and Status and Activity.** Many service providers use the LSR to request

---

(Continued from previous page)
permitted on the LSR, Verizon would need an extension of the implementation period to make the necessary systems and process changes).

[42] Comcast/Cox Comments at 12.

[43] *See* ATIS Comments at 10; AT&T Comments at 6.

[44] *See* AT&T Comments at 6; ATIS Reply at 4.

[45] *See* ATIS Comments at 10; AT&T Reply at 8; AT&T Comments at 8; COMPTEL Comments at 2-3.

[46] *See* Comcast/Cox Comments at 6 (explaining that the Company Code field identifies the exchange carrier initiating the transaction and the New Network Service Provider field identifies the NPAC Service Provider Identifier of the new network service provider); AT&T Comments at 7-8 (stating that when a single entity performs the billing, ordering, and network provisioning functions, there may be duplication in the codes, although the appearance of duplication vanishes when more than one entity provides these functions in a single transaction).

[47] *See* AT&T Comments at 7-8 (stating that the use of the Customer Carrier Name Abbreviation code is pervasive in the ordering processing systems of many LECs who trade with many carriers of all sizes).

a number of different types of services.[48]  Together, the Requisition Type and Status and Activity fields identify the type of service order to be processed.[49]  Based on the record before us, we agree that without the Requisition Type and Status and Activity fields, service providers that offer multiple products would be unable to determine whether an order received using an LSR form is for a simple port request or for another product.[50]  We are concerned about the potential for a high fallout rate for port requests if large numbers of service providers are unable to identify when they receive a port request.  In addition, we believe that failure to include these fields may lead to delays in porting for consumers because, as one commenter stated, "without this field, the existing use of LSR process automation could not be utilized and all simple ports would have to be processed manually, making compliance with the Commission's one day porting rule all but impossible."[51]  Therefore, because of the potential for port fallout and delay, we include the Requisition Type and Status and Activity fields among those required to accomplish a simple port.[52]

14.  **Telephone Number (Initiator).**  We also include the Telephone Number (Initiator) field in our list of required standardized fields for accomplishing simple port requests.  As mentioned above, this field provides contact information for the new service provider initiating the port.  Though not strictly required for accomplishing a port, the Commission believes on balance that the overall benefits to the consumer of including this field outweigh the arguments for excluding it from our list of standard fields.  We agree with commenters that this field can help facilitate prompt resolution of issues, without which compliance with the one-business day porting interval could be jeopardized.[53]  Thus, because inclusion of this field may reduce the number of ports rejected and thus delayed for consumers, we include it among the 14 standard fields that service providers must exchange to accomplish a simple port.  It is our expectation that current service providers will use this information to contact new service providers to resolve issues that arise with a port request rather than simply reject the request, and will make every effort to ensure that simple ports are completed within one business day.

15.  **Agency Authority Status.**  Finally, we include the Agency Authority Status field among the standard fields for the simple port ordering process.  We conclude that this field serves consumers by guarding against inadvertent ports in that it requires the new service provider to acknowledge that it is acting as the customer's agent and has an authorization on file.[54]  Moreover, the Agency Authority Status

---

[48] *See* AT&T Comments at 8-9; AT&T Reply at 8.  Types of orders for processing that may be submitted using the LSR form may include, for example:  loop; loop with number portability; number portability; retail/bundled; resale; unbundled local switching (Port); directory listings; directory listings and assistance; resale private line; resale frame relay; combined loop and unbundled local switching (Port); D/DOD/PBX; CENTREX resale; ISDN; ATM.  *See* ATIS Comments at 11-12.

[49] *See* NANC Dec. 2, 2009 *Ex Parte* Letter, Attach. 4-B; ATIS Comments at 11; AT&T Comments at 8-9.

[50] *See* ATIS Comments at 11-12; ATIS Reply at 5; AT&T Comments at 8-9; AT&T Reply at 8; COMPTEL Comments at 2; Cincinnati Bell Reply at 3.

[51] ATIS Comments at 12-13; *see* ATIS Reply at 6.

[52] We note that the burden providers face in populating these two fields is minimal, amounting to two keystrokes.  *See, e.g.*, AT&T Comments at 9; AT&T Reply at 5.

[53] *See* ATIS Comments at 15 (stating that given the size of communications companies and the sheer number of personnel assigned to ordering processes, there is no reasonable way to find contact information regarding the person, group, or department who initiated a port without this field, and that contacting the general call center number has proven to be ineffective in the timely resolution of questions and concerns); *see also* Charter Comments at 4.

[54] *See* ATIS Comments at 14.  We note that the Agency Authority Status field does not require the new service provider to produce or provide the authorization to the current service provider.

field is essentially a check box indicating the new service provider has authorization and amounts to one keystroke. Therefore, because this field may add benefits for consumers in the form of fewer inadvertent ports, and because the burden on the industry is minimal,[55] we include the Agency Authority Status field as a mandatory standard field for the simple port ordering process.

16. We agree with the NANC's recommendation that we consider the passcode field an optional field. The NANC recommends that a passcode not be required unless the passcode has been requested and assigned by the end user, rather than the service provider. CenturyLink, Iowa Telecommunications, and Windstream argue that this recommendation undercuts the protections and convenience offered by carriers that automatically generate passcodes for customers, but provide notice of and ready ability to obtain or change their passcodes at any time.[56] We disagree with CenturyLink, Iowa Telecommunications, and Windstream. Because customers may be unaware of carrier-initiated passcodes at the time they choose to port their number, we believe that making the passcode field mandatory for carrier-initiated passcodes would delay the porting process by requiring customers to contact their current service providers for this information. We are concerned that this additional step for the customer would also add a layer of frustration and complexity to the number porting process, with anticompetitive effects. For these reasons, we adopt the NANC's recommendation that we consider the passcode field optional unless it has been requested and assigned by the end user.

17. We emphasize that we do not at this time adopt any particular form or format for the exchange of these 14 standard information fields for simple ports. Whether it is appropriate to standardize LSR forms and, if so, how that should be accomplished remains an open issue pending before the Commission.[57] We also note that we do not adopt the full Working Group Proposal, but rather only find that the information fields we specify in this Order are mandatory standard fields for the simple port ordering process. This means, for example, that we do not adopt the Working Group's recommendation that "Directory listings must be retained or deleted for orders involving directory listings in order to be considered for simple port processing. Orders involving change(s) to directory listing(s) will not be considered for simple port processing. The Directory Listing (DL) form is not permitted for a simple port."[58] Whether the definition of what constitutes a simple port should be modified is currently pending before the Commission.[59]

## IV.  ADOPTION OF PROVISIONING PROCESS FLOWS

18. As discussed above, the Commission's *Porting Interval Order* directed the NANC to develop new LNP provisioning process flows that take into account the one-business day porting interval.[60] The NANC submitted these flows on November 2, 2009. We adopt the NANC's recommended provisioning flows in support of the porting process and require the industry to adhere to

---

[55] *See* ATIS Comments at 13; AT&T Comments at 13.

[56] *See* CenturyLink *et al.* Comments at 11.

[57] *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6095, para. 19.

[58] NANC Dec. 2, 2009 *Ex Parte* Letter, Attach. 4-A; *see also* Charter Reply at 5; Letter from Neal M. Goldberg, Vice President and General Counsel, National Cable & Telecommunications Association, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244 (filed Apr. 28, 2010) (urging the Commission to reject this NANC recommendation and clarify that a porting request that includes a change in directory listing should be considered a "simple port" that is subject to the one-day porting interval). *But see* Letter from Ann D. Berkowitz, Director, Federal Regulatory Advocacy, Verizon, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 07-244, CC Docket No. 95-116 (filed May 12, 2010).

[59] *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6095, para. 19.

[60] *See id.* at 6090, para. 10.

them.[61] Specifically, the NANC recommends provisioning flows that consist of diagrams and accompanying narratives setting forth the processes to be used by service providers and database administrators in specific scenarios, including a new flow for determining the type of port at the beginning of the porting process.[62] We conclude that the provisioning process flows recommended by the NANC are essential to the deployment of the one-business day porting interval for simple ports. As with previous flows, we find that the provisioning process flows recommended by the NANC will ensure that communications between service providers and database administrators proceed in a clear and orderly fashion so that porting requests can be handled in an efficient and timely manner.[63]

19. The NANC-recommended flows also address the time interval for the current service provider to return a Customer Service Record (CSR) to the new service provider, if requested.[64] Specifically, the NANC recommends that the CSR be returned within 24 clock hours, unless otherwise negotiated, excluding weekends and current service provider holidays.[65] The record reflects that the time interval for return of a CSR is often longer than the Commission's one-business day interval, which can make the overall time to port seem longer for a consumer.[66] Thus, the Commission's efforts to streamline and make the porting process more efficient by reducing the porting interval may be frustrated by the CSR process, which is often a prelude to porting. We therefore adopt the NANC's recommendation, and find that it is consistent with the Commission's efforts to improve the effectiveness and efficiency of the porting process.[67]

20. In addition, the NANC's November 2 submission identifies "key" recommendations contained in certain sections of the revised provisioning flows. Some commenters argue that portions of

---

[61] *See* 47 U.S.C. § 251(b)(2) (requiring LECs to "provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission"); 47 U.S.C. § 251(e) (giving the Commission plenary jurisdiction over the North American Numbering Plan (NANP) and related telephone numbering issues in the United States); *see also supra* paras. 2-3.

[62] *See* NANC Nov. 2, 2009 *Ex Parte* Letter, Attach. 1, Sec. 3.2.; http://www.nanc-chair.org/docs/mtg_docs/Oct09_LNPA_WG_FCC_09_41_Implementation_Plan_v5.doc at 17 (NANC Flows v.4.0 - 10-16-2009.ppt and NANC_OPS_Flows_Narratives v4.0 (10-16-2009).doc); *see also* http://www.fcc.gov/wcb/cpd/Nanc/nanccorr.html.

[63] *See Telephone Number Portability*, CC Docket No. 95-116, RM 8535, Second Report and Order, 12 FCC Rcd 12281, 12316, para. 58 (1997) (*Second Number Portability Order*).

[64] *See* NANC Nov. 2, 2009 *Ex Parte* Letter, Attach. 1 at 18 ("3.2 Recommended Revised NANC LNP Provisioning Flows").

[65] *See id.*; *see also id.* at Attach. 1 at 25 ("3.5.2 Recommended Customer Service Record (CSR) Requirements").

[66] *See, e.g.*, AT&T FNRPM Reply at 10 (stating that the time in which a competitive LEC will return a CSR can vary from around five days for a simple port to 15 days for a complex port); Verizon FNPRM Comments, Decl. at para. 4 (stating that Cbeyond, Global Crossing, and Sprint take 48 hours, 72 hours, and two business days, respectively, to supply a CSR to Verizon). In its *Further Notice*, the Commission sought comment on whether it is appropriate to establish a single standard time interval in which providers must return a CSR request. *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6095, para 19.

[67] We note that commenters also agree. *See* Verizon FNPRM Comments at 4-5 (urging the Commission to require all providers to return CSRs in 24 hours, and stating that certain states, such as New York and Pennsylvania, already require CSRs to be returned within 24 hours); AT&T FNPRM Reply at 10-11 (proposing that the Commission require providers to return CSRs within 24 clock hours of receipt); Joint CLEC Commenters FNPRM Reply at 13 (agreeing that CSRs should be returned promptly and without unreasonable delay); Cbeyond *et al.* FNPRM Reply at 14 (agreeing that CSRs should be returned within 24 hours); Verizon FNPRM Reply at 5-6 (commenting that a number of states already have 24-hour requirements for the return of a CSR request and urging the Commission to mandate the same 24-hour interval for the return of the CSR).

the "key" recommendations for the "Port Type Determination"[68] process flow should be revised to address concerns regarding disclosure of sensitive customer information through CSRs released to a requesting carrier without validating that the carrier has permission from the customer.[69] While we understand these commenters' concern regarding unauthorized disclosure of sensitive customer information, we disagree that the NANC recommendation needs to be revised.[70] As the Commission has stated repeatedly, protection of customer information is of the utmost importance. Service providers have an obligation to protect sensitive customer and carrier information;[71] our adoption of this recommendation does not alter the application or enforcement of the Commission's customer privacy rules.[72] We remind carriers that they are obligated not only to protect their customers' sensitive information, but also to protect carriers' proprietary information.[73] We also take this opportunity to remind carriers that in the number porting context, service providers may only request and provide CSRs for the purpose of transferring a number and not for the sole purpose of gaining customer or carrier information.

21. The NANC recommendation does not address, nor do we address in this Order, what information the current service provider can require from a new service provider to verify the existence of a port request before it will disclose a CSR.[74] However, as we have stated in the porting interval context, and find equally applicable here, "limiting carriers to requiring a minimum but reasonable amount of information . . . will ensure that customers can port their numbers without impairment of the convenience of switching providers due to delays in the process that can result when additional information is required."[75] If this issue becomes a concern after the one-business day porting interval is fully implemented, the Commission will review the NANC's "key" recommendations for the Port Type Determination process flow in a further action in the pending *Further Notice*. The Commission has a significant interest in making porting easy for consumers to enable them to react to competing providers'

---

[68] *See* NANC Nov. 2, 2009 *Ex Parte* Letter, Attach. 1 at 18 ("3.2 Recommended Revised NANC LNP Provisioning Flows").

[69] *See* CenturyLink *et al.* Comments at 2; Letter from Jennie B. Chandra, Regulatory Counsel & Director – Federal Government Affairs, Windstream Communications, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket 07-244, at 1-2, 4 (filed May 12, 2010).

[70] We note that other commenters support the Commission's position. *See* Qwest Reply at 4-9; Insight Reply at 4.

[71] *See* 47 U.S.C. § 222(a) ("Every telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to, other telecommunications carriers . . . and customers."); 47 C.F.R. §§ 64.2001 *et seq.*

[72] *See id.*

[73] 47 U.S.C. § 222(a); 47 U.S.C. § 222(b) ("A telecommunications carrier that receives or obtains proprietary information from another carrier for purposes of providing any telecommunications service shall use such information only for such purpose, and shall not use such information for its own marketing efforts."); *see also Implementation of the Telecommunications Act of 1996; Telecommunications Carriers' Use of Customer Proprietary Network Information; Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended*, Order on Reconsideration and Petitions for Forbearance, 14 FCC Rcd 14409, 14449, para. 77 (1999) (finding that section 222 does not permit a carrier to use proprietary information to retain soon-to-be-former customers where the carrier gained notice of a customer's imminent cancellation of service through the provision of carrier-to-carrier service, such as an order for a transfer of service).

[74] However, carrier-assigned passcodes may not be required in order to obtain a CSR. *See* NANC Nov. 2, 2009 *Ex Parte* Letter, Attach. 1, Sec. 3.2., at 18. ("Any Service Provider assigned password/PIN may not be utilized as a requirement in order to obtain a CSR.").

[75] *See Four Fields Declaratory Ruling*, 22 FCC Rcd at 19554, para. 43.

service offerings,[76] while at the same time safeguarding the privacy of customer and carrier information[77] and ensuring that consumers are protected from unauthorized ports.[78]

22. We recognize that ongoing changes to process flows will likely be warranted to meet the changing demands of the industry.[79] Given the fundamental purpose of the NANC to advise the Commission on numbering issues and its experience with provisioning process flows, we conclude that the NANC is best situated to monitor the continued effectiveness of the provisioning process flows, and make recommendations when changes are needed. Thus, we clarify that these porting flows will remain in effect until the Commission approves, upon recommendation by the NANC, revised provisioning flows for the porting process. We hereby delegate authority to the Chief of the Wireline Competition Bureau to approve NANC recommendations for revised provisioning process flows, and direct the NANC to make any approved, revised porting provisioning flows available online to the public at www.nanc-chair.org. Revised provisioning flows that are approved by the Bureau and made available to the public through the NANC's website are binding on the industry.[80]

23. In the *First Number Portability Order*, the Commission directed the NANC to determine, among other things, the technical and operational standards for local number portability.[81] In response, on April 25, 1997, the NANC recommended a set of provisioning process flows to carry out operations needed to implement local number portability.[82] On August 18, 1997, the Commission adopted and incorporated into its rules the NANC's recommendation for the provisioning process flows.[83] The provisioning flows submitted by the NANC that we adopt in this Order supersede and replace those that the Commission incorporated by reference into section 52.26(a) of its rules in 1997.[84] As a result, we revise our rules accordingly to exclude the outdated provisioning flows.[85]

---

[76] *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6087, para 6 (stating that "[d]elays in porting cost consumers time and money and limit consumer choice and competition because when consumers get frustrated with slow porting, they often abandon efforts to switch providers").

[77] *See* 47 U.S.C. § 222.

[78] *See, e.g.*, 47 U.S.C. § 258(a).

[79] For example, in 2003, the NANC revised the flows for LNP between wireless and wireline service providers. *See* Letter from Robert C. Atkinson, NANC Chair to William Maher, Chief, Wireline Competition Bureau, FCC (filed Aug. 21, 2003).

[80] *See supra* note 61.

[81] *First Number Portability Order*, 11 FCC Rcd at 8463, para. 216.

[82] *See* Letter from Alan C. Hasselwander, Chairman, NANC, to Reed Hundt, Chairman, FCC, CC Docket No. 95-116 (filed May 1, 1997), transmitting the NANC's *Working Group Report*. The primary provisioning process flow diagram laid out the general process by which a customer's telephone number is ported, with subsequent flows to set forth the processes by which the service providers and LNPAs handle specific scenarios, such as porting numbers with or without unconditional ten-digit dialing triggers, cancelling porting requests, disconnecting ported numbers, arranging audits of service providers to assist in resolution of repair problems, and resolving conflicts between service providers. *See Second Number Portability Order*, 12 FCC Rcd at 12315, para. 56.

[83] *See Second Number Portability Order and Further Notice*, 12 FCC Rcd at 12315, para. 55.

[84] *See* 47 C.F.R. § 52.26(a). We note that the provisioning flows that we accept today are a logical outgrowth of the one-business day porting interval adopted by the Commission, and subsequent request for comment on ways to streamline the number porting processes and improve efficiencies for simple and non-simple ports. *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6089, 6095, paras. 8, 19.

[85] *See* Appendix B.

24. The Commission also adopted in 1997 the NANC's recommendation of a four-business day porting interval for wireline ports, which covered both simple and non-simple ports.[86] As discussed above, the Commission's *Porting Interval Order* reduced the porting interval for simple wireline and simple intermodal port requests to one business day. As in the past, the provisioning process flows the NANC recommends today address the processes for both simple and non-simple ports.[87] We agree that the NANC's recommended provisioning process flows should address both simple and non-simple ports as it would be impracticable to address one without the other. Thus, we clarify that the NANC's provisioning process flows we adopt today address both simple and non-simple port processes.[88] We further clarify that the porting interval for simple wireline-to-wireline and simple intermodal ports is one business day, while the porting interval for non-simple wireline-to-wireline and non-simple intermodal ports remains four business days.[89]

## V. THE ONE BUSINESS DAY INTERVAL

25. The Commission's decision requiring porting within one-business day for simple wireline-to-wireline and simple intermodal ports, once effective, will ensure that consumers are able to port their telephone numbers quickly and will enhance competition for all communications services.[90] This action fulfills the Commission's promise of giving "customers flexibility in the quality, price, and variety of telecommunications services."[91]

26. In order for simple ports to be completed within one business day, precision in explaining what constitutes a "business day" for purposes of the porting process is vital.[92] At the Commission's

---

[86] North American Numbering Council Local Number Portability Selection Working Group Final Report and Recommendation to the FCC, Appendix E (rel. Apr. 25, 1997). *See also Telephone Number Portability; CTIA Petitions for Declaratory Ruling on Wireline-Wireless Porting Issues*, Memorandum Opinion and Order and Further Notice of Proposed Rulemaking, 18 FCC Rcd 23697, 23712, para. 38 (2003) (noting that the four-business day wireline porting interval represents the outer limit of what the Commission would consider a reasonable amount of time in which to complete intermodal ports).

[87] *See* NANC Nov. 2, 2009 *Ex Parte* Letter, Attach. 1, Section 3.2, at 17. Because there are aspects of the simple and non-simple port provisioning processes that overlap, it would not be feasible to separate out the provisioning flows for simple and non-simple ports. *See, e.g., id.* ("Figure 1 – Port Type Determination: This is a new flow that will be used to determine the type of port at the beginning of the process, i.e., wireless-to-wireless, wireline-to-wireline or intermodal Simple or Non-Simple, if Broadband/DSL is involved, in order to point the process user to the appropriate subsequent flows."); *see also id.* at 19 (describing a flow for handling port requests that are submitted by the new service provider as involving simple ports, but that are determined by the old service provider to involve non-simple ports).

[88] We note the NANC recommended provisioning flows for porting non-simple ports in a four-business day interval are consistent with the 1997 NANC recommendation adopted by the Commission. *See supra* note 86.

[89] *See* NANC Nov. 2, 2009 *Ex Parte* Letter, Attach. 1, Section 3.2, at 17.

[90] *See Porting Interval Order and Further Notice*, 24 FCC Rcd 6084, para. 1.

[91] *See First Number Portability Order*, 11 FCC Rcd at 8368, para. 30.

[92] One business day was adopted, instead of a measure of time in hours, to account for staffing issues for requests made outside of regular business hours. *See Porting Interval Order and Further Notice*, 24 FCC Rcd. at 6089, para. 8. *See also 2007 LNP NPRM*, 22 FCC Rcd at 19561-62, para. 63 (seeking comment on how the Commission should define the various porting interval timelines in terms of operating hours); *Porting Interval Order and Further Notice*, 24 FCC Rcd at 6095, para. 19 (asking commenters to refresh the record on what further steps the Commission should take to improve the process of changing providers, provide ideas that reflect and build upon the new one-business day interval, and address whether there are additional ways to streamline the number porting processes or improve efficiencies for simple and non-simple ports).

direction, the NANC's recommended LNP provisioning process flows also address how a "business day" should be construed for the purposes of determining the appropriate porting interval and generally how the porting time should be measured.[93] We adopt this recommendation, as summarized below and as demonstrated in the attached charts,[94] and we require the industry to adhere to it.

27. Under the NANC recommendation, the traditional work week of Monday through Friday represents mandatory business days and 8 a.m. to 5 p.m. represent the minimum business hours.[95] An accurate and complete LSR must be received by the current service provider between 8 a.m. and 1 p.m. local time[96] for a simple port request to be eligible for activation at midnight on the same day.[97] Any simple port LSRs received after this time will be considered received on the following business day.[98]

28. The above explanation and the attached charts make clear the process and timeframes that must be followed by the industry. We expect that compliance with these processes and the flows discussed above will enable providers to complete simple ports within one business day.

## VI. PROCEDURAL MATTERS

### A. Regulatory Flexibility Act

29. As required by the Regulatory Flexibility Act of 1980, *see* 5 U.S.C. § 604, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) of the possible significant economic impact on small entities of the polices and rules addressed in this document. The FRFA is set forth in Appendix D.

### B. Paperwork Reduction Act

30. This document contains new information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. It will be submitted to the Office of Management and Budget (OMB) for review under Section 3507(d) of the PRA. OMB, the general public, and other Federal agencies are invited to comment on the new or modified information collection requirements

---

[93] *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6060, para. 10; *see also* NANC Nov. 2, 2009 *Ex Parte* Letter, Attach. 1, at Section 3.1. As is demonstrated in Appendix C, the current service provider must respond within four hours with a Firm Order Confirmation (FOC) or a reject. In its recent filing, the National Telecommunications Cooperative Association (NTCA) requests that the Commission not adopt the four-hour LSR-to-FOC interval, or if it does, NTCA asks for an exception for rural carriers which would limit the number of port requests that must be completed in a business day to five total (both simple and non-simple ports). NTCA states that for many rural carriers a four-hour LSR-to-FOC interval is too burdensome because their process is manual. Nevertheless, NTCA admits that currently these carriers are not receiving many port requests, but is concerned about the possibility of enhanced competition in rural America. As the number of port requests today are not overly burdensome to rural carriers, we will adopt the four-hour LSR-to-FOC interval as recommended by the NANC, with the understanding that if the *status quo* for rural carriers changes, carriers may request waivers at that time. *See* NTCA Reply at 2-6; *see also* OPASTCO/NTCA FNPRM Reply at 1-4, 7 (filed Aug. 31, 2009).

[94] *See* Appendix C, NANC Business Day Recommendations Simple Port – LSR-to-FOC Intervals & Simple Port—LSR-to-FOC Intervals, Weekly Demonstration.

[95] These definitions exclude the current service provider's company-defined holidays. *See also* NANC Nov. 2, 2009 *Ex Parte* Letter, Attach. 1, Section 3.1.

[96] Local time is in the predominant time zone of the Number Portability Administration Center (NPAC) Region in which the telephone number is being ported. *Id.*

[97] *See id.*

[98] The response clock on the following business day would start at 8 a.m., local time and a response would be due no later than noon. *Id.*; *see also* Appendix C.

contained in this proceeding.  In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.

31.   In this present document, we have assessed the effects of imposing standardized data fields for the simple port ordering process, and find that the information collection burden of doing so in regards to small business concerns will be minimal, as small providers generally exchange this information already.

### C.  Congressional Review Act

32.   The Commission will send a copy of this Report and Order in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

### D.  Accessible Formats

33.   To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at (202) 418-0531 (voice), (202) 418-7365 (TTY).

## VII.    ORDERING CLAUSES

34.   Accordingly, IT IS ORDERED that, pursuant to sections 1, 4(i)-4(j), 251, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i)-(j), 251, 303(r), this Report and Order in WC Docket No. 07-244 and CC Docket No. 95-116 IS ADOPTED, and that Part 52 of the Commission's Rules, 47 C.F.R. Part 52, IS AMENDED as set forth in Appendix B.  The Report and Order SHALL BECOME EFFECTIVE 30 days after publication in the Federal Register.  The information collection requirements contained in the Report and Order will become effective following OMB approval.

35.   IT IS FURTHER ORDERED that, consistent with the compliance deadline established in the *Porting Interval Order*, telecommunications carriers and interconnected VoIP providers will not be required to comply with amended Rule 52.35(a) until August 2, 2010.

36.   IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**APPENDIX A**

**List of Commenters**

**WC Docket No. 07-244**

**Further Notice of Proposed Rulemaking**

| **Commenter** | **Abbreviation** |
|---|---|
| Alliance for Telecommunications Industry Solutions | ATIS |
| AT&T Inc. | AT&T |
| Cbeyond, Inc., Integra Telecom, Inc., and One Communications Corp. | Cbeyond *et al.* |
| CenturyLink | CenturyLink |
| Comcast Corporation | Comcast |
| MetroPCS Communications, Inc. | MetroPCS |
| Nebraska Public Service Commission | Nebraska Commission |
| One Communications Corp. | One Communications |
| Qwest Corporation | Qwest |
| Sprint Nextel Corporation | Sprint Nextel |
| T-Mobile USA, Inc. | T-Mobile |
| Verizon | Verizon |
| Vonage Holdings Corporation | Vonage |
| XO Communications, LLC | XO |

| **Reply Comments** | **Abbreviation** |
|---|---|
| AT&T Inc. | AT&T |
| Broadview Networks, Inc., Cavalier Telephone, LLC, New Edge Networks, NuVox, U.S. TelePacific Corp. d//b/a TelePacific Communications, and XO Communications, LLC | Joint CLEC Commenters |
| CenturyLink | CenturyLink |
| Cbeyond, Inc., Integra Telecom, Inc., One Communications Corp., and TW Telecom, Inc. | Cbeyond *et al.* |
| Comcast Corporation | Comcast |
| Cox Communications, Inc. | Cox |
| GVNW Consulting, Inc. | GVNW |
| Level 3 Communications, LLC | Level 3 |
| Organization for the Promotion and Advancement of Small Telecommunications Companies and the National Telecommunications Cooperative Association | OPASTCO/NTCA |
| Qwest Corporations | Qwest |
| Texas Statewide Telephone Cooperative, Inc. | TSTCI |
| T-Mobile USA, Inc. | T-Mobile |
| Verizon and Verizon Wireless | Verizon |

**Public Notice**

| Commenter | Abbreviation |
|---|---|
| Alliance for Telecommunications Industry Solutions | ATIS |
| AT&T Inc. | AT&T |
| California Public Utilities Commission and the People of the State of California | CPUC |
| CenturyLink, Iowa Telecommunications, and Windstream | CenturyLink *et al.* |
| Charter Communications, Inc. | Charter |
| Comcast Corporation and Cox Communications, Inc. | Comcast/Cox |
| COMPTEL | COMPTEL |
| Sprint Nextel Corporation, T-Mobile USA, Inc., Verizon, Verizon Wireless, Qwest Corporation, CTIA – The Wireless Association®, and U.S. Cellular Corporation | Joint Commenters |

| Reply Comments | Abbreviation |
|---|---|
| Alliance for Telecommunications Industry Solutions | ATIS |
| AT&T Inc. | AT&T |
| California Public Utilities Commission and the People of the State of California | CPUC |
| Charter Communications, Inc. | Charter |
| Cincinnati Bell Telephone Company LLC | Cincinnati Bell |
| Insight Communications Company, Inc. | Insight |
| National Telecommunications Cooperative Association | NTCA |
| Qwest Corporation | Qwest |
| Verizon and Verizon Wireless | Verizon |

**APPENDIX B**

**Final Rules**

Part 52 of Title 47 of the Code of Federal Regulations is amended to read as follows:

**PART 52 – NUMBERING**

1. The authority citation for Part 52 continues to read as follows:

   Authority: Secs. 1, 2, 4, 5, 48 Stat. 1066, as amended; 47 U.S.C. 151, 152, 154 and 155 unless otherwise noted. Interpret or apply secs. 3, 4, 201-205, 207-09, 218, 225-27, 251-52, 271 and 332, 48 Stat. 1070, as amended, 1077; 47 U.S.C. 153, 154, 201-05, 207-09, 218, 225-27, 251-52, 271 and 332 unless otherwise noted.

2. Section 52.26 is amended by revising paragraph (a) as follows:

   **§ 52.26 NANC Recommendations on Local Number Portability Administration**

   (a) Local number portability administration shall comply with the recommendations of the North American Numbering Council (NANC) as set forth in the report to the Commission prepared by the NANC's Local Number Portability Administration Selection Working Group, dated April 25, 1997 (*Working Group Report*) and its appendices, which are incorporated by reference pursuant to 5 U.S.C. 552(a) and 1 CFR part 51. *Except that:* Section 7.10 of Appendix D and the following portions of Appendix E: section 7, Issue Statement I of Appendix A, and Appendix B in the *Working Group Report* are *not* incorporated herein.

   \* \* \* \* \*

3. Section 52.35 is amended by redesignating paragraph (b) as paragraph (c), redesignating paragraph (c) as paragraph (e), redesignating paragraph (d) as paragraph (f), revising paragraphs (a) and redesignated paragraph (e), and adding new paragraphs (b) and (d) as follows:

   **§ 52.35 Porting Intervals**

   (a) All telecommunications carriers required by the Commission to port telephone numbers must complete a simple wireline-to-wireline or simple intermodal port request within one business day unless a longer period is requested by the new provider or by the customer. The traditional work week of Monday through Friday represents mandatory business days and 8 a.m. to 5 p.m. represents minimum business hours, excluding the current service provider's company-defined holidays. An accurate and complete Local Service Request (LSR) must be received by the current service provider between 8 a.m. and 1 p.m. local time for a simple port request to be eligible for activation at midnight on the same day. Any simple port LSRs received after this time will be considered received on the following business day at 8 a.m. local time.

   (b) Small providers, as described in the *2009 LNP Porting Interval Order*, must comply with this section by February 2, 2011.

   (c) Unless directed otherwise by the Commission, any telecommunications carrier granted a waiver by the Commission of the one-business day porting interval described in subsection (a) must complete a simple wireline-to-wireline or simple intermodal port request within four business days unless a longer period is requested by the new provider or by the customer.

   (d) All telecommunications carriers required by the Commission to port telephone numbers must complete a non-simple wireline-to-wireline or non-simple intermodal port request within four business days unless a longer period is requested by the new provider or by the customer.

   (e) For purposes of this section, (1) the term "telecommunications carrier" includes an interconnected Voice over Internet Protocol (VoIP) provider as that term in defined in § 52.21(h);

(2) the term "local time" means the predominant time zone of the Number Portability Administration Center (NPAC) Region in which the telephone number is being ported; and (3) the term "intermodal ports" includes (i) wireline-to-wireless ports, (ii) wireless-to-wireline ports, and (iii) ports involving interconnected VoIP service.

4.      Section 52.36 is added to read as follows:

**§ 52.36 Standard Data Fields for Simple Port Order Processing**

(a)  A telecommunications carrier may require only the data described in subsections (b) and (c) of this section to accomplish a simple port order request from an end user customer's new telecommunication's carrier.

(b) *Required Standard Data Fields.*  (1) Ported Telephone Number; (2) Account Number; (3) Zip Code; (4) Company Code; (5) New Network Service Provider; (6) Desired Due Date; (7) Purchase Order Number; (8) Version; (9) Number Portability Direction Indicator; (10) Customer Carrier Name Abbreviation; (11) Requisition Type and Status; (12) Activity; (13) Telephone Number of Initiator; and (14) Agency Authority Status.

(c) *Optional Standard Data Field.*  The Passcode field shall be optional unless the passcode has been requested and assigned by the end user.

(d) For purposes of this section, the term "telecommunications carrier" includes an interconnected VoIP provider as that term is defined in § 52.21(h).

**APPENDIX C**

**NANC Business Day Recommendations**

### Simple Port – LSR-to-FOC Intervals

| Accurate/Complete Local Service Request (LSR) Received | Firm Order Confirmation (FOC) or Reject Due Back by Day/Time |
|---|---|
| Mon 8:00am through 8:59am | Mon 12:00pm (noon) through 12:59pm |
| Mon 9:00am through 9:59am | Mon 1:00pm through 1:59pm |
| Mon 10:00am through 10:59am | Mon 2:00pm through 2:59pm |
| Mon 11:00am through 11:59am | Mon 3:00pm through 3:59pm |
| Mon 12:00pm (noon) through 12:59pm | Mon 4:00pm through 4:59pm |
| Mon 1:00pm | Mon 5:00pm |
| Mon 1:01pm through Tues 7:59am | Tues 12:00pm (noon) |
| Tues 8:00am through 8:59am | Tues 12:00pm (noon) through 12:59pm |
| Tues 9:00am through 9:59am | Tues 1:00pm through 1:59pm |
| Tues 10:00am through 10:59am | Tues 2:00pm through 2:59pm |
| Tues 11:00am through 11:59am | Tues 3:00pm through 3:59pm |
| Tues 12:00pm (noon) through 12:59pm | Tues 4:00pm through 4:59pm |
| Tues 1:00pm | Tues 5:00pm |
| Tues 1:01pm through Weds 7:59am | Weds 12:00pm (noon) |
| Weds 8:00am through 8:59am | Weds 12:00pm (noon) through 12:59pm |
| Weds 9:00am through 9:59am | Weds 1:00pm through 1:59pm |
| Weds 10:00am through 10:59am | Weds 2:00pm through 2:59pm |
| Weds 11:00am through 11:59am | Weds 3:00pm through 3:59pm |
| Weds 12:00pm (noon) through 12:59pm | Weds 4:00pm through 4:59pm |
| Weds 1:00pm | Weds 5:00pm |
| Weds 1:01pm through Thurs 7:59am | Thurs 12:00pm (noon) |
| Thurs 8:00am through 8:59am | Thurs 12:00pm (noon) through 12:59pm |
| Thurs 9:00am through 9:59am | Thurs 1:00pm through 1:59pm |
| Thurs 10:00am through 10:59am | Thurs 2:00pm through 2:59pm |
| Thurs 11:00am through 11:59am | Thurs 3:00pm through 3:59pm |
| Thurs 12:00pm (noon) through 12:59pm | Thurs 4:00pm through 4:59pm |
| Thurs 1:00pm | Thurs 5:00pm |
| Thurs 1:01pm through Fri 7:59am | Fri 12:00pm (noon) |
| Fri 8:00am through 8:59am | Fri 12:00pm (noon) through 12:59pm |
| Fri 9:00am through 9:59am | Fri 1:00pm through 1:59pm |
| Fri 10:00am through 10:59am | Fri 2:00pm through 2:59pm |
| Fri 11:00am through 11:59am | Fri 3:00pm through 3:59pm |
| Fri 12:00pm (noon) through 12:59pm | Fri 4:00pm through 4:59pm |
| Fri 1:00pm | Fri 5:00pm |
| Fri 1:01pm through  Mon 7:59am | Mon 12:00pm (noon) |
| **(go back to top of chart)** | |

**Simple Port—LSR-to-FOC Intervals**
**Weekly Demonstration**

Note: This chart demonstrates the activity during a normal business week without holidays. Minimum business hours are 8 a.m. to 5 p.m., in the predominant time zone of the NPAC Region for the end user's telephone number, Monday through Friday, excluding the old service provider's company-defined holidays. If an old service provider's company-defined holiday falls on Monday through Friday, the activity that would have fallen on the holiday will occur the following business day.

| Accurate/Complete Local Service Request (LSR) Received | Firm Order Confirmation (FOC) Due Back by Date/Time (See Footnote 1) | Ready-to-Port Day/Time (See Footnote 2) |
|---|---|---|
| Mon 8:00am through 8:59am | Mon 12:00pm.(noon) through 12:59pm | Tues 00:00:00 |
| Mon 9:00am through 9:59am | Mon 1:00pm through 1:59pm | Tues 00:00:00 |
| Mon 10:00am through 10:59am | Mon 2:00pm through 2:59pm | Tues 00:00:00 |
| Mon 11:00am through 11:59am | Mon 3:00pm through 3:59pm | Tues 00:00:00 |
| Mon 12:00pm (noon) through 12:59pm | Mon 4:00pm through 4:59pm | Tues 00:00:00 |
| Mon 1:00pm | Mon 5:00pm | Tues 00:00:00 |
| Mon 1:01pm through Tues 7:59am | Tues 12:00pm (noon) | Weds 00:00:00 |
| Tues 8:00am through 8:59am | Tues 12:00pm (noon) through 12:59pm | Weds 00:00:00 |
| Tues 9:00am through 9:59am | Tues 1:00pm through 1:59pm | Weds 00:00:00 |
| Tues 10:00am through 10:59am | Tues 2:00pm through 2:59pm | Weds 00:00:00 |
| Tues 11:00am through 11:59am | Tues 3:00pm through 3:59pm | Weds 00:00:00 |
| Tues 12:00pm (noon) through 12:59pm | Tues 4:00pm through 4:59pm | Weds 00:00:00 |
| Tues 1:00pm | Tues 5:00pm | Weds 00:00:00 |
| Tues 1:01pm through Weds 7:59am | Weds 12:00pm (noon) | Thurs 00:00:00 |
| Weds 8:00am through 8:59am | Weds 12:00pm (noon) through 12:59pm | Thurs 00:00:00 |
| Weds 9:00am through 9:59am | Weds 1:00pm through 1:59pm | Thurs 00:00:00 |
| Weds 10:00am through 10:59am | Weds 2:00pm through 2:59pm | Thurs 00:00:00 |
| Weds 11:00am through 11:59am | Weds 3:00pm through 3:59pm | Thurs 00:00:00 |
| Weds 12:00pm (noon) through 12:59pm | Weds 4:00pm through 4:59pm | Thurs 00:00:00 |
| Weds 1:00pm | Weds 5:00pm | Thurs 00:00:00 |
| Weds 1:01pm through Thurs 7:59am | Thurs 12:00pm (noon) | Fri 00:00:00 |
| Thurs 8:00am through 8:59am | Thurs 12:00pm (noon) through 12:59pm | Fri 00:00:00 |
| Thurs 9:00am through 9:59am | Thurs 1:00pm through 1:59pm | Fri 00:00:00 |
| Thurs 10:00am through 10:59am | Thurs 2:00pm through 2:59pm | Fri 00:00:00 |
| Thurs 11:00am through 11:59am | Thurs 3:00pm through 3:59pm | Fri 00:00:00 |
| Thurs 12:00pm (noon) through 12:59pm | Thurs 4:00pm through 4:59pm | Fri 00:00:00 |
| Thurs 1:00pm | Thurs 5:00pm | Fri 00:00:00 |

| Thurs 1:01pm through Fri 7:59am | Fri 12:00pm (noon) | Mon 00:00:00 |
|---|---|---|
| Fri 8:00am through 8:59am | Fri 12:00pm (noon) through 12:59pm | Mon 00:00:00 |
| Fri 9:00am through 9:59am | Fri 1:00pm through 1:59pm | Mon 00:00:00 |
| Fri 10:00am through 10:59am | Fri 2:00pm through 2:59pm | Mon 00:00:00 |
| Fri 11:00am through 11:59am | Fri 3:00pm through 3:59pm | Mon 00:00:00 |
| Fri 12:00pm (noon) through 12:59pm | Fri 4:00pm through 4:59pm | Mon 00:00:00 |
| Fri 1:00pm | Fri 5:00pm | Mon 00:00:00 |
| Fri 1:01pm through Mon 7:59am | Mon 12:00pm (noon) | Tues 00:00:00 |
| **(go back to top of chart)** | | |

FN 1    The FOC interval is 4 business hours.  However, for LSRs arriving after the 1 p.m. cutoff time, the LSR will be considered received at 8 a.m. the next business day.  The old service provider must respond to an LSR within 4 business hours, with either a FOC (if it receives a complete and accurate LSR) or a reject (if it receives an incomplete and/or inaccurate LSR).  Issuing a FOC or a reject in this time frame assumes that the requested due date is in 1-2 business days and the LSR was received by 1 p.m.  If the requested due date is three or more business days, the FOC or reject is due within 24 clock hours.  If the port request is non-simple, a response is also due within 24 clock hours.  Nevertheless, if the request is for a simple port, but the old service provider determines that it is actually a non-simple port request, a response (a FOC with an extended due date or a reject) is still due back within 4 hours.

FN 2    Once the FOC is received, the port will be ready to activate on the business day and time indicated in this column.  No provider is required to activate on a non-business day (Saturday, Sunday or old service provider company-defined holiday).  However, a non-business day activation may be performed as long as both service providers agree and any service provider activating a port on a non-business day understands that the old (porting-out) service provider may not have, and is not required to have, operational support available on non-business days.  In agreeing to non-business day activations, the old (porting-out) service provider may require that the LSR/FOC and the new (porting-in) service provider Subscription Version (SV) Create message that is sent to the NPAC be due-dated for the appropriate normal business day seen in Ready-to-Port column, in order to ensure that the end user's service is maintained.

**APPENDIX D**

**Final Regulation Flexibility Analysis**

**WC Docket No. 07-244, CC Docket No. 95-116**

1.     As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Analysis (IFRA) was incorporated in the *Porting Interval Order and Further Notice* in WC Docket No. 07-244.[2]   The Commission sought written public comment on the proposals in the Further Notice, including comment on the IRFA.[3]  We received comments on the Further Notice and also received comments directed toward the IRFA from two commenters in WC Docket No. 07-244. These comments are discussed below.  This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[4]

**A.     Need for, and Objective of, the Rules**

2.     This Report and Order (Order) adopts standardized data fields for simple number porting to streamline the port process and enable service providers to accomplish simple wireline-to-wireline and intermodal ports within one business day.[5]  The Commission's purpose in mandating a one-business day porting interval was to "ensure that consumers are able to port their telephone numbers efficiently and to enhance competition for all communications services."[6]  However, the industry has expressed concern that meeting the Commission's one-business day porting interval for simple ports will be difficult without standardization of information fields for the simple port ordering process.  There is a need for uniformity and standardization in the exchange of information fields.[7]  Too many information fields increase the opportunity for errors in the simple port ordering process, as do too few fields.  Errors lead to delays, which harm consumers and thwart competition, as consumers may attribute delays to their new service providers.

3.     Timely implementation of the one-business day simple porting interval is crucial so that both consumers and service providers may begin to realize the benefits of the shortened porting interval. The Commission concludes that 14 information fields are necessary to accomplish a simple port, and mandates that service providers use the 14 fields described in this Order – and only those 14 fields – to accomplish a simple port.[8]  The Commission recognizes that some carriers can accomplish simple ports

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See Local Number Portability Porting Interval and Validation Requirements; Telephone Number Portability*, WC Docket No. 07-244, CC Docket No. 95-116, Report and Order and Further Notice of Proposed Rulemaking, 24 FCC Rcd 6084, 6095, para. 19 & Appendix D (2009) (*Porting Interval Order and Further Notice*).

[3] *See id.* at 6095, para. 19 & Appendix D (seeking comment on the benefits and burdens on small entities of adopting rules regarding the porting process).

[4] *See* 5 U.S.C. § 604.

[5] *See Local Number Portability Porting Interval and Validation Requirements; Telephone Number Portability*, WC Docket No. 07-244, CC Docket No. 95-116, Report and Order and Further Notice of Proposed Rulemaking, 24 FCC Rcd 6084, 6095, para. 19 (2009) (*Porting Interval Order and Further Notice*) (seeking comment on additional ways to streamline the number porting processes and whether different or additional information fields are necessary for completing simple ports).

[6] *Porting Interval Order and Further Notice*, 24 FCC Rcd at 6084, para. 1.

[7] *See* Order, *supra* para. 8.

[8] *See* Order, *supra* para. 9.

using fewer than 14 fields, while other carriers have built systems that require more than 14 fields. However, the Commission believes, and the industry agrees, that standardization and uniformity are of greater importance than the precise number and substance of the fields. Further, the Commission believes that the fields it has chosen strike the right balance between minimizing the number of simple ports that fall out of the porting process and the burden on the industry, ensuring that consumers are able to reap the most benefit from the shortened one-business day porting interval. The Commission finds that it is reasonable to require all providers to use these 14 standardized fields to accomplish simple ports within one business day, and that doing so will minimize errors and port request fallout, streamline the simple port process, and maximize the benefits to consumers.

4.    In addition, the Order adopts recommendations submitted to the Commission by the North American Numbering Council (NANC) in response to the Commission's request in its May 13, 2009, *Porting Interval Order and Further Notice*.[9]  Specifically, the Commission adopts the NANC's recommendations for porting process provisioning flows. The Commission finds that the provisioning process flows recommended by the NANC are essential to the deployment of the one-business day porting interval for simple ports because they will ensure that communications between service providers and database administrators proceed in a clear and orderly fashion so that porting requests can be handled in an efficient and timely manner.[10]

5.    The Order also adopts as part of the NANC-recommended flows the recommendation that a current service provider return a Customer Service Record (CSR), if requested and available, to the new service provider within 24 clock hours, unless otherwise negotiated, excluding weekends and current service provider holidays.[11]  Because the time interval for return of a CSR is often longer than the Commission's one-business day interval, the Commission's efforts to streamline and make the porting process more efficient by reducing the porting interval may be frustrated by the CSR process, which is often a prelude to porting. Therefore, the Commission adopts the NANC's recommendation, and finds it consistent with the Commission's efforts to improve the effectiveness and efficiency of the porting process.

6.    The Order also adopts the NANC's recommendation for counting a business day in the context of number porting, and adopts a rule to aid in implementing the one-business day simple porting interval. The Order finds that precision in explaining what constitutes a "business day" for purposes of the porting process is vital in order for simple ports to be completed within one business day.

**B.    Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

7.    In this section, we respond to comments filed in response to the IRFA. To the extent we received comments raising general small business concerns during this proceeding, those comments are discussed throughout the Report and Order.

8.    Sprint Nextel comments that many rural LECs resist number portability and standardization because of the rural LECs' costly manual processing, but contends that rural LECs would benefit from additional standardization of the port process. Sprint Nextel suggests that a trade association could develop a number portability communications package that each rural LEC could utilize, eliminating the

---

[9] *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6090, para. 10.

[10] *See Telephone Number Portability*, CC Docket No. 95-116, RM 8535, Second Report and Order, 12 FCC Rcd 12281, 12316, para. 58 (1997) (*Second Number Portability Order*).

[11] *See* NANC Nov. 2, 2009 *Ex Parte* Letter, Attach. 1 at 18 ("3.2 Recommended Revised NANC LNP Provisioning Flows").

current reliance on consultants for these functions and significantly reducing operational costs for the rural LECs.[12]  T-Mobile comments that new porting rules outweigh any potential burdens because an efficient porting process will ultimately lower all providers' costs, specifically mentioning the wireless-to-wireless process as an example.[13]

9.    We agree with these assertions, and have considered the economic impact on small entities and what ways are feasible to minimize the burdens imposed on those entities.  To the extent feasible, we have implemented those less burdensome alternatives, and we discuss these alternatives in Section E, *infra*.

C.    **Description and Estimate of the Number of Small Entities to Which the Rules Will Apply**

10.    The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[14]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[15]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[16]  A small business concern is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[17]

11.    *Small Businesses*.  Nationwide, there are a total of approximately 29.6 million small businesses, according to the SBA.[18]

12.    *Small Organizations*.  Nationwide, there are approximately 1.6 million small organizations.[19]  A "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[20]

1.    **Telecommunications Service Entities**

a.    **Wireline Carriers and Service Providers**

13.    We have included small incumbent local exchange carriers (LECs) in this present RFA analysis.  As noted above, a "small business" under the RFA is one that, *inter alia*, meets the pertinent small business size standard (*e.g.*, a telephone communications business having 1,500 or fewer

---

[12] *See* Sprint Nextel Comments at 14-15.

[13] *See* T-Mobile Comments at 7.

[14] 5 U.S.C. §§ 603(b)(3), 604(a)(3).

[15] 5 U.S.C. § 601(6).

[16] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such terms which are appropriate to the activities of the agency and publishes such definitions(s) in the Federal Register."

[17] 15 U.S.C. § 632.

[18] *See* SBA, Office of Advocacy, "Frequently Asked Questions," http://web.sba.gov/faqs/faqindex.cfm?areaID=24 (revised Sept. 2009).

[19] Independent Sector, The New Nonprofit Almanac & Desk Reference (2002).

[20] 5 U.S.C. § 601(4).

employees) and "is not dominant in its field of operation."[21] The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent LECs are not dominant in their field of operation because any such dominance is not "national" in scope.[22] We have therefore included small incumbent LECs in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

14. *Incumbent LECs.* Neither the Commission nor the SBA has developed a small business size standard specifically for incumbent local exchange services. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[23] According to Commission data,[24] 1,311 carriers have reported that they are engaged in the provision of incumbent local exchange services. Of these 1,311 carriers, an estimated 1,024 have 1,500 or fewer employees and 287 have more than 1,500 employees. Consequently, the Commission estimates that most providers of incumbent local exchange service are small businesses that may be affected by our proposed action.

15. *Competitive LECs, Competitive Access Providers (CAPs), "Shared-Tenant Service Providers," and "Other Local Service Providers."* Neither the Commission nor the SBA has developed a small business size standard specifically for these service providers. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[25] According to Commission data,[25] 1005 carriers have reported that they are engaged in the provision of either competitive access provider services or competitive local exchange carrier services. Of these 1005 carriers, an estimated 918 have 1,500 or fewer employees and 87 have more than 1,500 employees. In addition, 16 carriers have reported that they are "Shared-Tenant Service Providers," and all 16 are estimated to have 1,500 or fewer employees. In addition, 89 carriers have reported that they are "Other Local Service Providers." Of the 89, all have 1,500 or fewer employees. Consequently, the Commission estimates that most providers of competitive local exchange service, competitive access providers, "Shared-Tenant Service Providers," and "Other Local Service Providers" are small entities that may be affected by our proposed action.

16. *Interexchange Carriers (IXCs).* Neither the Commission nor the SBA has developed a small business size standard specifically for providers of interexchange services. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[27] According to Commission data,[28] 300 carriers have

---

[21] 15 U.S.C. § 632.

[22] Letter from Jere W. Glover, Chief Counsel for Advocacy, SBA, to William E. Kennard, Chairman, FCC (May 27, 1999). The Small Business Act contains a definition of "small-business concern," which the RFA incorporates into its own definition of "small business." *See* 15 U.S.C. § 632(a) (Small Business Act); 5 U.S.C. § 601(3) (RFA). SBA regulations interpret "small business concern" to include the concept of dominance on a national basis. *See* 13 C.F.R. § 121.102(b).

[23] 13 C.F.R. § 121.201, North American Industry Classification System (NAICS) code 517110.

[24] FCC, Wireline Competition Bureau, Industry Analysis and Technology Division, *Trends in Telephone Service* at Table 5.3, Page 5-5 (Aug. 2008) (*Trends in Telephone Service*). This source uses data that are current as of November 1, 2006.

[25] 13 C.F.R. § 121.201, NAICS code 517110.

[26] *Trends in Telephone Service* at Table 5.3.

[27] 13 C.F.R. § 121.201, NAICS code 517110.

[28] *Trends in Telephone Service* at Table 5.3.

reported that they are engaged in the provision of interexchange service. Of these, an estimated 268 have 1,500 or fewer employees and 32 have more than 1,500 employees. Consequently, the Commission estimates that the majority of IXCs are small entities that may be affected by our proposed action.

17. *Local Resellers.* The SBA has developed a small business size standard for the category of Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[29] According to Commission data,[30] 151 carriers have reported that they are engaged in the provision of local resale services. Of these, an estimated 149 have 1,500 or fewer employees and two have more than 1,500 employees. Consequently, the Commission estimates that the majority of local resellers are small entities that may be affected by our proposed action.

18. *Toll Resellers.* The SBA has developed a small business size standard for the category of Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[31] According to Commission data,[32] 815 carriers have reported that they are engaged in the provision of toll resale services. Of these, an estimated 787 have 1,500 or fewer employees and 28 have more than 1,500 employees. Consequently, the Commission estimates that the majority of toll resellers are small entities that may be affected by our proposed action.

19. *Operator Service Providers (OSPs).* Neither the Commission nor the SBA has developed a small business size standard specifically for operator service providers. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[33] According to Commission data,[34] 28 carriers have reported that they are engaged in the provision of operator services. Of these, an estimated 27 have 1,500 or fewer employees and one has more than 1,500 employees. Consequently, the Commission estimates that the majority of OSPs are small entities that may be affected by our proposed action.

20. *Prepaid Calling Card Providers.* Neither the Commission nor the SBA has developed a small business size standard specifically for prepaid calling card providers. The appropriate size standard under SBA rules is for the category Telecommunications Resellers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[35] According to Commission data,[36] 88 carriers have reported that they are engaged in the provision of prepaid calling cards. Of these, an estimated 85 have 1,500 or fewer employees and three have more than 1,500 employees. Consequently, the Commission estimates that the majority of prepaid calling card providers are small entities that may be affected by our proposed action.

21. *800 and 800-Like Service Subscribers.*[37] Neither the Commission nor the SBA has developed a small business size standard specifically for 800 and 800-like service ("toll free") subscribers. The appropriate size standard under SBA rules is for the category Telecommunications

---

[29] 13 C.F.R. § 121.201, NAICS code 517310.

[30] *Trends in Telephone Service* at Table 5.3.

[31] 13 C.F.R. § 121.201, NAICS code 517310.

[32] *Trends in Telephone Service* at Table 5.3.

[33] 13 C.F.R. § 121.201, NAICS code 517110.

[34] *Trends in Telephone Service* at Table 5.3.

[35] 13 C.F.R. § 121.201, NAICS code 517310.

[36] *Trends in Telephone Service* at Table 5.3.

[37] We include all toll free number subscribers in this category, including those for 888 numbers.

Resellers.  Under that size standard, such a business is small if it has 1,500 or fewer employees.[38]  The most reliable source of information regarding the number of these service subscribers appears to be data the Commission receives from Database Service Management on the 800, 866, 877, and 888 numbers in use.[39]  According to our data, at the end of December 2007, the number of 800 numbers assigned was 7,860,000; the number of 888 numbers assigned was 5,210,184; the number of 877 numbers assigned was 4,388,682; and the number of 866 numbers assigned was 7,029,116.  We do not have data specifying the number of these subscribers that are independently owned and operated or have 1,500 or fewer employees, and thus are unable at this time to estimate with greater precision the number of toll free subscribers that would qualify as small businesses under the SBA size standard.  Consequently, we estimate that there are 7,860,000 or fewer small entity 800 subscribers; 5,210,184 or fewer small entity 888 subscribers; 4,388,682 or fewer small entity 877 subscribers, and 7,029,116 or fewer entity 866 subscribers.

### b.     International Service Providers

22.   *Satellite Telecommunications and All Other Telecommunications.*  These two economic census categories address the satellite industry.  The first category has a small business size standard of $15 million or less in average annual receipts, under SBA rules.[40]  The second has a size standard of $25 million or less in annual receipts.[41]  The most current Census Bureau data in this context, however, are from the (last) economic census of 2002, and we will use those figures to gauge the prevalence of small businesses in these categories.[42]

23.   The category of Satellite Telecommunications "comprises establishments primarily engaged in providing telecommunications services to other establishments in the telecommunications and broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications."[43]  For this category, Census Bureau data for 2002 show that there were a total of 371 firms that operated for the entire year.[44]  Of this total, 307 firms had annual receipts of under $10 million, and 26 firms had receipts of $10 million to $24,999,999.[45]  Consequently, we estimate that the majority of Satellite Telecommunications firms are small entities that might be affected by our action.

24.   The second category of All Other Telecommunications comprises, *inter alia,* "establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation. This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and

---

[38] 13 C.F.R. § 121.201, NAICS code 517310.

[39] *Trends in Telephone Service* at Tables 18.4, 18.5, 18.6, and 18.7.

[40] 13 C.F.R. § 121.201, NAICS code 517410.

[41] 13 C.F.R. § 121.201, NAICS code 517919.

[42] 13 C.F.R. § 121.201, NAICS codes 517410 and 517910 (2002).

[43] U.S. Census Bureau, 2007 NAICS Definitions, "517410 Satellite Telecommunications"; http://www.census.gov/naics/2007/def/ND517410.HTM.

[44] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 517410 (issued Nov. 2005).

[45] *Id.*  An additional 38 firms had annual receipts of $25 million or more.

receiving telecommunications from, satellite systems."[46]  For this category, Census Bureau data for 2002 show that there were a total of 332 firms that operated for the entire year.[47]  Of this total, 303 firms had annual receipts of under $10 million and 15 firms had annual receipts of $10 million to $24,999,999.[48]  Consequently, we estimate that the majority of All Other Telecommunications firms are small entities that might be affected by our action.

      **c.**      **Wireless Telecommunications Service Providers**

    25.   Below, for those services subject to auctions, we note that, as a general matter, the number of winning bidders that qualify as small businesses at the close of an auction does not necessarily represent the number of small businesses currently in service.  Also, the Commission does not generally track subsequent business size unless, in the context of assignments or transfers, unjust enrichment issues are implicated.

    26.   *Wireless Service Providers (Except Satellite).*  Since 2007, the Census Bureau has placed wireless firms within this new, broad, economic census category.[49]  Prior to that time, such firms were within the now-superseded categories of "Paging" and "Cellular and Other Wireless Telecommunications."[50]  Under the present and prior categories, the SBA has deemed a wireless business to be small if it has 1,500 or fewer employees.[51]  Because Census Bureau data are not yet available for the new category, we will estimate small business prevalence using the prior categories and associated data.  For the category of Paging, data for 2002 show that there were 807 firms that operated for the entire year.[52]  Of this total, 804 firms had employment of 999 or fewer employees, and three firms had employment of 1,000 employees or more.[53]  For the category of Cellular and Other Wireless Telecommunications, data for 2002 show that there were 1,397 firms that operated for the entire year.[54]  Of this total, 1,378 firms had employment of 999 or fewer employees, and 19 firms had employment of 1,000 employees or more.[55]  Thus, we estimate that the majority of wireless firms are small.

---

[46] U.S. Census Bureau, 2007 NAICS Definitions, "517919 All Other Telecommunications"; http://www.census.gov/naics/2007/def/ND517919.HTM#N517919.

[47] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 517910 (issued Nov. 2005).

[48] *Id.*  An additional 14 firms had annual receipts of $25 million or more.

[49] U.S. Census Bureau, 2007 NAICS Definitions, "517210 Wireless Telecommunications Categories (Except Satellite)"; http://www.census.gov/naics/2007/def/ND517210.HTM#N517210.

[50] U.S. Census Bureau, 2002 NAICS Definitions, "517211 Paging"; http://www.census.gov/epcd/naics02/def/NDEF517.HTM.; U.S. Census Bureau, 2002 NAICS Definitions, "517212 Cellular and Other Wireless Telecommunications"; http://www.census.gov/epcd/naics02/def/NDEF517.HTM.

[51] 13 C.F.R. § 121.201, NAICS code 517210 (2007 NAICS).  The now-superseded, pre-2007 C.F.R. citations were 13 C.F.R. § 121.201, NAICS codes 517211 and 517212 (referring to the 2002 NAICS).

[52] U.S. Census Bureau, 2002 Economic Census, Subject Series:  Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 5, NAICS code 517211 (issued Nov. 2005).

[53] *Id.*  The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[54] U.S. Census Bureau, 2002 Economic Census, Subject Series:  Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 5, NAICS code 517212 (issued Nov. 2005).

[55]  *Id.*  The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

27. *Common Carrier Paging.* As noted, the SBA has developed a small business size standard for Wireless Telecommunications Carriers (except Satellite) firms within the broad economic census categories of "Cellular and Other Wireless Telecommunications."[56] Since 2007, the Census Bureau has placed wireless firms within this new, broad, economic census category.[57] Prior to that time, such firms were within the now-superseded categories of "Paging" and "Cellular and Other Wireless Telecommunications."[58] Under the present and prior categories, the SBA has deemed a wireless business to be small if it has 1,500 or fewer employees.[59] Because Census Bureau data are not yet available for the new category, we will estimate small business prevalence using the prior categories and associated data. For the category of Paging, data for 2002 show that there were 807 firms that operated for the entire year.[60] Of this total, 804 firms had employment of 999 or fewer employees, and three firms had employment of 1,000 employees or more.[61] For the category of Cellular and Other Wireless Telecommunications, data for 2002 show that there were 1,397 firms that operated for the entire year.[62] Of this total, 1,378 firms had employment of 999 or fewer employees, and 19 firms had employment of 1,000 employees or more.[63] Thus, we estimate that the majority of wireless firms are small.

28. In addition, in the *Paging Second Report and Order*, the Commission adopted a size standard for "small businesses" for purposes of determining their eligibility for special provisions such as bidding credits and installment payments.[64] A small business is an entity that, together with its affiliates and controlling principals, has average gross revenues not exceeding $15 million for the preceding three years.[65] The SBA has approved this definition.[66] An initial auction of Metropolitan Economic Area ("MEA") licenses was conducted in the year 2000. Of the 2,499 licenses auctioned, 985

[56] 13 C.F.R. § 121.201, NAICS code 517212.

[57] U.S. Census Bureau, 2007 NAICS Definitions, "517210 Wireless Telecommunications Categories (Except Satellite)"; http://www.census.gov/naics/2007/def/ND517210.HTM#N517210.

[58] U.S. Census Bureau, 2002 NAICS Definitions, "517211 Paging"; http://www.census.gov/epcd/naics02/def/NDEF517.HTM.; U.S. Census Bureau, 2002 NAICS Definitions, "517212 Cellular and Other Wireless Telecommunications"; http://www.census.gov/epcd/naics02/def/NDEF517.HTM.

[59] 13 C.F.R. § 121.201, NAICS code 517210 (2007 NAICS). The now-superseded, pre-2007 C.F.R. citations were 13 C.F.R. § 121.201, NAICS codes 517211 and 517212 (referring to the 2002 NAICS).

[60] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 5, NAICS code 517211 (issued Nov. 2005).

[61] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[62] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 5, NAICS code 517212 (issued Nov. 2005).

[63] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[64] *Revision of Part 22 and Part 90 of the Commission's Rules to Facilitate Future Development of Paging Systems*, Second Report and Order, 12 FCC Rcd 2732, 2811-2812, paras. 178-181 (*Paging Second Report and Order*); *see also Revision of Part 22 and Part 90 of the Commission's Rules to Facilitate Future Development of Paging Systems*, Memorandum Opinion and Order on Reconsideration, 14 FCC Rcd 10030, 10085-10088, paras. 98-107 (1999).

[65] *Paging Second Report and Order*, 12 FCC Rcd at 2811, para. 179.

[66] *See* Letter from Aida Alvarez, Administrator, SBA, to Amy Zoslov, Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, FCC (Dec. 2, 1998) (*Alvarez Letter 1998*).

were sold.[67]  Fifty-seven companies claiming small business status won 440 licenses.[68]  A subsequent auction of MEA and Economic Area ("EA") licenses was held in the year 2001.  Of the 15,514 licenses auctioned, 5,323 were sold.[69]  One hundred thirty-two companies claiming small business status purchased 3,724 licenses.  A third auction, consisting of 8,874 licenses in each of 175 EAs and 1,328 licenses in all but three of the 51 MEAs, was held in 2003.  Seventy-seven bidders claiming small or very small business status won 2,093 licenses.[70]

29.    Currently, there are approximately 74,000 Common Carrier Paging licenses.  According to the most recent *Trends in Telephone Service*, 281 carriers reported that they were engaged in the provision of "paging and messaging" services.[71]  Of these, an estimated 279 have 1,500 or fewer employees and two have more than 1,500 employees.[72]  We estimate that the majority of common carrier paging providers would qualify as small entities under the SBA definition.

30.    *Wireless Telephony*.  Wireless telephony includes cellular, personal communications services, and specialized mobile radio telephony carriers.  As noted, the SBA has developed a small business size standard for Wireless Telecommunications Carriers (except Satellite).[73]  Under the SBA small business size standard, a business is small if it has 1,500 or fewer employees.[74]  According to *Trends in Telephone Service* data, 434 carriers reported that they were engaged in wireless telephony.[75]  Of these, an estimated 222 have 1,500 or fewer employees and 212 have more than 1,500 employees.[76]  We have estimated that 222 of these are small under the SBA small business size standard.

31.    *Broadband Personal Communications Service*.  The broadband personal communications services ("PCS") spectrum is divided into six frequency blocks designated A through F, and the Commission has held auctions for each block.  The Commission has created a small business size standard for Blocks C and F as an entity that has average gross revenues of less than $40 million in the three previous calendar years.[77]  For Block F, an additional small business size standard for "very small business" was added and is defined as an entity that, together with its affiliates, has average gross revenues of not more than $15 million for the preceding three calendar years.[78]  These small business size

---

[67] *See 929 and 931 MHz Paging Auction Closes,* Public Notice, 15 FCC Rcd 4858 (WTB 2000).

[68] *See id.*

[69] *See Lower and Upper Paging Band Auction Closes*, Public Notice, 16 FCC Rcd 21821 (WTB 2002).

[70] *See Lower and Upper Paging Bands Auction Closes*, Public Notice, 18 FCC Rcd 11154 (WTB 2003).  The current number of small or very small business entities that hold wireless licenses may differ significantly from the number of such entities that won in spectrum auctions due to assignments and transfers of licenses in the secondary market over time.  In addition, some of the same small business entities may have won licenses in more than one auction.

[71] *Trends in Telephone Service* at Table 5.3.

[72] *Id.*

[73] 13 C.F.R. § 121.201, NAICS code 517210.

[74] *Id.*

[75] *Trends in Telephone Service* at Table 5.3.

[76] *Id.*

[77] *See Amendment of Parts 20 and 24 of the Commission's Rules – Broadband PCS Competitive Bidding and the Commercial Mobile Radio Service Spectrum Cap*, Report and Order, 11 FCC Rcd 7824, 7850-7852, paras. 57-60 (1996) (*PCS Report and Order*); *see also* 47 C.F.R. § 24.720(b).

[78] *See PCS Report and Order*, 11 FCC Rcd at 7852, para. 60.

standards, in the context of broadband PCS auctions, have been approved by the SBA.[79]  No small businesses within the SBA-approved small business size standards bid successfully for licenses in Blocks A and B.  There were 90 winning bidders that qualified as small entities in the Block C auctions.  A total of 93 "small" and "very small" business bidders won approximately 40 percent of the 1,479 licenses for Blocks D, E, and F.[80]  In 1999, the Commission reauctioned 155 C, D, E, and F Block licenses; there were 113 small business winning bidders.[81]

32.    In 2001, the Commission completed the auction of 422 C and F Broadband PCS licenses in Auction 35.  Of the 35 winning bidders in this auction, 29 qualified as "small" or "very small" businesses.[82]  Subsequent events, concerning Auction 35, including judicial and agency determinations, resulted in a total of 163 C and F Block licenses being available for grant.  In 2005, the Commission completed an auction of 188 C block licenses and 21 F block licenses in Auction 58.  There were 24 winning bidders for 217 licenses.[83]  Of the 24 winning bidders, 16 claimed small business status and won 156 licenses.  In 2007, the Commission completed an auction of 33 licenses in the A, C, and F Blocks in Auction 71.[84]  Of the 14 winning bidders, six were designated entities.[85]  In 2008, the Commission completed an auction of 20 Broadband PCS licenses in the C, D, E and F block licenses in Auction

33.    *Advanced Wireless Services.*  In 2008, the Commission conducted the auction of Advanced Wireless Services ("AWS") licenses.[86]  This auction, which was designated as Auction 78, offered 35 licenses in the AWS 1710-1755 MHz and 2110-2155 MHz bands ("AWS-1").  The AWS-1 licenses were licenses for which there were no winning bids in Auction 66.  That same year, the Commission completed Auction 78.  A bidder with attributed average annual gross revenues that exceeded $15 million and did not exceed $40 million for the preceding three years ("small business") received a 15 percent discount on its winning bid.  A bidder with attributed average annual gross revenues that did not exceed $15 million for the preceding three years ("very small business") received a 25 percent discount on its winning bid.  A bidder that had combined total assets of less than $500 million and combined gross revenues of less than $125 million in each of the last two years qualified for entrepreneur status.[87]  Four winning bidders that identified themselves as very small businesses won 17 licenses.[88]  Three of the winning bidders that identified themselves as a small business won five licenses.  Additionally, one other winning bidder that qualified for entrepreneur status won 2 licenses.

---

[79] *See Alvarez Letter 1998.*

[80] FCC News, "Broadband PCS, D, E and F Block Auction Closes," No. 71744 (rel. Jan. 14, 1997).

[81] *See C, D, E, and F Block Broadband PCS Auction Closes*, Public Notice, 14 FCC Rcd 6688 (WTB 1999).

[82] *See C and F Block Broadband PCS Auction Closes; Winning Bidders Announced*, Public Notice, 16 FCC Rcd 2339 (2001).

[83] *See Broadband PCS Spectrum Auction Closes; Winning Bidders Announced for Auction No. 58*, Public Notice, 20 FCC Rcd 3703 (2005).

[84] *See Auction of Broadband PCS Spectrum Licenses Closes; Winning Bidders Announced for Auction No. 71*, Public Notice, 22 FCC Rcd 9247 (2007).

[85] *Id.*

[86] *See AWS-1 and Broadband PCS Procedures*, Public Notice, 23 FCC Rcd 7496.  Auction 78 also included an auction of Broadband PCS licenses.

[87] *Id.* at 7521-22.

[88] *See Auction of AWS-1 and Broadband PCS Licenses Closes, Winning Bidders Announced for Auction 78, Down Payments Due September 9, 2008, FCC Forms 601 and 602 Due September 9, 2008, Final Payments Due September 23, 2008, Ten-Day Petition to Deny Period*, Public Notice, 23 FCC Rcd 12749-65 (2008).

### 2. Cable and OVS Operators

34. *Cable Television Distribution Services.* Since 2007, these services have been defined within the broad economic census category of Wired Telecommunications Carriers; that category is defined as follows: "This industry comprises establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks. Transmission facilities may be based on a single technology or a combination of technologies."[89] The SBA has developed a small business size standard for this category, which is: all such firms having 1,500 or fewer employees. To gauge small business prevalence for these cable services we must, however, use current census data that are based on the previous category of Cable and Other Program Distribution and its associated size standard; that size standard was: all such firms having $13.5 million or less in annual receipts.[90] According to Census Bureau data for 2002, there were a total of 1,191 firms in this previous category that operated for the entire year.[91] Of this total, 1,087 firms had annual receipts of under $10 million, and 43 firms had receipts of $10 million or more but less than $25 million.[92] Thus, the majority of these firms can be considered small.

35. *Cable Companies and Systems.* The Commission has also developed its own small business size standards, for the purpose of cable rate regulation. Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers, nationwide.[93] Industry data indicate that, of 1,076 cable operators nationwide, all but eleven are small under this size standard.[94] In addition, under the Commission's rules, a "small system" is a cable system serving 15,000 or fewer subscribers.[95] Industry data indicate that, of 6,635 systems nationwide, 5,802 systems have under 10,000 subscribers, and an additional 302 systems have 10,000-19,999 subscribers.[96] Thus, under this second size standard, most cable systems are small.

36. *Cable System Operators.* The Communications Act of 1934, as amended, also contains a size standard for small cable system operators, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than 1 percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed

---

[89] U.S. Census Bureau, 2007 NAICS Definitions, "517110 Wired Telecommunications Carriers" (partial definition); http://www.census.gov/naics/2007/def/ND517110.HTM#N517110.

[90] 13 C.F.R. § 121.201, NAICS code 517110.

[91] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, Table 4, Receipts Size of Firms for the United States: 2002, NAICS code 517510 (issued November 2005).

[92] *Id.* An additional 61 firms had annual receipts of $25 million or more.

[93] 47 C.F.R. § 76.901(e). The Commission determined that this size standard equates approximately to a size standard of $100 million or less in annual revenues. *Implementation of Sections of the 1992 Cable Act: Rate Regulation,* Sixth Report and Order and Eleventh Order on Reconsideration, 10 FCC Rcd 7393, 7408 (1995).

[94] These data are derived from: R.R. Bowker, *Broadcasting & Cable Yearbook 2006,* "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); Warren Communications News, *Television & Cable Factbook 2006,* "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

[95] 47 C.F.R. § 76.901(c).

[96] Warren Communications News, *Television & Cable Factbook 2008,* "U.S. Cable Systems by Subscriber Size," page F-2 (data current as of Oct. 2007). The data do not include 851 systems for which classifying data were not available.

$250,000,000."[97] The Commission has determined that an operator serving fewer than 677,000 subscribers shall be deemed a small operator, if its annual revenues, when combined with the total annual revenues of all its affiliates, do not exceed $250 million in the aggregate.[98] Industry data indicate that, of 1,076 cable operators nationwide, all but ten are small under this size standard.[99] We note that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million,[100] and therefore we are unable to estimate more accurately the number of cable system operators that would qualify as small under this size standard.

37.    *Open Video Systems (OVS).*  The open video system ("OVS") framework was established in 1996, and is one of four statutorily recognized options for the provision of video programming services by local exchange carriers.[101]  The OVS framework provides opportunities for the distribution of video programming other than through cable systems.  Because OVS operators provide subscription services,[102] OVS falls within the SBA small business size standard covering cable services, which is "Wired Telecommunications Carriers."[103]  The SBA has developed a small business size standard for this category, which is:  all such firms having 1,500 or fewer employees.  To gauge small business prevalence for such services we must, however, use current census data that are based on the previous category of Cable and Other Program Distribution and its associated size standard; that size standard was:  all such firms having $13.5 million or less in annual receipts.[104]  According to Census Bureau data for 2002, there were a total of 1,191 firms in this previous category that operated for the entire year.[105]  Of this total, 1,087 firms had annual receipts of under $10 million, and 43 firms had receipts of $10 million or more but less than $25 million.[106]  Thus, the majority of cable firms can be considered small.  In addition, we note that the Commission has certified some OVS operators, with some now providing service.[107] Broadband service providers ("BSPs") are currently the only significant holders of OVS certifications or

[97]  47 U.S.C. § 543(m)(2); *see* 47 C.F.R. § 76.901(f) & nn. 1-3.

[98]  47 C.F.R. § 76.901(f); *see FCC Announces New Subscriber Count for the Definition of Small Cable Operator*, Public Notice, DA 01-158 (Cable Services Bureau, Jan. 24, 2001).

[99]  These data are derived from:  R.R. Bowker, *Broadcasting & Cable Yearbook 2006*, "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); Warren Communications News, *Television & Cable Factbook 2006*, "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

[100]  The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(f) of the Commission's rules.  *See* 47 C.F.R. § 76.909(b).

[101]  47 U.S.C. § 571(a)(3)-(4).  *See Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, Thirteenth Annual Report,* 24 FCC Rcd 542, 606 ¶ 135 (2009) (*Thirteenth Annual Cable Competition Report*).

[102]  *See* 47 U.S.C. § 573.

[103]  U.S. Census Bureau, 2007 NAICS Definitions, "517110 Wired Telecommunications Carriers"; http://www.census.gov/naics/2007/def/ND517110.HTM#N517110.

[104]  13 C.F.R. § 121.201, NAICS code 517110.

[105]  U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, Table 4, Receipts Size of Firms for the United States:  2002, NAICS code 517510 (issued November 2005).

[106]  *Id.*  An additional 61 firms had annual receipts of $25 million or more.

[107]  A list of OVS certifications may be found at http://www.fcc.gov/mb/ovs/csovscer.html.

local OVS franchises.[108]  The Commission does not have financial or employment information regarding the entities authorized to provide OVS, some of which may not yet be operational.  Thus, again, at least some of the OVS operators may qualify as small entities.

### 3.    Internet Service Providers

38.    *Internet Service Providers*.  The 2007 Economic Census places these firms, whose services might include voice over Internet protocol (VoIP), in either of two categories, depending on whether the service is provided over the provider's own telecommunications connections (*e.g.* cable and DSL, ISPs), or over client-supplied telecommunications connections (*e.g.* dial-up ISPs).  The former are within the category of Wired Telecommunications Carriers,[109] which has an SBA small business size standard of 1,500 or fewer employees.[110]  The latter are within the category of All Other Telecommunications,[111] which has a size standard of annual receipts of $25 million or less.[112]  The most current Census Bureau data for all such firms, however, are the 2002 data for the previous census category called Internet Service Providers.[113]  That category had a small business size standard of $21 million or less in annual receipts, which was revised in late 2005 to $23 million.  The 2002 data show that there were 2,529 such firms that operated for the entire year.[114]  Of those, 2,437 firms had annual receipts of under $10 million, and an additional 47 firms had receipts of between $10 million and $24,999,999.[115]  Consequently, we estimate that the majority of ISP firms are small entities.

39.    *All Other Information Services*.  "This industry comprises establishments primarily engaged in providing other information services (except new syndicates and libraries and archives)."[116]  The SBA has developed a small business size standard for this category; that size standard is $7.0 million or less in average annual receipts.[117]  However, data has not yet been collected under the new size standard, and so we refer to data collected under the previous size standard, $6.5 million or less in average annual receipts.  According to Census Bureau data for 2002, there were 155 firms in this category that operated for the entire year.[118]  Of these, 138 had annual receipts of under $5 million, and an additional four firms had

---

[108]  *See Thirteenth Annual Cable Competition Report*, 24 FCC Rcd at 606-07, para. 135.  BSPs are newer firms that are building state-of-the-art, facilities-based networks to provide video, voice, and data services over a single network.

[109]  U.S. Census Bureau, 2007 NAICS Definitions, "517110 Wired Telecommunications Carriers", http://www.census.gov/naics/2007/def/ND517110.HTM#N517110.

[110]  13 C.F.R. § 121.201, NAICS code 517110 (updated for inflation in 2008).

[111]  U.S. Census Bureau, 2007 NAICS Definitions, "517919 All Other Telecommunications"; http://www.census.gov/naics/2007/def/ND517919.HTM#N517919.

[112]  13 C.F.R. § 121.201, NAICS code 517919 (updated for inflation in 2008).

[113]  U.S. Census Bureau, "2002 NAICS Definitions, "518111 Internet Service Providers"; http://www.census.gov/eped/naics02/def/NDEF518.HTM.

[114]  U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 518111 (issued Nov. 2005).

[115]  An additional 45 firms had receipts of $25 million or more.

[116]  U.S. Census Bureau, "2002 NAICS Definitions:  519190 All Other Information Services," *available at* http://www.census.gov/epcd/naics02/def/ND519190.HTM (visited Apr. 7, 2010).

[117]  13 C.F.R. § 121.201, NAICS code 519190.

receipts of between $5 million and $9,999,999.  Consequently, we estimate that the majority of these firms are small entities that may be affected by our action.

> **D.**  **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements**

40.  This Order does not impose any new or modified reporting or recordkeeping requirements. However, service providers that are required to comply with the Commission's LNP requirements are now required to exchange these standard 14 data fields during the simple port ordering process.  For many providers, this is less than the number of fields they were previously exchanging.  However, for some providers, this may be greater than the number of fields they were previously exchanging during the simple port ordering process in order to accomplish a port.

> **E.**  **Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

41.  The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others):  (1) the establishment of differing compliance and reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or part thereof, for small entities.[119]

42.  In the *Porting Interval Order and Further Notice*, the Commission sought comment on the benefits and burdens, especially the burdens on small entities, of adopting any new rules regarding the porting process.[120]  However, we must assess the interests of small businesses in light of the overriding public interest in ensuring that all consumers benefit from local number portability.  The requirements adopted in today's Order implement the one-business day porting interval adopted in the Commission's *Porting Interval Order*.[121]  In that Order, the Commission concluded that reducing the porting interval for simple wireline-to-wireline and simple intermodal ports to one business day was necessary to enable customers to port their numbers in a timely fashion and to enhance competition.[122]  The steps the Commission takes today are critical to ensure that carriers are able to implement the one-business day simple porting interval in a timely manner.  The Commission did not receive comments regarding significant alternatives to the steps we take today for small providers as there was general industry consensus for our actions.  Further, in order for the steps we take today to be effective in ensuring that providers are able to accomplish simple ports in one business day, it is necessary that *all* providers follow the standardized fields, provisioning flows, and mandatory business hours.  We note, however, that the Commission has allowed small providers a longer period of time for implementing the one-business day porting interval.  Specifically, small providers are required to implement the reduced one-business day porting interval for simple wireline and simple intermodal ports no later than February 2, 2011.

---

(Continued from previous page)

[118] U.S. Census Bureau, 1997 Economic Census, Subject Series:  Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 514199 (issued Oct. 2000).  This category was created for the 2002 Economic Census by taking a portion of the superseded 1997 category, "All Other Information Services," NAICS code 514199.  The data cited in the text above are derived from the superseded category.

[119] *See* 5 U.S.C. § 603(c).

[120] *See Porting Interval Order and Further Notice*, 24 FCC Rcd at 6095, para. 19.

[121] *Id.* at 6089, para. 8.

[122] *See id.* at 6089, para. 8.

43. Further, small providers have options for seeking modification of the new LNP interval requirements. For example, under section 251(f)(2) of the Act, a LEC "with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for suspension or modification of the application of the requirements" of section 251(b), which includes the "duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission."[123] Providers may also apply for a waiver of the one-business day porting interval under the Commission's rules.[124] To demonstrate the good cause required by the Commission's waiver rule, a provider must show with particularity that it would be unduly economically burdensome for the provider to implement the reduced porting interval. In making this showing, a provider should address the number of port requests it receives as well as the specific costs that complying with the reduced porting interval would impose.

44. **Report to Congress:** The Commission will send a copy of the Order, including this FRFA, in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act.[125] A copy of the Order and FRFA (or summaries thereof) will also be published in the Federal Register.[126]

---

[123] *See* 47 U.S.C. §§ 251(f)(2), 251(b).

[124] *See* 47 C.F.R. § 1.3.

[125] *See* 5 U.S.C. § 801(a)(1)(A).

[126] *See* 5 U.S.C. § 604(b).

**STATEMENT OF**
**CHAIRMAN JULIUS GENACHOWSKI**

Re:     *Local Number Portability Porting Interval and Validation Requirements*, WC Docket No.
        07-244; *Telephone Number Portability*, CC Docket No. 09-116

        The Commission is taking an important step to ensure that consumers can quickly and easily
switch their telephone service providers if they want.  The Commission today completes the process of
requiring carriers to transfer customers' telephone numbers to their new service provider in a single
business day.  This *Order* demonstrates that smart government action can promote competition and
benefit consumers.

        While this *Order* provides many of the technical details that carriers need to port telephone
numbers in a streamlined manner, it is first and foremost about consumers.  Though few Americans may
care whether their phone company has to provide arcane information such as the "Purchase Order
Number" or the "Requisition Type and Status," we all understand what it means if our request to switch
to a new service provider is held up for multiple days.  Thanks to today's decision, that won't happen any
more.

        This *Order* also is about competition.  Consumers want carriers to compete on service quality and
price.  Consumers want phone companies to retain them as customers because they provide an excellent
service, not because it's too difficult to switch service providers.

        I am pleased that the item reflects a good amount of consensus.  While there was not complete
agreement among industry, many service providers agreed on a majority of the information fields that are
necessary to ensure seamless transitions from one carrier to another.  I appreciate the industry's active
participation in the proceeding and believe the *Order* benefits greatly from companies' hands-on
experience.  It shows what can happen when stakeholders roll up their sleeves and work with the
Commission on important goals.

        I thank Commissioner Copps for his work as Acting Chairman last May in beginning this
process, and the staff for their hard work in carrying it out.  While the average consumer may not spend
much time on the details, I appreciate that staff do.

**STATEMENT OF**
**COMMISSIONER MICHAEL J. COPPS**

Re:     *Local Number Portability Porting Interval and Validation Requirements*, WC Docket No. 07-244; *Telephone Number Portability*, CC Docket No. 95-116

I am pleased to support today's Order, which provides the final steps needed for carriers to implement the one-business day local number porting interval for wireline-to-wireline and intermodal ports that this Commission unanimously adopted just over one year ago when I was Acting Chairman.  In the 1996 Telecommunications Act, Congress imposed a number portability obligation on providers so consumers could retain their phone numbers when switching carriers.  This was both consumer-friendly and competition-friendly.  But not only do consumers have to be able to port their numbers, the providers need to complete the ports in a timely manner.  The FCC figured this out over a dozen years ago when it implemented a four-business day interval, and I think the shortened interval we adopted in last year's *Porting Interval Order* was a much-needed and achievable update.  I am pleased that, as promised, this Order adopts the necessary steps—standardized data fields for simple ports and the North American Numbering Council (NANC) recommendations for porting process provisioning flows and for addressing the one-business day requirement—to make the one-business day interval happen.  No doubt, there are always other issues to be considered—the interval for some non-simple ports or outstanding questions regarding CPNI to name just two.  But, at this time, the NANC, the FCC staff and the Chairman's office have done great work in preparing companies to implement this, starting in August.  I thank you all, and my colleagues, for the hard work put into finishing this process.  I look forward to witnessing and experiencing the many benefits that will, I am confident, flow from the implementation of this change.

**STATEMENT OF**
**COMMISSIONER ROBERT M. McDOWELL**

Re:     *Local Number Portability Porting Interval and Validation Requirements*, WC Docket No.
        07-244; *Telephone Number Portability*, CC Docket No. 95-116

        A year ago - almost to the day (May 13, 2009) - the Commission approved an order that reduced
the porting interval for simple wireline ports and simple intermodal ports from four days to one day.  I
wholeheartedly supported that decision because it empowered consumers to enjoy the benefits of
marketplace choice almost as quickly as technology allows.  At that time, the Commission provided a
generous and sensible glide path for implementing the change which first called for recommendations
from the North American Numbering Council (NANC).  In response to last year's order, NANC
submitted its recommendations, additional comments were filed, and we are now ready to move forward.
Accordingly, I am pleased to join my colleagues in establishing the implementation deadlines of August
2, 2010 for the large carriers and February 2, 2011 for the small carriers.

        This order finalizes some key outstanding issues such as clarifying, in great detail, what the
Commission means when it says a port must be completed in "one day."  For example, the order explains
that business days are Monday through Friday (excluding holidays) from 8:00 a.m. to 5:00 pm.
Additionally, we set forth that if a complete and accurate request for a port - Local Service Request (LSR)
- is received before 1:00 p.m., the number must be ready to port at midnight.  However, any LSR received
after 1:00 p.m. triggers a requirement that the port be ready to port the next day at midnight.  Such
information may seem basic but it is critical to ensure that all stakeholders are operating under the same
assumptions to avoid confusion and delays.

        I commend representatives from consumer groups and those in industry who participated in the
NANC working group.  The policy of one-day porting is a simple one but involves complex, technical
planning behind the scenes to ensure that consumers experience a seamless process.  As such, the advice
and comments from experts were critical to this process.  Second, I would like to recognize
Commissioner Copps for his leadership on this issue because he pushed through the resolution for a one-
day porting requirement while he was Acting Chairman.  Finally, I applaud Chairman Genachowski and
his staff for following through with the final necessary implementation requirements.  This is a positive
development for competition and, ultimately, for America's consumers who benefit from it.

**STATEMENT OF**
**COMMISSIONER MIGNON L. CLYBURN**

Re:     *Local Number Portability Porting Interval and Validation Requirements*, WC Docket No. 07-244; *Telephone Number Portability*, CC Docket No. 09-116

For many years the Commission has required that providers allow consumers to retain their telephone numbers when switching carriers, a pro-consumer and pro-competitive policy.  However, for wireline numbers, consumers have had to wait up to four days to switch providers.  With this Order, consumers will be able to switch their wireline provider or cut the cord and move their wireline number to a wireless carrier within one business day.  While I look forward to the day when the wireline porting interval is as short as the wireless-to-wireless interval (which is only two and one-half hours when consumers change wireless providers), I am pleased that we are removing the current untenable delay of three days for simple wireline ports, thereby allowing consumers who choose to switch providers to do so sooner than ever before.  I commend industry for working with NANC to implement the new one-business day interval for simple wireline ports.

**STATEMENT OF**
**COMMISSIONER MEREDITH A. BAKER**

Re:      *Local Number Portability Porting Interval and Validation Requirements*, WC Docket No.
         07-244; *Telephone Number Portability*, CC Docket No. 95-116

     I support this item today because efficient and timely local number portability is important to promote competition among service providers to the benefit of consumers. But perhaps more importantly, consumers care about numbers. They care about retaining their numbers when they switch providers and they care that porting their numbers goes as smoothly as possible. We take an important step toward improving the efficiency and timeliness of simple ports with this Order today. I thank the NANC members for their work on this issue and I commend the bureau staff for their fine work on this proceeding.