**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| Telephone Number Portability – | ) |
| | ) |
| | )    CC Docket No. 95-116 |
| Carrier Requests for Clarification of Wireless- | ) |
| Wireless Porting Issues | ) |
| | ) |
| | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

**Adopted:  October 3, 2003**                     **Released:  October 7, 2003**

By the Commission:  Commissioner Abernathy issuing a separate statement.

**TABLE OF CONTENTS**

                                                                    Paragraph

I.      INTRODUCTION................................................................................................1

II.     BACKGROUND................................................................................................3

III.    DISCUSSION

        A.    Business Rules....................................................................................10

        B.    Contract Abrogation ..........................................................................13

        C.    Request Requirement .........................................................................19

        D.    The Porting Interval ..........................................................................25

        E.    Porting of Numbers Served by Type 1 Interconnection ......................27

        F.    Requirement to Support Nationwide Roaming ...................................33

IV.     PROCEDURAL MATTERS AND ORDERING CLAUSES

        A.    Regulatory Flexibility Act..................................................................42

        B.    Paperwork Reduction Act of 1995 Analysis ......................................43

        C.    Ordering Clauses ...............................................................................44

## I.       INTRODUCTION

1.        In this order, we offer further guidance to the industry as it nears the November 24, 2003, deadline to provide wireless local number portability (LNP).  The guidance we offer today is applicable to wireless-wireless porting only.  We intend to address issues related to wireline-wireless porting in a separate order.  Today, in response to a Petition for Declaratory Ruling/Application for Review,[1] we hold that while carriers may agree to rules with their customers via contract, such rules may not restrict carriers' obligations to port numbers to other carriers upon receipt of a valid request to do so.

2.        In addition, we address several separate LNP implementation issues that have been raised in the context of the Cellular Telecommunications & Internet Association's May 13th Petition for Declaratory Ruling.[2]  We clarify that wireless carriers may not refuse a request to provide LNP from another wireless carrier on the basis of the lack of proximity of the requesting carrier's switch to the porting out carrier's switch.  We confirm also that interconnection agreements are not required for wireless to wireless porting and that, in cases where wireless carriers are unable to reach agreement regarding the terms and conditions of porting, all such carriers must port numbers upon receipt of a valid request from another carrier, with no conditions.  We encourage wireless carriers to complete "simple" ports within the industry-established two and one half hour porting interval.  We find that no action is necessary regarding the porting of numbers served by Type 1 interconnection because carriers are migrating these numbers to switches served by Type 2 interconnection or are otherwise developing solutions.  Finally, we reiterate the requirement that wireless carriers support roaming nationwide for customers with pooled and ported numbers, and we address outstanding petitions for waiver of the roaming requirement.

## II.      BACKGROUND

3.        On May 13, 2003, the Cellular Telecommunications & Internet Association (CTIA) filed a Petition for Declaratory Ruling, asking the Commission to resolve several outstanding LNP implementation issues.[3]  One of the issues CTIA raised was the wireless-to-wireless "porting interval," which refers to the amount of time it takes to complete the process of porting a number from one wireless carrier to another.  The wireless industry has established a two and one half hour porting interval as a guideline for ports between wireless carriers.[4]  In its

---

[1] Telephone Number Portability, CC Docket No. 95-116, Petition for Declaratory Ruling or, in the Alternative, Application for Review of ALLTEL Communications, Inc., AT&T Wireless Services, Inc., Cingular Wireless, Nextel Communications, and Sprint Corp., filed Aug. 1, 2003 (Wireless Carrier Group Petition).

[2] Telephone Number Portability, CC Docket No. 95-116, Petition for Declaratory Ruling of CTIA, filed May 13, 2003 (May 13th Petition).  We note that issues pertaining to wireless-wireline porting that have been raised in CTIA's May 13th petition and in other pleadings will be addressed separately.

[3] *Id.*.

[4] *See* North American Numbering Council Local Number Portability Administration Working Group Report on Wireless Wireline Integration, May 8, 1998, CC Docket No. 95-116 (filed May 18, 1998) (First Report on Wireless Wireline Integration); North American Numbering Council Wireless Number Portability Subcommittee Report on Wireless Number Portability Technical, Operational, and Implementation Requirements Phase II, CC Docket No. 95-116 (filed Sept. 26, 2000); ATIS Operations and Billing Forum, Wireless Intercarrier Communications: Interface Specification for Local Number Portability, Version 2, at § 2 p. 6 (Jan. 2003).

Petition, however, CTIA urged the Commission to adopt a porting interval in its rules to provide uniformity and certainty in the porting process. CTIA further asked for guidance on how carriers should comply with the Commission's wireless E911 requirements during the porting interval.

4. In addition to raising porting interval issues, the Petition sought a Commission ruling on whether CMRS carriers are required to enter into interconnection agreements as a pre-condition to porting numbers.[5] Although CTIA presented this issue primarily in the context of wireline-wireless porting, which we do not address in this order, some wireless carriers filed comments in response to the Petition asserting that this issue affects wireless-wireless porting also. In particular, certain rural wireless carriers asserted that in order for one wireless carrier to request number portability from another, the requesting carrier must have a local point of presence, local numbering resources, and local interconnection with the porting out carrier in the rate center with which the ported number is associated.[6] In a subsequent *ex parte* filing responding to the rural carriers, CTIA urged the Commission to address this issue in the wireless-wireless context.[7]

5. Finally, CTIA's Petition urged the Commission to address several other wireless-wireless porting issues, including the porting of numbers served by Type 1 interconnection and the requirement to support nationwide roaming with ported and pooled numbers.

6. On May 20, 2003, Verizon Wireless filed a letter asking the Commission to address so-called "business rules" associated with the wireless porting process. Specifically, Verizon requested confirmation from the Commission that wireless carriers may not impose restrictions on the porting-out process, beyond necessary customer validation requirements.[8] Verizon argued that, in the absence of clear guidance from the Commission, carriers might attempt to impose non-porting related conditions as an impediment to porting, e.g., by refusing to port if a customer owes an early termination fee to the old service provider or otherwise has an arrearage on an account.[9] Verizon argued that the Commission must ensure a level playing field for porting and that one carrier should not be allowed to implement portability subject to restrictive conditions, while other carriers allow customers to leave freely upon validation of identity.[10]

7. On July 3, 2003, the Wireless Telecommunication Bureau (Bureau) released a letter providing guidance on certain issues raised by CTIA and Verizon.[11] First, the Bureau addressed the implication of the porting interval for E911, clarifying that carriers could use a

---

[5] May 13th Petition at 16-23.

[6] *Ex Parte* Presentation of the Rural Wireless Working Group Re: Rural Wireless Number Portability Guidelines, Section 1.3, (filed Aug. 25, 2003) (Rural Wireless Working Group Filing).

[7] Letter from Diane Cornell, CTIA to Marlene H. Dortch, Secretary, FCC (filed Aug. 26, 2003).

[8] Letter from John T. Scott, III, Verizon Wireless to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116 (filed May 20, 2003).

[9] *Id*. at 2.

[10] *Id*. at 1.

[11] Letter from John B. Muleta, Chief, Wireless Telecommunications Bureau to John T. Scott, III, Verizon Wireless and Michael Altschul, CTIA CC Docket No. 95-116, DA 03-2190 (rel. July 3, 2003) (Bureau Letter).

mixed service approach in completing port requests.[12]  The Bureau clarified that a carrier's obligations during a "mixed service" period would extend only to delivering the 911 call and available calling party information.[13]

8.       Next, the Bureau addressed the issue of whether carriers may impose restrictions on the porting out process, beyond necessary customer validation requirements to prevent fraud. The Bureau clarified that, under the Act and the Commission's rules, carriers are required to port a number when they receive a valid request and may not refuse to port a number while attempting to collect fees, or settle an account, or for other reasons unrelated to validating a customer's identity. [14]

9.       On August 1, 2003, ALLTEL, AT&T Wireless, Cingular Wireless, Nextel, and Sprint (collectively "Wireless Petitioners") filed a petition seeking clarification or invalidation of the "business rules" portion of the Bureau's letter.[15]  The Wireless Petitioners contended that they do not view the letter as legally binding, but that in light of the fact that at least one carrier has asserted that the letter has binding affect, they believe that the industry would benefit from clarification of the legal status of the letter.  The carriers requested that the Commission rule that the statement in the Bureau letter regarding unconditional porting is non-binding.[16]  In the alternative, the group requested that the Commission review the Bureau letter and invalidate the Bureau's statement regarding unconditional porting on the grounds that such action: (1) exceeded authority delegated to the Chief of the Wireless Telecommunications Bureau; (2) violated the Administrative Procedure Act; (3) abrogated contracts without the requisite finding; and (4) created unsound public policy.[17]

## III.    DISCUSSION

### A.    Business Rules

10.      The Wireless Petitioners contend that if binding, the Bureau's letter would establish a "new" requirement—that wireless carriers port a number anytime they receive a verified porting request—in an area in which the Commission has issued no detailed rules.[18]  The carriers claim that if the guidance in the Bureau's letter is deemed binding, it would abrogate carriers' contractual rights, upset the delicate balance of benefits and obligations in wireless service arrangements, and harm rather than serve the public interest.[19]  The carriers ask the Commission to clarify that the Bureau's letter constitutes non-binding guidance, or in the alternative, that the Commission invalidate the Bureau's directive on unconditional porting.[20]

---

[12] *Id.* at 2.

[13] *Id.* at 2-3.

[14] *Id.* at 3.

[15] *See* Wireless Carrier Group Petition. The carriers did not seek clarification or review of that portion of the Bureau's letter pertaining to the implication of the porting interval for E911.

[16] *Id.* at 2.

[17] *Id.*

[18] *Id.* at 9.

[19] *Id.* at 6.

[20] *Id.*

11.     In considering whether the LNP rules permit carriers to impose restrictions on the porting out process, we must first analyze the definition of number portability. Under the Act and the Commission's rules, number portability is defined as the "ability of users of telecommunications services to retain at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another."[21] We interpret this language to mean that consumers must be able to change carriers while keeping their telephone number as easily as they may change carriers without taking their telephone number with them. Today, in the absence of portability, consumers may change service providers at any time, regardless of their standing with their current provider. We believe, therefore, that consumers should have the same flexibility to change service providers in a porting environment. Accordingly, we conclude that carriers may not impose non-porting related restrictions on the porting out process.

12.     With respect to the Wireless Petitioners' argument that the Bureau exceeded the scope of its delegated authority, we find that the issue is rendered moot since the Commission is addressing the merits of the Wireless Petitioners substantive claims.[22]

### B.     Contract Abrogation

13.     The group contends that preventing carriers from imposing restrictions on the porting-out process would interfere with carriers' existing contractual provisions, including those that establish minimum contract terms, early termination fees, and credit requirements.[23] The group contends that, as long as carriers have the option of delaying the port until the customer satisfies any outstanding financial obligations, the forgoing provisions allow carriers a reasonable opportunity to recover their investment in the customer.[24] In addition, the carrier group contends, the delay of a port in such circumstances reminds the customer of the outstanding obligations and allows the customer to make an informed decision about whether to proceed with the port. According to the carrier group, preventing carriers from imposing restrictions on the porting-out process would disrupt this equilibrium and effectively prevent carriers from recovering their full investment.[25] Moreover, the Wireless Petitioners argue, the policy would have an even greater effect where a contract explicitly provides that the carrier is not obligated to port a number if the customer's account is not paid in full.[26] The carriers contend that such provisions are a fair and elemental part of the carrier customer bargain, where the provider of the service need not perform a new service if the beneficiary has not paid for the service already rendered.[27] The carriers argue that they have the right to include such bargained for provisions in their service agreements and that the Bureau may not unilaterally abrogate such provisions.[28]

14.     We disagree that preventing carriers from imposing restrictions on the porting-

---

[21] 47 U.S.C. § 153 and 47 C.F.R. § 52.21(k).

[22] Wireless Carrier Group Petition at 7-8.

[23] *Id*. at 17.

[24] *Id*.

[25] *Id*.

[26] *Id*. at 18.

[27] *Id*.

[28] *Id*.

out process interferes with carriers' existing contractual provisions concerning minimum contract terms, early termination fees, credit requirements, or other similar provisions. Although we prevent carriers from imposing restrictions on porting beyond necessary customer validation procedures, this does not in any way invalidate provisions in carrier contracts pertaining to minimum contract terms, early termination fees, credit requirements, or other similar provisions. Nor do we prevent carriers from recovering their investment in their customers, as carriers remain free to seek compensation for any breach of contractual agreements. We clarify only that carriers may not hold a customer's number while attempting to settle the customer's account.

15.     Carriers may include provisions in their customer contracts on issues such as early termination and credit worthiness, but, to the extent that carriers' customer contracts have provisions stating specifically that consumers may not port their number before settling their account, we find such provisions to be without effect on the carrier's porting obligation. The Commission's number portability rules impose on carriers an obligation to port numbers to other carriers upon receipt of a valid request to do so.[29] Specifically, section 52.31 of the rules provides that, by the implementation deadline, "CMRS providers must provide a long term database method for number portability, including the ability to support roaming … in switches for which another carrier has made a specific request for the provision of number portability…."[30] Because of this requirement, carriers may not avoid their obligation to port numbers by establishing contracts with third parties, such as consumers. Accordingly, provisions in consumer contracts that purport to limit porting between carriers are ineffective.

16.     We disagree also with the Wireless Petitioners' argument that preventing carriers from imposing restrictions on the porting-out process constitutes unsound public policy. As explained above, we do not sanction or encourage consumers to breach their contractual obligations. Nor do we prevent carriers from collecting any outstanding fees or charges from consumers pursuant to traditional contractual remedies. We clarify only that carriers may not refuse to complete a port while attempting to collect fees or settle an account with a customer. We do not prevent carriers from alerting a customer to the consequences of terminating service prior to the end of the carrier's agreement with the customer. For example, if carriers wish to, they may agree among themselves to notify a customer during the porting process that an unpaid bill or unfulfilled contract remains with the porting out carrier. Indeed, we would encourage carriers to come to such arrangements to provide their customers with all the information they need to decide whether it is in their best interest to actually switch to another carrier.

17.     Moreover, we disagree with the Wireless Petitioners' argument that preventing carriers from imposing restrictions on the porting-out process will harm consumers or affect carriers' abilities to offer discounted rates or improved features.[31] Preventing carriers from imposing restrictions on porting will benefit consumers by preventing carriers from establishing barriers to competitive switching. With consumers able to switch more freely among carriers, competitive pressure will encourage carriers to compete for customers by offering lower prices and new services.

18.     As the industry implements portability, we intend to monitor the effect of our directive. If there is evidence indicating any widespread abuse of the porting process, we will

---

[29] 47 CFR §§ 52.23, 52.31.

[30] 47 C.F.R. § 52.31.

[31] Wireless Carrier Group Petition at 20-21.

reexamine this issue to determine whether any further action is necessary.

### C.   Request Requirement

19.     The comments filed in response to CTIA's Petition have revealed divergent views about whether wireless-wireless porting can occur in the absence of an interconnection agreement between the requesting carrier and the porting out carrier.  As noted above, some rural wireless carriers have asserted that in order for one wireless carrier to request number portability from another, the requesting carrier must have a local point of presence, local numbering resources, and local interconnection with the porting out carrier in the rate center with which the ported number is associated.[32]  These carriers contend that, absent such preconditions, LNP will lead to massive customer confusion and discrimination against small and rural carriers.[33]  Therefore, the rural carriers claim that requests for portability from carriers without interconnecting facilities and agreements need not be considered "bona fide" requests for portability.  Guidelines for wireless porting recently proposed by a group of rural wireless carriers provide for porting only where the conditions outlined above are met.[34]

20.     In response, CTIA and several carriers argue that carriers should not be allowed to impose these types of conditions on wireless-wireless porting.   They contend that porting is technically feasible regardless of whether the requesting carrier has a presence or numbering resources in the rate center, or interconnects directly with the porting out carrier, and that limiting the obligation to port numbers on this basis would be economically inefficient, waste numbering resources, and frustrate the competitive objectives of LNP.  They further note that in the absence of Commission clarification on this issue, some wireless carriers have rejected porting requests unless these conditions are met, potentially impeding the availability of wireless LNP in their areas by the November 24 deadline.[35]

21.     In light of this divergence of views, we take this opportunity to reiterate the number portability requirements for wireless-wireless porting.  However, we do not here address the issues related to wireline-wireless porting.  Issues associated with wireline-wireless porting will be addressed in a separate item, and we affirm that none of the actions we take here today bind the Commission in any way in taking future action on the implementation of wireline-wireless porting.  Section 52.31 of the rules provides that, by the LNP implementation deadline, all CMRS carriers must provide a long term database method for number portability in switches for which another carrier has made a request for the provision of number portability.[36]  Nothing in the rules provides that wireless carriers must port numbers only in cases where the requesting carrier has numbering resources and/or a direct interconnection in the rate center associated with the number to be ported and wireless carriers may not demand that carriers meet these conditions before porting.  Similarly, any agreements establishing terms for interconnection are also not required between wireless carriers.  Of course, nothing would prevent carriers from entering into interconnection agreements on a voluntary basis; however, no carrier may unilaterally refuse to

---

[32] Rural Telecommunications Group (RTG) Comments on CTIA's May 13th Petition at ii.

[33] *Id.*

[34] *Ex Parte* Presentation of the Rural Wireless Working Group Re: Rural Wireless Number Portability Guidelines, Section 1.3, (filed Aug. 25, 2003) (Rural Wireless Working Group Filing).

[35] Letter from Diane Cornell, CTIA to Marlene H. Dortch, Secretary, FCC (filed Aug. 26, 2003).

[36] 47 C.F.R. § 52.31.

port with another carrier because that carrier will not enter into an interconnection agreement.

22.     Limiting wireless-wireless porting based on wireline rate centers as the rural wireless carriers suggest would also undermine the competitive benefits of wireless LNP. The Commission established number portability requirements for wireless carriers to spur increased competition, thereby creating incentives for wireless carriers to offer lower prices and higher quality service.  But the practical effect of limiting wireless-wireless porting based on wireline rate centers would be to limit the ability of some consumers to port their telephone numbers from one wireless carrier to another.  We see no reason to impose such restrictions on the competitive alternatives available to wireless consumers.  Because wireless service is spectrum-based and mobile in nature, wireless carriers do not utilize or depend on the wireline rate center structure to provide service:  wireless licensing and service areas are typically much larger than wireline rate center boundaries, and wireless carriers typically charge their subscribers based on minutes of use rather than location or distance.

23.     We also note that some rural wireless carriers have expressed concern about potential rating issues that may be associated with transporting calls to ported numbers.  For example, RTG asserts that, in porting numbers to wireless carriers that do not have a point of presence in the local area, a donating rural wireless carrier delivering a call to a ported number would be forced to deliver the call outside of its local service area and thereby incur transport charges that were not factored into its rate design.[37]  We recognize the concerns of these wireless providers, but find that they are outside the scope of this order.  The requirements of our wireless LNP rules on wireless carriers do not vary depending on how calls to the number will be rated and routed after the port occurs.  We also note that the rating and routing issues raised by the rural wireless carriers have been raised in the context of non-ported numbers and are before the Commission in other proceedings.[38]  Therefore, without prejudging the outcome of any other proceeding, we decline to address these issues further as they relate to wireless to wireless LNP.

24.     Although our rules allow carriers to determine on their own what type of agreement to use to facilitate porting and ensure efficient exchange of information, we are concerned about delays in implementation that could result from uncertainty regarding baseline requirements for porting or from carriers' inability to reach agreements.  In light of these concerns, we find it appropriate to address how porting should be implemented in cases where carriers cannot reach agreement.  As stated above, the number portability rules require carriers to port upon receipt of a request from another carrier to do so.[39]  Under this requirement, in cases where carriers are not able to reach agreement, carriers must port numbers upon request, with no conditions.  Absent an agreement setting additional terms, carriers need only share basic contact and technical information sufficient to perform the port.[40]  We trust that by clarifying this default

---

[37] RTG Comments on CTIA's May 13th Petition at 4.

[38] *See, e.g.* In the Matter of Sprint Petition for Declaratory Ruling, Obligation of Incumbent LECs to Load Numbering Resources Lawfully Acquired and to Honor Routing and Rating Points Designated by Interconnecting Carriers, Sprint Petition for Declaratory Ruling, CC Docket No. 01-92 (filed July 18, 2002).

[39] 47 C.F.R. § 52.31.

[40] Sprint's profile information exchange process is an example of the type of contact and technical information that would trigger an obligation to port.  *See,* Letter from Luisa L. Lancetti, Vice President PCS Regulatory Affairs, Sprint Corp. to John B. Muleta, Chief, Wireless Telecommunications Bureau
(continued....)

requirement, we will eliminate uncertainty and provide an incentive for carriers to reach agreement quickly. Moreover, this requirement will ensure that carrier negotiations do not delay the availability of portability for consumers, while permitting carriers the flexibility to negotiate porting agreements that meet their particular needs.

### D.      The Porting Interval

25.      In its May 13th petition, CTIA asserts that, although the porting interval is primarily a concern with respect to ports between wireless and wireline carriers, disputes regarding the porting interval may also affect wireless to wireless ports where certain wireless carriers refuse to complete a port within the two and one half hour porting interval that has been established by industry working groups.[41] While the majority of wireless carriers support the industry guideline,[42] a number of rural wireless carriers responding to CTIA May 13th petition argue that the Commission should not mandate a porting interval for all carriers.[43] The carriers argue that, instead, the porting interval is a matter that can be addressed by contact between the donor and recipient carriers based on the requirements of a particular market.[44] The rural carriers assert that adopting a two and one half hour wireless porting interval would be unduly burdensome to rural carriers who lack resources to implement such an interval.[45]

26.      We share CTIA's concern about potential delays that could occur in cases where carriers refuse to comply with the industry-established porting interval. Members of the wireless industry have worked together cooperatively over the past several years to establish procedures for wireless porting, and have determined that simple ports between wireless carriers should take no longer than two and one half hours to complete.[46] We view this industry standard as feasible and would encourage carriers to complete wireless-wireless ports within this timeframe. Although we recognize the concerns that some carriers have expressed, there is insufficient evidence for us to conclude that it is technically or operationally infeasible for these carriers to

---

(...continued from previous page)
(filed Sept. 23, 2003); Letter from Luisa L. Lancetti, Vice President, PCS Regulatory Affairs, Sprint Corp. to John B. Muleta, Chief, Wireless Telecommunications Bureau and William Maher, Chief, Wireline Competition Bureau (filed August 8, 2003).

[41] May 13th Petition at 8.

[42] *See e.g.*, Cingular Comments on CTIA's May 13th Petition at 26-27, Sprint Comments on CTIA's May 13th Petition at 10, T-Mobile Comments on CTIA's May 13th Petition at 7.

[43] RTG Comments on CTIA's May 13th Petition at 12.

[44] *Id.*

[45] *Id.*

[46] *See* North American Numbering Council Local Number Portability Administration Working Group Report on Wireless Wireline Integration, May 8, 1998, CC Docket No. 95-116 (filed May 18, 1998) (First Report on Wireless Wireline Integration); North American Numbering Council Wireless Number Portability Subcommittee Report on Wireless Number Portability Technical, Operational, and Implementation Requirements Phase II, CC Docket No. 95-116 (filed Sept. 26, 2000); ATIS Operations and Billing Forum, Wireless Intercarrier Communications: Interface Specification for Local Number Portability, Version 2, at § 2 p. 6 (Jan. 2003). We note that the two and one half hour interval does not apply to complex ports. Complex ports are ports that generally require more time for coordination due to factors such as number of lines, multiple geographic locations, multiple time zones, involvement of multiple service providers, or other similar factors. Simple ports generally involve fewer complicating factors, e.g. single-line account port.

meet the industry standard that carriers have worked to develop. At the same time, because wireless LNP implementation is still in its early stages, we do not see a present need to propose formally incorporating the industry standard into our rules. We encourage all members of the industry to continue to work together to make further refinements to porting procedures as LNP is implemented and to continue their efforts to facilitate the process of porting for consumers. We also note that even though we are not proposing to adopt a mandatory wireless porting interval at this time, the reasonableness standard of section 201 of the Communications Act of 1934[47] does apply to the amount of time carriers take to complete port requests. It may be unreasonable for carriers to take longer than two and one half hours to complete a port. If we receive numerous complaints from consumers about the length of the porting process as wireless LNP is implemented, we will reexamine this issue to determine whether further action is required.

### E. Porting of Numbers Served by Type 1 Interconnection

27. In its May 13th Petition, CTIA urges the Commission to address BellSouth's claims with respect to porting by wireless carriers using Type 1 interconnection. CTIA refers to comments filed by BellSouth in response to its January 23rd Petition, in which BellSouth argues that because the industry has been unable to reach consensus on procedures for Type I porting, the Commission should initiate a rulemaking to examine the issue more closely.[48] BellSouth explains that Type 1 numbers reside in an end office of a LEC and are assigned to a Type 1 interconnection group, which connects the wireless carrier's switch and the LEC's end office switch. All traffic terminating to Type 1 wireless numbers routes to the LEC Type 1 interconnection office.[49] BellSouth explains that, because of this interconnection arrangement, a wireline LEC will always be involved in the porting of a Type 1 wireless number, regardless of whether the porting is between two wireless carriers or a wireless and wireline carrier.[50]

28. BellSouth asserts that, because wireline carriers are involved in porting of numbers served by Type 1 interconnection, a number of issues are raised. For example, BellSouth notes that porting of Type 1 numbers must pass rate center validation.[51] Another issue, BellSouth asserts, concerns central office code administration and the NPAC. BellSouth explains that, although dedicated Type 1 codes are designated in the Local Exchange Routing Guide (LERG) as owned by the wireless service provider, the codes reside in a wireline end office switch. According to BellSouth, this presents an issue with indicating the correct service provider ID ownership in the NPAC database.[52] BellSouth argues that the industry has experienced difficulty reaching consensus on the processes and requirements for coordinating service orders

---

[47] 47 U.S.C. § 201.

[48] BellSouth Comments on CTIA's January 23rd Petition at 3.

[49] *Id.* at 2.

[50] *Id.*

[51] BellSouth explains that in order to pass rate center validation, both the donor switch and the recipient switch must reside in the same toll message rate center. BellSouth asserts that this issue could block the following types of ports: wireless to wireless (Type 1 to Type 1), wireless to wireline (Type 1 to BST or reseller), and wireline to wireless (BST or reseller to Type 1). *See* Letter from Kathleen B. Levitz, Vice President-Federal Regulatory, BellSouth Corp. to Marlene H. Dortch, Secretary, FCC at 7 (filed May 1, 2003).

[52] *Id.* at 8.

and developing interfaces to accommodate Type 1 porting.[53]

29.     CTIA argues that the Commission can achieve resolution of these matters by granting its rate center petition and affirming the right of all consumers to port their numbers, including those served by Type 1 interconnection.  CTIA contends that granting its rate center petition would oblige wireline carriers to develop a new procedure to honor port requests involving wireless carriers that does not involve rate center validation.  CTIA further contends that the Commission need not establish the procedures for Type 1 porting itself, it need only establish the right of customers to port numbers to and from CMRS providers irrespective of wireline rate center boundaries, including customers served by Type 1 interconnection.[54]

30.     As CTIA acknowledges, the NANC has been working to address issues associated with Type 1 porting over the past several years.[55]  Specifically, the NANC's Local Number Portability Administration Working Group released a report last November addressing Type 1 interconnection.[56]  The report proposed that service providers be allowed to migrate the telephone number blocks associated with Type 1 interconnection from the wireline switches into wireless switches which would interface with the Public Switched Telephone Network over Type 2 interconnection trunks.  The report found that migrating numbers into wireless switches offers advantages to wireless carriers and minimizes the number of complex porting activities involving wireline carriers.  The report noted, however, that carriers would not be required to migrate Type 1 number blocks.

31.     In light of the consensus recommendation in the Working Group report, it appears that members of the industry have been working cooperatively to address the issues associated with porting numbers served by Type 1 interconnection and have made substantial progress.  We support the recommendations of the Working Group report and strongly encourage carriers to pursue a migration strategy.   As noted in the Working Group Report, the migration strategy offers several significant advantages, including allowing wireless carriers to offer advanced services to their Type 1 customers, and reducing the number of complex wireline ports.[57]

32.     For numbers that are not migrated, evidence from the record suggests that carriers are working to finalize procedures to ensure that these numbers may be ported.  Particularly, BellSouth, in an *ex parte* filing, indicates that it has developed and implemented switch translations to facilitate the porting of numbers served by Type 1 interconnection.[58]  Accordingly, it appears that even apart from pursuing a migration strategy, carriers have made significant progress in addressing issues associated with porting numbers served by a Type 1 interconnection and that further Commission action is not necessary at this time.  As porting is implemented, we intend to closely monitor Type 1 porting to determine whether any additional

---

[53] BellSouth Comments on CTIA's May 13th Petition at 12.

[54] May 13th Petition at 28.

[55] May 13th Petition at 28-29.

[56] Local Number Portability Working Group Report on the Migration of Numbers Associated with Type 1 Interconnection Arrangements (dated June 28, 2002) (revised Nov. 12, 2002) (Migration Report).

[57] *Id*. at 2, 5.

[58] *See* Letter from Kathleen B. Levitz, Vice President-Federal Regulatory, BellSouth, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116 (dated July 23, 2003).

action is needed.

### F.      Requirement to Support Nationwide Roaming

33.      In its May 13th petition, CTIA argues that the Commission needs to clarify when the requirement to support nationwide roaming goes into effect for rural and small carriers.[59] CTIA notes that several rural carriers have filed petitions for extension of the deadline for supporting roaming,[60] and argues that these requests pose genuine claims and raise serious implications for consumers and carriers alike.  CTIA argues that the Commission must resolve these issues to ensure that carriers clearly understand their obligations with respect to roaming.

34.      Under Commission rules and orders, all wireless carriers were required to support roaming by customers with pooled or ported numbers by November 24, 2002.[61]  The requirement to support roaming was intended to ensure that if a customer with a ported or pooled number roams into another wireless carrier's network, that carrier will support the customer's ability to make and receive calls.  We expect carriers to comply with their regulatory obligations and support roaming nationwide for customers with pooled and ported numbers.  We do not agree with CTIA that, because several carriers have filed requests for extension, the rules regarding roaming are unclear.  Nevertheless, we take this opportunity to resolve outstanding extension requests.

35.      *Pine Belt.*  On November 22, 2002, Pine Belt PCS, Inc. and Pine Belt Cellular (Pine Belt) filed a petition seeking an extension of the November 24, 2002, deadline for wireless carriers to provide nationwide roaming support for end-users with pooled or ported numbers.[62] Pine Belt requested a one-year extension of the November 24, 2002, deadline.  In addition to the extension of the deadline to support roaming, Pine Belt also requested a waiver or temporary extension of the Commission's requirement under section 20.18(d) of the rules that carriers deliver valid call back numbers to Public Safety Answering Points (PSAPs) in the areas where they are providing Phase I Enhanced 911 (E911) service.  On September 23, 2003, Pine Belt filed an amended petition for waiver, requesting an additional six months, until May 23, 2004, to provide nationwide roaming support for customers with pooled or ported numbers.[63]

36.      The Commission's rules provide that the Commission may suspend or waive its rules, in whole or in part, for "good cause shown."[64]  In addition, the Commission may waive

---

[59] May 13th Petition at 31.

[60] *See* Petition for Waiver by Pine Belt PCS, Inc. and Pine Belt Cellular, Inc. CC Docket No. 99-200 and 95-116, WT Docket No. 01-184, filed Nov. 22, 2002 (Pine Belt Petition); Petition for Limited Waiver and Extension of Time by Kodiak Wireless, LLC, CC Docket No. 99-200, filed Nov. 22, 2002; Petition for Limited Waiver and Tension of Time by Cellular Phone of Kentucky, Inc., CC Docket No. 99-200, filed Nov. 22, 2002; Petition for Limited Waiver and Extension of Time by Litchfield Cellular, CC Docket No. 99-200, filed Nov. 22, 2002.

[61] *See* 47 C.F.R. 52.31(a); *See also* Verizon Wireless Petition for Partial Forbearance from the Commercial Mobile Radio Services Number Portability Obligation, WT Docket No. 01-184, and CC Docket No. 95-116, *Memorandum Opinion and Order*, 17 FCC Rcd 14972, 14976, para. 31.

[62] *See* Pine Belt Petition.

[63] Amended Petition for Waiver by Pine Belt PCS, Inc. and Pine Belt Cellular, Inc. CC Docket Nos. 99-200, 95-116, WT Docket No. 01-184, filed Sept. 23, 2003 (Pine Belt's Amended Petition).

[64] 47 C.F.R. § 1.3.

specific requirements of a rules where, in view of unique or unusual factual circumstances, application of the rule would be inequitable, unduly burdensome, or contrary to the public interest, or if the applicant has no reasonable alternative.[65]  The courts have found that waiver is appropriate "if special circumstances warrant a deviation from the general rule and such deviation will serve the public interest."[66]

37.      We find that the extension of time that Pine Belt requests is warranted in view of Pine Belt's particular circumstances.  Pine Belt has demonstrated its efforts to minimize disruptions to roamers during the temporary extension period.  Specifically, Pine Belt reports that it has informed PSAPs in its service area of its inability to provide a correct call back number for roamers on its network served by ported or pooled numbers and has developed a procedure for PSAPs to notify Pine Belt in any case where a PSAP experiences difficulty handling a 911 call on Pine Belt's network.[67]  Since it filed its original petition, Pine Belt indicates, it has not received reports from any PSAP indicating problems relating to call back roamers.  Pine Belt commits to maintaining this procedure throughout the term of the extension period and to reporting any notification from PSAPs to the Commission.  In view of Pine Belt's efforts, and the limited potential for disruption to E911 service, we find that it would be appropriate to grant the relief Pine Belt requests.  Moreover, considering that Pine Belt does not serve an area in the largest 100 MSAs and therefore is not required to offer LNP to its own customers until May 24, 2004, at the earliest, we find that it is not unreasonable to permit Pine Belt a limited amount of additional time to complete the network upgrades necessary to support roaming.  We therefore, grant Pine Belt's request for an extension until May 23, 2004, of the deadline for support of roaming by customers with ported or pooled numbers.

38.      *Kodiak Wireless.*  On November 22, 2002, Kodiak Wireless (Kodiak) filed a petition seeking an extension of the November 24, 2002, deadline to support roaming nationwide for customers with pooled and ported numbers.[68]  Kodiak, a small, rural CMRS provider argued that it had been particularly burdened by the costs of providing roaming support for phones with pooled or ported numbers because of its limited resources.  Kodiak argued that its resources were already strained by the need to meet other federal mandates such as E911.  As a result, Kodiak indicated that it would not be able to meet the November 24, 2002, deadline and requested a partial waiver and an extension of the deadline to July 1, 2003.  On February 11, 2003, Kodiak filed an Amendment to its petition, requesting to shorten the amount of time it requested to meet the Commission's requirements from the end of the second quarter of 2003 to February 28, 2003.[69]

39.      Subsequently, on February 27, 2003, Kodiak filed a letter indicating that it had completed the necessary upgrades to its networks and was able to support roaming for customers

---

[65] 47 C.F.R. § 1.925(b)(3)(ii).

[66] *See* Northeast Cellular Telephone Co. v. FCC, 897 F. 2d 1164, 1166 (D.C. Cir. 1990) (citing WAIT Radio v. FCC 418 F. 2d 1153 (D.C. Cir. 1969)).

[67] *See* Letter from John Kuykendall, Kraskin, Lesse & Cosson, LLC to Marlene H. Dortch, Secretary, FCC (filed Mar. 24, 2003).

[68] Petition for Limited Waiver and Extension of Time by Kodiak Wireless, LLC, CC Docket No. 99-200 (filed Nov. 22, 2002).

[69] Letter from Georgina L.O. Feigen, Wilkinson Barker Knauer, LLP to Marlene H. Dortch, Secretary, FCC (filed Feb. 11, 2003).

with pooled or ported numbers.[70]  Because Kodiak has informed the Commission that its system is now capable of supporting roaming for customers with pooled or ported numbers in accordance with Commission requirements, we conclude that it no longer necessary to address Kodiak's pending request for additional time in which to meet the deadline to support roaming, and we dismiss that request as moot.

40.     *Litchfield County Cellular*.  On January 24, 2003, Litchfield County Cellular (Litchfield) filed an addendum to its petition for extension of time to support nationwide roaming of ported and pooled numbers by November 24, 2002.[71]  Litchfield's original petition requested a two-month extension of the November 24, 2002 deadline.  On January 17, 2003, the Commission granted Litchfield's two-month extension.[72]  In its January 24th addendum, Litchfield requested an additional thirty days, until February 24, 2003, to meeting it regulatory obligations, citing delays in the timeline for receiving and installing necessary upgrades and equipment.

41.     Because Litchfield's request concerns an extension for a period of time that has already passed and because there is no evidence indicating that Litchfield currently seeks any additional time to prepare its network to support roaming of customers with ported or pooled numbers, we conclude that it is no longer necessary to address Litchfield's pending request for extension and we dismiss that request as moot.

## IV.     PROCEDURAL MATTERS AND ORDERING CLAUSES

### A.     Regulatory Flexibility Act

42.     The Commission is not required by the Regulatory Flexibility Act, 5 U.S.C. § 604 to prepare a Regulatory Flexibility Analysis of the possible economic impact of this order on small entities.

### B.     Paperwork Reduction Act of 1995 Analysis

43.     This order does not contain an information collection.

### C.     Ordering Clauses

44.     Accordingly, IT IS ORDERED that the CTIA May 13th Petition for Declaratory Ruling is GRANTED IN PART, and the Wireless Petitioners' August 1, 2003, Petition for Declaratory Ruling or in the Alternative, Petition for Review IS DENIED.

45.     IT IS FURTHER ORDERED that Pine Belt's September 23, 2003, Amended Petition for Waiver IS GRANTED.

46.     IT IS FURTHER ORDERED that Kodiak Wireless's November 22, 2002, Petition for Limited Waiver and Extension of Time IS DISMISSED.

---

[70] Letter from Georgina L.O. Feigen, Wilkinson Barker Knauer, LLP to Marlene H. Dortch, Secretary, FCC (filed Feb. 27, 2003).

[71] Letter from William J. Sill, Wilkinson Barker Knauer, LLP to Marlene H. Dortch, Secretary, FCC (filed Jan. 24, 2003).

[72] Letter from James D. Schlichting, Deputy Bureau Chief, Wireless Telecommunications Bureau to William J. Sill, Wilkinson Barker Knauer, LLC, CC Docket No. 99-200, DA 03-165 (rel. Jan. 17, 2003).

47.     IT IS FURTHER ORDERED that Litchfield Cellular's January 24, 2003, Petition for Limited Waiver and Extension of Time IS DISMISSED.


FEDERAL COMMUNICATIONS COMMISSION


Marlene H. Dortch
Secretary

**SEPARATE STATEMENT OF
COMMISSIONER KATHLEEN Q. ABERNATHY**

*Re: Telephone Number Portability – Carrier Requests for Clarification on Wireless-Wireless Porting Issue, CC Docket No. 95-116*

    This Order is an important step in providing additional necessary guidance to wireless carriers concerning the implementation of wireless-to-wireless local number portability (LNP). There is no doubt that as wireless LNP is implemented, customers will benefit from the ability to port their numbers to whatever wireless or wireline service provider they choose.

    Nonetheless, despite the best efforts of the Commission and the industry to ensure that wireless LNP is fully implemented, there is a potential for operational problems to arise, as can happen with the rollout of any new technology. For example, at least one study has estimated that as many as six million customers may to seek to port numbers the first week our new rules take effect (with volumes dropping dramatically after the first week). As the porting framework is tested, it is possible that some customers may experience delays in the porting between carriers and other potential problems may arise.

    Accordingly, it is critical for the Commission and industry to continue to work collaboratively to ensure that wireless LNP is fully available to the American public and to educate consumers about the process. Industry must work diligently to implement these requirements on a timely basis and cooperate with one another to complete the porting process. Perhaps most importantly, industry and the FCC need to ensure that customers understand their rights.